## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

NATIONAL CREDIT UNION ADMINISTRATION
BOARD, as Liquidating Agent of U.S. Central Federal
Credit Union, Western Corporate Federal Credit Union,
Members United Corporate Federal Credit Union, and
Southwest Corporate Federal Credit Union,

and

GRAEME W. BUSH, as Separate Trustee of NCUA
GUARANTEED NOTES TRUST 2010-R1, NCUA
GUARANTEED NOTES TRUST 2010-R2, NCUA
GUARANTEED NOTES TRUST 2010-R3, NCUA
GUARANTEED NOTES TRUST 2011-R1, NCUA
GUARANTEED NOTES TRUST 2011-R2, NCUA
GUARANTEED NOTES TRUST 2011-R3, NCUA and
NCUA GUARANTEED NOTES TRUST 2011-M1,

                                    Plaintiffs,

                -against-

U.S. BANK NATIONAL ASSOCIATION, and
BANK OF AMERICA, NATIONAL ASSOCIATION,

                                    Defendants.

------------------------------------------------------------x

Case No. 18-cv-11366

**<u>COMPLAINT</u>**

**DEMAND FOR JURY TRIAL**

TABLE OF CONTENTS

I.    NATURE OF THE ACTION ................................................................. 1

II.   PARTIES ............................................................................................. 5

      A.    Plaintiff NCUA Board as Liquidating Agent ........................... 5

      B.    The Separate Trustee .............................................................. 7

      C.    Defendants .............................................................................. 11

III.  JURISDICTION AND VENUE ......................................................... 12

IV.   THE TRUSTS ..................................................................................... 13

V.    BACKGROUND ................................................................................. 14

      A.    RMBS Trusts .......................................................................... 14

      B.    The Trustees' General Duties ................................................ 15

      C.    The Trustees' Duties Under the Pooling
            and Servicing Agreements and Transfer Agreements ........... 15

      D.    Duty to Properly Take Title to the Mortgage Loans
            Conveyed to the Trust ........................................................... 16

      E.    Duty to Provide Notice of Incomplete or Defective Mortgage
            Files and Enforce Repurchase Rights with Respect to Mortgage
            Files that Cannot be Cured .................................................... 18

      F.    Duty to Provide Notice of Breaches and to Enforce Repurchase
            Rights with Respect to Defective Loans ................................ 19

      G.    Duties Regarding the Servicers .............................................. 20

      H.    The Trustees' Duties Upon Knowledge of an Event of Default ............................ 21

VI.   **DEFENDANTS KNEW THAT TRUSTS SUFFERED FROM WIDESPREAD BREACHES OF REPRESENTATIONS AND WARRANTIES AND SHOULD HAVE TAKEN APPROPRIATE ACTION**......................................................................................22

    A.   General Reports Concerning Originators' Systematic Abandonment of their Underwriting Standards and Sponsors' Disregard of Prudent Securitization Standards ......................................................22

    B.   Specific Reports Concerning the Originators of Loans in the Trusts Abandoning their Underwriting Standards and the Sponsors Disregarding Prudent Securitization Practices.......................................28

    C.   A High Number of Borrower Delinquencies and Defaults on Mortgages in the Trusts' Loan Pools and Enormous Trust Losses Are Further Evidence of the Originators' Systematic Disregard of Underwriting Standards ...................................................29

        1.   The Trusts Suffered from High Delinquency and Default Rates..........................................................................29

        2.   The Trusts Suffered Huge Losses ........................................30

    D.   The Collapse of the Certificates' Credit Ratings Is Further Evidence of Systematic Disregard of Underwriting Guidelines...........................31

VII.   **ADDITIONAL EVIDENCE SHOWS THAT DEFENDANTS KNEW OF ISSUES WITH THE TRUSTS** ......................................32

    A.   In Their Capacities as RMBS Servicers for Other Trusts, Defendants Discovered Extensive Responsible Party Breaches of Representations and Warranties ..........................................................32

    B.   Defendants Received Written Notice of Systematic, Widespread Breaches of Representations and Warranties from Monoline Insurers ...................................................................................33

    C.   Global RMBS Repurchase Investigations and Settlements Alerted Defendants to Systematic, Widespread Breaches of Representations and Warranties...............................................................34

    D.   Defendants Have Been Involved in Repurchase Litigation Against Responsible Parties......................................................................35

VIII.  DEFENDANTS FAILED TO PRUDENTLY ADDRESS MASTER
       SERVICER AND/OR SERVICER DEFAULTS ................................................37

       A.   Defendants Breached the Governing Agreements and Their
            Common Law Obligations By Failing to Fulfill Their Duties
            After Defaults and Events of Default Triggered By Master
            Servicer and Servicer Misconduct ...........................................37

       B.   Specific Servicer Misconduct ...................................................40

       C.   The Master Servicers and Servicers Defaulted on Their Duty to
            Notify the Trustees of Breaches of the Mortgage Loan
            Representations and Warranties.................................................40

       D.   Defendants Knew that the Trusts Suffered from Widespread
            Master Servicer and/or Servicer Defaults ...............................41

IX.    DEFENDANTS FAILED TO ENSURE LOAN FILES WERE
       PROPERLY CONVEYED TO THE TRUSTS AND FAILED TO
       REMEDY ANY DEFECTS................................................................44

       A.   Defendants Failed to Take Possession of Complete Mortgage
            Loan Files...................................................................................44

       B.   Defendants Knew That the Loan Files Were Incomplete .......45

X.     DEFENDANTS HAD CONFLICTS OF INTEREST .................................47

XI.    DEFENDANTS FAILED TO SATISFY THEIR PRE-AND POST-
       DEFAULT DUTIES AND BREACHED THE GOVERNING
       AGREEMENTS ...............................................................................51

XII.   THE "NO ACTION" CLAUSES DO NOT APPLY.................................53

XIII.  DEFENDANTS MAY NOT USE CERTIFICATEHOLDERS' TRUST
       FUNDS TO DEFEND AGAINST SUITS BY TRUST-BENEFICIARY
       INVESTORS ...................................................................................54

       A.   The Parties Entered Binding Agreements Conveying Beneficial
            Ownership of the Trusts to Certificateholders ........................54

       B.   Defendants' Limited Rights to Indemnification from
            Certificateholders' Trust Funds Does Not Extend to Suits by
            Certificateholders.....................................................................55

       C.   Defendants Are Not Entitled to Judgment-Shifting
            Indemnification .........................................................................59

D.     Claims in this Litigation, If Proven, Would Necessarily
Establish Defendants' Negligence, and Defendants Therefore
Cannot Meet Their Burden of Proving Entitlement to
Indemnification ........................................................................................59

E.     Any Indemnification From Trust Funds Would Be Limited to
Reasonable Fees and Expenses .................................................................60

XIV.  **CLAIMS FOR RELIEF** ....................................................................................61

COUNT ONE-BREACH OF CONTRACT ....................................................61

COUNT TWO-NEGLIGENCE AND GROSS NEGLIGENCE ......................62

COUNT THREE-BREACH OF FIDUCIARY DUTY ....................................63

COUNT FOUR-DECLARATORY JUDGMENT REGARDING
RIGHT TO INDEMNIFICATION FROM THE TRUST FUNDS ..................64

COUNT FIVE-BREACH OF CONTRACT REGARDING
UNLAWFUL WITHDRAWALS FROM TRUST FUNDS AND
DISGORGEMENT .........................................................................................65

PRAYER FOR RELIEF ..................................................................................66

XV.   **JURY DEMAND**.................................................................................................67

The National Credit Union Administration Board ("NCUA Board"), acting in its capacity as Liquidating Agent for each of U.S. Central Federal Credit Union ("U.S. Central"), Western Corporate Federal Credit Union ("WesCorp"), Members United Corporate Federal Credit Union ("Members United"), and Southwest Corporate Federal Credit Union ("Southwest") (collectively, the "CCUs") and Graeme W. Bush, as Separate Trustee of NCUA Guaranteed Notes Trust 2010-R1 ("NCUA 2010-R1 Trust"); NCUA Guaranteed Notes Trust 2010-R2 ("NCUA 2010-R2 Trust"); NCUA Guaranteed Notes Trust 2010-R3 ("NCUA 2010-R3 Trust"); NCUA Guaranteed Notes Trust 2011-R1 ("NCUA 2011-R1 Trust"); NCUA Guaranteed Notes Trust 2011-R2 ("NCUA 2011-R2 Trust"); NCUA Guaranteed Notes Trust 2011-R3 ("NCUA 2011-R3 Trust"); and NCUA Guaranteed Notes Master Trust ("NCUA 2011-M1 Trust") (in such capacity, the "Separate Trustee") bring this Complaint against Defendants U.S. Bank, N.A. ("U.S. Bank") and Bank of America, N.A. ("Bank of America") (collectively, "Defendants"), and allege as follows:

## I.    NATURE OF THE ACTION

1.    This action arises out of Defendants' roles as trustees for the 59 trusts identified on Exhibit A that issued residential mortgage-backed securities ("RMBS").[1] Each trust consists

---

[1] Of the 59 trusts at issue here, U.S. Bank was the original trustee for 22 trusts, LaSalle Bank, N.A. ("LaSalle") was the original trustee for 34 trusts, and Wachovia Bank, N.A. ("Wachovia") was the original trustee for 3 trusts. U.S. Bank acquired Wachovia's corporate trust and institutional custody businesses on December 30, 2005 and was subsequently appointed as successor trustee to Wachovia on those 3 trusts. In or about October 2007, Bank of America acquired LaSalle through its acquisition of ABN AMRO North America Holding Company, thus becoming the trustee of the 34 trusts for which LaSalle was originally the trustee. Between February and April 2009, Bank of America resigned as trustee for 6 trusts in which the CCUs invested, and U.S. Bank was appointed as the successor trustee for those trusts. U.S. Bank acquired Bank of America's securities trust administration business on or about December 31, 2010, and became the trustee of the remaining trusts thereafter. As noted in Exhibit A, the NCUA Board and the Separate Trustee are not asserting claims against Bank of America with

of hundreds of individual residential mortgage loans that were pooled together and securitized for sale to investors. Investors purchased certificates issued by the RMBS trust that entitled the investors (or "certificateholders") to fixed principal and interest payments from the income stream generated as borrowers made monthly payments on the mortgage loans in the trusts.

2. The CCUs purchased the certificates in the trusts identified on Exhibit A at an original face value of approximately $4.8 billion at or near the time of the original offering.

3. The certificates' value was dependent on the quality and performance of the mortgage loans in the trusts and swift correction of any problems with the loans. But, because of the structure of the securitizations, certificateholders do not have access to the mortgage loan files or the power to remedy or replace any defective loans. Instead, certificateholders must rely on the trustees to protect their interests.

4. Defendants, as the trustees for the trusts, had contractual duties to address and correct problems with the mortgage loans and to protect the trusts' and the certificateholders' interests. The trustee for each trust has three primary duties.

5. First, the trustee must take possession and acknowledge receipt of the mortgage files, review the documents in the mortgage files, identify any mortgage files that lack a complete chain of title or that have missing documents, and then certify that the mortgage files are complete and accurate. If the trustee identifies defects in the mortgage files, it must notify the appropriate parties and take steps to enforce the responsible party's obligation to cure, substitute,

---

respect to the following trusts (in addition to trusts where neither LaSalle nor Bank of America ever served as trustee): Banc of America Funding 2005-F Trust; Banc of America Funding 2005-H Trust; Banc of America Funding 2007-B Trust; Banc of America Funding 2007-D Trust; Merrill Lynch Mortgage Investors Trust Series MLCC 2005-3; Merrill Lynch Mortgage Investors Trust Series 2006-RM2; Merrill Lynch Mortgage Investors Trust Series 2006-RM3; and Merrill Lynch Mortgage Investors Trust Series 2007-HE3.

or repurchase any mortgage loans with defective mortgage files.

6.      Second, if the trustee discovers a breach of the representations and warranties ("R&Ws") concerning the mortgage loans, including but not limited to representations concerning the characteristics of the mortgage borrowers, the collateral for the mortgage loans, or the assurances that the mortgage loans were originated in accordance with applicable underwriting criteria, the trustee must notify the appropriate parties and take steps to enforce the responsible party's obligation to cure, substitute, or repurchase the defective mortgage loans. If the trustee fails to exercise this duty, then the trusts and the certificateholders will suffer losses properly borne by the party responsible for the defective loans.

7.      Third, the trustee must act to protect the interests of the trust and the certificateholders when it becomes aware of defaults concerning the trust. Thus, when the trustee discovers a default, or is notified by other parties, such as servicers, of defaults like breaches of representations and warranties with respect to the underlying mortgage loans, the trustee must act prudently to investigate those defaults, notify certificateholders of the defaults, and take appropriate action to address the defaults.

8.      Here, Defendants failed to perform even the threshold duties of taking full possession of the original notes and mortgages and properly reviewing the mortgage loan files for irregularities. If they had fulfilled their obligations, a significant percentage of the mortgage loans in the trusts would have been repurchased or substituted.

9.      Moreover, an overwhelming number of events alerted Defendants to the fact that the trusts suffered from numerous problems, including, among other things: 1) general reports concerning originators' systematic abandonment of their underwriting standards and reports concerning the sponsors' pervasive disregard of prudent securitization standards; 2) specific

reports concerning the originators of loans in the trusts abandoning their underwriting standards and sponsors of the securitizations failing to follow prudent practices; 3) the high number of borrower delinquencies and defaults on mortgages in the trusts' loan pools and enormous losses to the trusts; 4) the collapse of the certificates' credit ratings from high, investment-grade ratings when purchased to much lower ratings, including numerous "junk" ratings; and 5) the numerous lawsuits brought by and against Defendants and their affiliates alleging the systematic abandonment of originator underwriting guidelines. Yet Defendants failed to take steps to preserve their rights or hold the responsible parties accountable for the repurchase or substitution of defective mortgage loans in direct contravention of their obligations as trustees.

10.     Finally, Defendants failed to address servicer and/or master servicer defaults and events of default. Defendants knew that the master servicers and servicers were ignoring many of their duties, including their duty to notify other parties, including Defendants as trustees, upon the master servicers' and servicers' discovery of breaches of the mortgage loan representations and warranties. Despite Defendants' knowledge of these ongoing defaults and events of default, Defendants failed to act prudently to protect the interests of the trusts and the certificateholders.

11.     Defendants' failures resulted in the trusts and certificateholders suffering losses rightfully borne by other parties. Had Defendants adequately performed their contractual obligations, breaching loans would have been removed from the loan pools underlying the certificates and returned to the responsible party. Defendants' improper conduct directly caused losses to certificateholders like the Plaintiffs.

12.     Defendants failed to act in part because protecting the best interests of the trusts and the certificateholders would have conflicted with Defendants' interests. As participants in many roles in the securitization process, Defendants were economically intertwined with the

parties they were supposed to police. Further, Defendants had incentives to ignore other parties' misconduct in order to avoid drawing attention to their own misconduct.

13.     Defendants were required to exercise their rights and powers to protect the trusts. Once Defendants became aware of the various failures discussed in this complaint, Defendants were required to use the same degree of care and skill that a prudent person would. But instead of protecting the trusts and the certificateholders, Defendants sat by as the trusts wasted away. As a result, Defendants breached the governing agreements.

14.     Defendants' failure to perform their duties has damaged Plaintiffs. Accordingly, Plaintiffs now bring this action to recover damages against Defendants for breaching the governing agreements.

## II.    PARTIES

### A.    Plaintiff NCUA Board as Liquidating Agent

15.     The National Credit Union Administration ("NCUA") is an independent agency of the Executive Branch of the United States Government that, among other things, charters and regulates federal credit unions, and operates and manages the National Credit Union Share Insurance Fund ("NCUSIF") and the Temporary Corporate Credit Union Stabilization Fund ("TCCUSF"). The TCCUSF was created in 2009 to allow the NCUA to borrow funds from the United States Department of the Treasury ("Treasury Department") to stabilize corporate credit unions under conservatorship or liquidation, or corporate credit unions threatened with conservatorship or liquidation. The NCUA must repay all monies borrowed from the Treasury Department for the purposes of the TCCUSF by 2021. The NCUSIF insures the deposits of account holders in all federal credit unions and the majority of state-chartered credit unions. The NCUA has regulatory authority over state-chartered credit unions that have their deposits insured

by the NCUSIF. The NCUA Board manages the NCUA. *See* Federal Credit Union Act ("FCU Act"), 12 U.S.C. §§ 1751, 1752a(a). Pursuant to 12 U.S.C. § 1787(a) and (b)(2)(A), the NCUA Board, in specified circumstances and in a distinct capacity, may close an insured credit union and appoint itself the liquidating agent for such credit union. As the liquidating agent for a failed credit union, the NCUA Board succeeds to all rights, titles, powers, and privileges of the credit union, its members, accountholders, officers, and directors.

16.    U.S. Central was a federally chartered corporate credit union with its offices and principal place of business in Lenexa, Kansas.

17.    WesCorp was a federally chartered corporate credit union with its offices and principal place of business in San Dimas, California.

18.    Members United was a federally chartered corporate credit union with its offices and principal place of business in Warrenville, Illinois.

19.    Southwest was a federally chartered corporate credit union with its offices and principal place of business in Plano, Texas.

20.    As corporate credit unions, the CCUs provided investment and financial services to other credit unions.

21.    Pursuant the FCU Act, 12 U.S.C. § 1786(h) 12 U.S.C. § 1766(a) and 12 U.S.C. § 1787(a)(1)(A), the NCUA Board placed U.S. Central and WesCorp into conservatorship on March 20, 2009, and into involuntary liquidation on October 1, 2010, appointing itself as the liquidating agent. The NCUA Board placed Members United and Southwest into conservatorship on September 24, 2010, and into involuntary liquidation on October 31, 2010, appointing itself as the liquidating agent.

22.    Pursuant to 12 U.S.C. § 1787(b)(2)(A), the NCUA Board as the liquidating agent

has succeeded to all rights, titles, powers, and privileges of the CCUs and of any member,

account holder, officer or director of the CCUs, with respect to the CCUs and their assets,

including the right to bring the claims asserted in this action. The NCUA Board as liquidating

agent may sue on the CCUs' behalf. *See* 12 U.S.C. §§ 1766(b)(3)(A), 1787(b)(2), 1789(a)(2).

23.     The NCUA Board as liquidating agent brings this action with respect to the

certificates at issue here held by the NCUA Board as liquidating agent as reflected on Exhibit A

incorporated herein and are referred to in this Complaint as the "NCUA Certificates."

**B.     The Separate Trustee**

24.     In 2010, the NCUA and the NCUA as liquidating agent created the NCUA

Guaranteed Notes Program (the "NGN Program") as a means of stabilizing funding for the credit

union system. The Legacy Assets consist of over 2,000 investment securities, secured by

approximately 1.6 million residential mortgages, as well as commercial mortgages and other

securitized assets. The NCUA as liquidating agent transferred certain Legacy Assets, including

the 88 certificates in the trusts at issue here, to the NGN Trusts. The NGN Trusts then issued

approximately $28.3 billion of NGNs, backed by the cash flows from the Legacy Assets.

25.     The Separate Trustee brings this action with respect to the certificates at issue

here held by NGN Trusts as reflected on Exhibit A incorporated herein and are referred to in this

Complaint as the "Resecuritized Certificates."

26.     Each NGN Trust created under the NGN Program issued Notes pursuant to an

Offering Memorandum and three key agreements: (i) NGN Indentures by and between the NGN

Trusts, as Issuers, and The Bank of New York Mellon ("BNYM"), as Indenture Trustee; (ii)

Trust Agreements by and among the NCUA Board in its Capacity as Liquidating Agent, as

Seller, Wells Fargo Delaware Trust Company, N.A. ("Wells Fargo"), in its capacity as Owner

Trustee, and BNYM, as Certificate Registrar and the Certificate Paying Agent; and (iii) Guaranty

Agreements by and among NCUA in its capacity as an Agency of the Executive Branch of the

United States, as Guarantor, the NGN Trusts, as Issuer, and BNYM, as the Indenture Trustee.

The NGN Indentures, NGN Trust Agreements, and NGN Guaranty Agreements are referred to

collectively herein as the "NGN Agreements."[2]

27.    In short, the creation of the NGN Trusts involved the following: (i) the NCUA

Board in its Capacity as Liquidating Agent (as Sellers) transferred the Resecuritized Certificates

to the NGN Trusts (as Issuers) pursuant to the NGN Trust Agreements, and Wells Fargo (as

Owner Trustee) caused the Owner Trust Certificates (defined below) to be issued to the NCUA

Board as Liquidating Agent (as Sellers); (ii) the NGN Trusts (as Issuers) pledged the Certificates

and the other assets of the trust estates to BNYM (as Indenture Trustee) and caused the NGN

Notes to be issued pursuant to the NGN Indentures; (iii) BNYM (as Indenture Trustee) delivered

the Notes, or NGNs, to the Initial Purchasers for further sale to investors.

28.    Under the NGN Trust Agreements, the NCUA Board transferred and assigned its

rights, title, and interest to assert the claims at issue in this complaint related to the Resecuritized

Certificates to the NGN Trusts. Ex. C, NGN Trust Agreement § 3.01.[3] In exchange, the NCUA

---

[2] The NGN Agreements are substantially similar. Representative examples of an NGN Indenture, NGN Trust Agreement, and NGN Guaranty Agreement from the NCUA 2011-R1 Trusts are attached hereto as Exhibits B, C, and D.

[3] The NCUA Board notified investors that it was actively investigating and pursuing certain legal claims against different defendants under federal and state securities laws in connection with the securities underlying the NGNs and that any recovery on those claims would benefit the NCUA Board as Liquidating Agent for the CCUs (referred to as the "Sellers" under the NGN securitization agreements) exclusively. *See*, *e.g.*, Ex. E, NGN Trust 2011-R1 Offering Memorandum at 31 ("Beginning in September 2010, in connection with these investigations, the NCUA requested that various potential defendants, including potentially these Initial Purchasers, enter into separate tolling agreements to suspend for a period of time the running of any statutes

Board received certain certificates that represent a beneficial ownership interest in the NGN

Trusts (the "Owner Trust Certificates"). *Id.* As the holder of the Owner Trust Certificates, the

NCUA Board as liquidating agent is entitled to payments from the NGN Trusts after the

principal balance of the Notes issued by the various NGN Trusts has been reduced to zero; all

accrued and unpaid interest on the Notes has been paid; all amounts owed to the Guarantor have

been reimbursed; and the other parties to the NGN Agreements have been paid in full. *Id.*

29.     Once the principal balance of the Notes issued by any NGN Trust has been

reduced to zero, all accrued and unpaid interest on the Notes has been paid, all amounts owed to

the Guarantor have been reimbursed, any other parties to the NGN Agreements have been paid in

full, and certain other conditions have been fulfilled, then the NGN Indenture is satisfied and

discharged, permitting the NCUA Board as liquidating agent and Owner Trust Certificateholder

to receive distribution of all remaining assets of the Trust Estate in accordance with written

instructions provided to the Certificate Paying Agent. Ex. B, NGN Indenture Agreement § 3.01;

Ex. C, NGN Trust Agreement § 8.01(a).[4]

30.     Under the NGN Guaranty Agreements, the NCUA, in its capacity as an agency of

---

of limitations that apply to potential claims, including claims under federal and state securities
laws, with respect to specified asset-backed securities sold to the Corporate Credit Unions. It is
not known at this time whether specific legal claims will be asserted by the NCUA in respect of
the Underlying Securities, or whether litigation will ensue. Any damages or other amounts
recovered by the NCUA in connection with any such claims will not be part of the Trust Estate
and will not be used to make payments on the Offered Notes. Any such recoveries will benefit
the Sellers exclusively."). The NCUA Board did not transfer those claims against underwriters
and originators under federal and state securities laws to the NGN Trusts. The claims at issue
here were not subject to that reservation.

[4] The Owner Trust Certificateholders, in this case the NCUA Board as liquidating agent,
may also receive transfer of certificates from the NGN Trusts through an Early Termination, if
applicable, or an Optional Purchase, if applicable. Ex. B, NGN Indenture Agreement §§ 2.16(a);
3.01(d).

the Executive Branch of the United States Government (in such capacity, the "Guarantor"),

provided a guarantee, backed by the full faith and credit of the United States, of the timely

repayment of all principal and interest to the investors in the NGN Trusts. Ex. D, NGN Guaranty

Agreement § 1.

31.    Under the NGN Indentures, BNYM was granted the right to take action against

Defendants with respect to the Resecuritized Certificates. Ex. B, NGN Indenture, Granting

Clause (granting BNYM all right, title, and interest to "all present and future claims, demands,

causes and choses in action in respect of the [Resecuritized Certificates]"); *see also id.* §

5.01(a)(i) ("The Indenture Trustee shall have the full power and authority to do all things not

inconsistent with the provisions of this Indenture that it may deem advisable in order to enforce

the provisions hereof or to take any action with respect to a default or an Event of Default

hereunder, or to institute, appear in or defend any suit or other proceeding with respect hereto, or

to protect the interests of the Noteholders and the Guarantor").[5]

32.    On April 4, 2016, BNYM, in its capacity as the Indenture Trustee of the NGN

Trusts, transferred all legal title, claims, powers, rights, authorities, and duties of BNYM,

including the claims at issue in this complaint, to the Separate Trustee and appointed the

Separate Trustee for purposes of exercising any and all of the Indenture Trustee's powers, rights

and authorities and/or fulfilling any and all of the Indenture Trustee's duties under each

applicable Indenture with respect to the claims at issue in this complaint. Ex. F, Instrument of

Appointment and Acceptance. The Separate Trustee is a citizen of Colorado and has standing to

pursue these claims in his own name as duly appointed separate trustee of the NGN Trusts and

---

[5] By contrast, Wells Fargo, as the Owner Trustee, has no such rights under the Trust
Agreement, which is similar to an article of incorporation for the NGN Trusts. *See generally* Ex.
C, NGN Trust Agreement.

holder of legal title, claims, powers, rights, authorities, and duties of BNYM, including the claims set forth herein.

### C.    Defendants

33.    U.S. Bank is a national banking association organized and existing under the laws of the United States. U.S. Bank's principal place of business and principal place of trust administration is located in Minneapolis, Minnesota. U.S. Bank's main office is located in Cincinnati, Ohio. As trustee for the trusts, U.S. Bank owed certificateholders certain contractual duties with respect to the trusts. As of December 31, 2013, U.S. Bank's corporate parent, U.S. Bancorp, was the fifth largest commercial bank in the United States based on assets and the fourth largest in total branches. U.S. Bank is U.S. Bancorp's second largest subsidiary. U.S. Bank does business in and maintains offices in New York, including a corporate trust office at 100 Wall Street, New York, New York 10005.

34.    U.S. Bank, together with its affiliates, is involved in all aspects of the private-label RMBS market. U.S. Bank currently acts as trustee of more than $3 trillion in trust assets, operating 50 corporate trust offices across the country. U.S. Bank currently serves as trustee for thousands of RMBS trusts with assets of over $1 trillion in original face value. U.S. Bank is trustee for approximately 30% of all RMBS issued between 2004 and 2007.

35.    In addition, U.S. Bank, together with its subsidiary, U.S. Bank Home Mortgage, Inc., serves as a master servicer of residential mortgage loans. U.S. Bank's master servicing portfolio includes approximately 45,700 loans with an unpaid principal balance of approximately $6 billion as of January 2014.

36.    U.S. Bank Home Mortgage, Inc. has acted as a mortgage loan seller, selling over $400 million of loans in RMBS deals issued between 2004 and 2007.

37.    Bank of America is a national banking association organized and existing under the laws of the United States. Bank of America's principal place of business and main office is located in Charlotte, North Carolina. In or about October 2007, Bank of America acquired LaSalle, which was serving as the original trustee for some trusts, and became the successor trustee via its acquisition of ABN AMRO North America Holding Company. As trustee for some of the trusts, Bank of America owed certificateholders certain contractual duties with respect to the trusts.

## III.    JURISDICTION AND VENUE

38.    This Court has subject matter jurisdiction pursuant to the following statutes: (a) 12 U.S.C. § 1789(a)(2), which provides that "[a]ll suits of a civil nature at common law or in equity to which the [NCUA Board] shall be a party shall be deemed to arise under the laws of the United States, and the United States district courts shall have original jurisdiction thereof, without regard to the amount in controversy"; (b) 28 U.S.C. § 1345, which provides that "the district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States, or by any agency or officer thereof expressly authorized to sue by Act of Congress"; (c) 12 U.S.C. § 1348, providing that national banking associations shall, for the purposes of all other actions by or against them, be deemed citizens of the States in which they are respectively located; (d) 15 U.S.C. § 1331, providing for "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States"; (e) 28 U.S.C. § 1332 because there is compete diversity of citizenship of the parties and the amount in controversy, without interest and costs, exceeds $75,000; and (f) 15 U.S.C. § 1367, providing for "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy."

39.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1), because Defendant is a resident of and/or conducts business in this District. This Court has personal jurisdiction over Defendants because they are residents of and/or conduct business in this District and under N.Y. C.P.L.R. 301, New York's long arm statute. The claims relate to Defendants' roles as trustees over trusts created under New York law and/or administered at least in part in New York. In addition, Defendants have filed foreclosure cases on behalf of the trusts in New York and in the course of such proceedings either discovered or should have discovered multiple defaults and representation and warranty breaches.

## IV.     THE TRUSTS

40.     The trusts identified on Exhibit A (which also identifies which Plaintiff holds the certificate(s) within each trust) are 59 New York common law trusts or Delaware statutory trusts created in connection with residential mortgage-backed securitizations between 2004 and 2007.

41.     The trusts have a high concentration of loans originated by the following lenders and their affiliates: American Home Mortgage Corp. and American Home Mortgage Investment Corp.; Decision One Mortgage Co., LLC; DLJ Mortgage Capital, Inc.; National City Mortgage Co.; Bank of America, N.A.; Countrywide Home Loans, Inc. and Countrywide Home Loans Servicing LP; Credit Suisse Financial Corp.; First National Bank of Nevada; MortgageIT, Inc.; GreenPoint Mortgage Funding, Inc.; IndyMac Bank, F.S.B.; Residential Funding Corp.; WMC Mortgage Corp.; OwnIt Mortgage Solutions, Inc.; Washington Mutual Bank; and Wells Fargo Bank, N.A.. (collectively, the "originators").

42.     A significant portion of the trusts were sponsored by the following sponsors and their affiliates: DLJ Mortgage Capital, Inc.; Bank of America, N.A.; Morgan Stanley Mortgage Capital, Inc. and Morgan Stanley Mortgage Capital Holdings, LLC.; Merrill Lynch Mortgage

Lending, Inc.; Washington Mutual Bank and Washington Mutual Mortgage Securities Corp.;

Greenwich Capital Financial Products, Inc.; and UBS Real Estate Securities, Inc. (collectively,

the "sponsors").

## V.    BACKGROUND

### A.    RMBS Trusts

43.    RMBS certificates are debt instruments issued to investors by an issuing trust that

holds one or more mortgage pools. The corpus of the trust – like the trusts at issue here – consists

almost exclusively of the underlying mortgage loans. Certificateholders receive a portion of the

income stream generated by the trust as borrowers make payments on their mortgage loans.

44.    The establishment and administration of each trust is governed by an agreement

called a Pooling and Servicing Agreement ("PSA") and certain related agreements that the PSA

references and incorporates (the "governing agreements").

45.    Each trust is administered primarily by two entities – the trustee and the master

servicer, under the oversight of the trustee. The trustee owes certificateholders certain duties set

forth in the governing agreements.

46.    The purpose of having a trustee in an RMBS securitization is to ensure there is at

least one independent party to the governing agreements who, unlike the RMBS

certificateholders, does not face collective action, informational, or other limitations, and as a

result can protect the trusts and the interests of RMBS certificateholders. The governing

agreements impose critical duties on trustees, and the trustees' adherence to those duties affects

the value of the RMBS.

47.    The Defendants earned fees in connection with their roles as trustee, typically an

annual fee based on the percentage of principal outstanding on the loans underlying the RMBS.

Defendants also received significant benefits from the interest-free deposits maintained in their accounts when the servicing payments were remitted to their accounts. Defendants maintained accounts for thousands of trusts and earned enormous sums from the aggregate balances on these accounts. The RMBS trustee engagements further deepened Defendants' business relationships with the sponsors and underwriters of the RMBS, leading to more lucrative future engagements.

### B.    The  Trustees' General Duties

48.    The terms of the governing agreements are substantially similar, if not identical, and impose substantially the same, if not identical, duties and obligations on the trustee. *See* Exhibit G §§ I – IX. Further, upon information and belief, Defendants employed the same general set of policies and procedures to oversee and manage the trusts regardless of any individual variations contained within the governing agreements.

49.    Most importantly, Defendants have an absolute duty under the governing agreements to acquire and protect the trust corpus for the benefit of certificateholders. "The Trustee acknowledges receipt [of the mortgage loans] and declares that it holds and will hold such documents and the other documents delivered to it constituting a Mortgage File, and that it holds or will hold all such assets and such other assets . . . in trust for the exclusive use and benefit of all present and future Certificateholders." PSA Section 2.02; *see also* Ex. G § II.[6]

### C.    The Trustees' Duties Under the Pooling and Servicing Agreements and Transfer Agreements

50.    The PSAs are contracts between, in addition to others, the depositor, the master servicer or servicer, and the trustee, which govern the trusts that issued the certificates. The PSAs

---

[6] All cites to the PSA are to the PSA and related agreements specific to the MASTR Asset Backed Securities Trust 2006-WMC4 ("MABS 2006-WMC4"), which, as alleged above, are substantially similar to the governing agreements for all of the trusts. A copy of the MABS 2006-WMC4 PSA is attached as Ex. H.

for each of the trusts are substantially similar and memorialize the following events and conditions: (i) the transfer and conveyance of the mortgage loans from the depositor to the trust; (ii) the trust's issuance of beneficial certificates of interests in the trust to raise the funds to pay the depositor for the mortgage loans; and (iii) the terms of those certificates. *See* Ex. G §§ I – IX.

51.     Depending on the parties, there are several methods whereby the depositor acquires the loans for securitization. These include Mortgage Loan Purchase Agreements ("MLPAs"), Sale and Servicing Agreements ("SSAs"), and Assignment and Recognition Agreements (collectively, "transfer agreements"). These agreements are all substantially similar and govern the terms for transferring mortgage loans acquired for securitization from the originator to the depositor. Upon the sale of the mortgage loans to the trust, the rights under the transfer agreements, including the responsible party's representations and warranties concerning the mortgage loans, are generally assigned to Defendants, as trustees, for the benefit of the trusts and all certificateholders, in accordance with the governing agreements.

52.     The PSAs and transfer agreements set forth Defendants' contractual duties and obligations. *See* Ex. G §§ I – IX. Specifically, each PSA and transfer agreement requires Defendants to oversee and enforce the responsible parties'[7] and the servicers' obligations and give notice of breaches and deficiencies. In performing these contractual obligations, Defendants must act in the best interests of and for the protection of the trusts and the certificateholders.

### D.     Duty to Properly Take Title to the Mortgage Loans Conveyed to the Trust

53.     The trusts must take title to the mortgages conveyed to them for due

---

[7] One of the parties to the transfer agreement—typically an originator or sponsor—makes extensive representations and warranties concerning the characteristics, quality, and risk profile of the mortgage loans in either the PSA or the associated transfer agreement. For simplicity's sake, this complaint refers to that party as the "responsible party."

consideration for the RMBS properly to be backed by mortgage loans. The PSAs establish the conveyance terms of the mortgage loans to the trustee, on behalf of the trust and the RMBS certificateholders, and those terms are intended to ensure that the trustee, on behalf of the trusts, takes full title to the mortgage loans. *See* Ex. G § I – III.

54.     The first part of this conveyance involves the depositor assigning to the trustee, among other things, its rights, title, and interest in the mortgage loans and the depositor's rights under the transfer agreement whereby the depositor acquired the mortgage loans. *See* Ex. G § I.

55.     Furthermore, the PSAs require Defendants, or their agents acting as custodians, to acknowledge receipt of the mortgage loans on behalf of the trust and to acknowledge that all mortgage pool assets—including the mortgage files and related documents and property—are held by them as trustees. Significantly, Defendants, or their agents, must take physical possession of the mortgage files, including the mortgage note and the mortgage, properly endorsed and assigned to the trustee. As set forth in PSA Section 2.02:

> The Trustee acknowledges receipt (or receipt by the Custodian on behalf of the Trustee), subject to the provisions of Section 2.01 and subject to any exceptions noted on the exception report described in the next paragraph below, of the documents referred to in Section 2.01 . . . and declares that it holds and will hold such documents and the other documents delivered to it constituting a Mortgage File, and that it holds or will hold all such assets and such other assets . . . for the exclusive use and benefit of all present and future Certificateholders.

The other PSAs contain substantially similar provisions. *See* Ex. G §§ II, IV.

56.     Once the mortgage files are in Defendants' or their custodians' possession, Defendants, or the custodians on Defendants' behalf, are required to ensure that the underlying mortgage loans were properly conveyed to the trusts, and that the trusts have perfected enforceable title to the mortgage loans by reviewing the mortgage files for each mortgage loan. Defendants, or the custodians on Defendants' behalf, are required to review each mortgage file

within a certain period after the "closing date" of the securitization, identify any problems, and deliver to the depositor a certification that all necessary documents have been executed and received. *See* Ex. G § III.

57.     Defendants breached their contractual obligations by: 1) failing to take proper title to the mortgage loans; 2) failing to adequately review the mortgage loan files and certify their completeness; and 3) failing to properly oversee the custodian or its agents.

### E.     Duty to Provide Notice of Incomplete or Defective Mortgage Files and Enforce Repurchase Rights with Respect to Mortgage Files that Cannot be Cured

58.     If Defendants or the custodians identify any defect in a mortgage loan file for an underlying mortgage loan contained in a trust, Defendants must promptly notify the relevant parties. As set forth in PSA Section 2.02 (emphasis added):

> If in the process of reviewing the Mortgage Files and making or preparing, as the case may be, the certifications referred to above, the Trustee (or the Custodian on behalf of the Trustee) finds any document or documents constituting a part of a Mortgage File to be missing or defective in any material respect, at the conclusion of its review the **Trustee (or the Custodian on behalf of the Trustee) shall so notify the Depositor**, the NIMS Insurer, the Trustee, the Servicer and the Master Servicer.

59.     Once incomplete mortgage files or loans with defective transfer documentation are identified, the parties to the governing agreements must work to remedy these deficiencies. The trustee is tasked with enforcing the responsible party's obligation to cure the deficiencies or repurchase the mortgage loans. As set forth in PSA Section 2.03(a) (emphasis added):

> Upon receipt of written notice from the Custodian of any materially defective document in, or that a document is missing from, a Mortgage File … **the Trustee shall enforce the obligations of the Originator or the Seller**, as applicable, under the Assignment Agreement and/or Originator Master Agreement to repurchase such Mortgage Loan . . . at the Purchase Price.

The other PSAs contain substantially similar provisions. *See* Ex. G § V.

60.     Defendants breached their contractual obligations by: 1) failing to provide notice

of incomplete or defective mortgage files; and 2) failing to enforce repurchase rights with respect to mortgage files that could not be cured.

**F.    Duty to Provide Notice of Breaches and to Enforce Repurchase Rights with Respect to Defective Loans**

61.    The quality of the mortgage loans to which the trusts purportedly receive title is also critical to an RMBS securitization. For that reason, the governing agreements contain "representations and warranties" by the responsible party attesting to the characteristics of the borrower and collateral for the mortgage loans conveyed to the trusts, and that the loans were made in accordance with applicable underwriting guidelines.

62.    As in instances of missing documents or where the transfer of the mortgage was incomplete, the governing agreements also require the responsible party to cure, substitute, or repurchase any mortgage loans that materially breach the responsible party's representations and warranties concerning the quality of the mortgage loans conveyed to the trusts. Specifically, the governing agreements require the trustee, among others, to provide notice of the breaches and enforce the responsible party's repurchase obligations:

> **the Trustee shall promptly notify** the Trust Administrator, the Seller, the NIMS Insurer, the Originator, the Servicer and the Master Servicer of such defect, missing document or breach and request that the Originator or the Seller . . . . [and if the problem is not cured], **the Trustee shall enforce the obligations of the Originator or the Seller**, as applicable, under the Assignment Agreement and/or Originator Master Agreement to repurchase such Mortgage Loan from REMIC I at the Purchase Price.

PSA Section 2.03(a) (emphasis added); *see also* Ex. G § V. Even in instances where enforcement by the trustee of the repurchase obligation is not explicit, trustees still have a right and duty to protect the trusts by ensuring all parties to the governing agreements comply with their respective obligations.

63.    To protect the trusts and all certificateholders, the governing agreements require

Defendants to give prompt written notice to all parties to the governing agreements upon their knowledge of a breach of a representation or warranty made by the responsible party about the mortgage loans that materially and adversely affects the value of any mortgage loan or the interests of the certificateholders in any loan, and to take such action as may be necessary or appropriate to enforce the rights of the trusts regarding the breach.

64.    Defendants breached their contractual obligations by: 1) failing to provide notice of defective mortgage loans; 2) failing to enforce repurchase rights with respect to defective mortgage loans; and 3) failing to ensure the responsible party abided by their contractual obligations.

### G.    Duties Regarding the Servicers

65.    Each PSA requires the master servicer or servicer to prudently service the loans underlying the trusts.

66.     Section 3.01 of the PSA states that: "[t]he Servicer shall service and administer the Mortgage Loans on behalf of the Trust Fund and in the best interests of and for the benefit of the Certificateholders." Section 3.01 further provides: "the Servicer shall seek to maximize the timely and complete recovery of principal and interest on the Mortgage Notes." The other PSAs contain substantially similar provisions. *See* Ex. G § VII.

67.    Under the PSAs, Defendants, as trustees, have certain duties and obligations regarding monitoring the master servicers and/or servicers. In particular, the PSAs set forth Defendants' obligations upon occurrence of an "event of default," which is defined as a specified failure of the servicer to perform its servicing duties and cure this failure within a specified time. Section 7.01 of the PSAs identifies several types of failures by the servicer that may give rise to an event of default. The other PSAs contain substantially similar provisions. *See* Ex. G § VIII.

Such failures include a breach of servicer representations and warranties and failure to observe or perform in any material respect any other covenants or agreements, which continues unremedied for more than thirty to sixty days after written notice of such failure shall have been given to the servicer by the trustee.

68.     The remedies for uncured servicer events of default include, among other things, termination of the master servicers and/or servicers. *See* Ex. G § VIII.

69.     Defendants breached their contractual obligations by failing to properly monitor the servicers and take action upon defaults by the servicers.

**H.     The Trustees' Duties upon Knowledge of an Event of Default**

70.     The PSAs impose additional obligations upon Defendants once one of their responsible officers knows a default has occurred. First, under Section 7.01 of the PSAs, Defendants must give written notice to the servicer of the occurrence of such an event within the specified period after Defendants obtain knowledge of the occurrence.

71.     Second, within sixty to ninety days after a default has occurred, Defendants must provide written notice to all certificateholders about that event, unless the default has been cured or waived. *See* Ex. G § VIII.

72.     Third, and most importantly, Section 8.01 of the PSAs requires Defendants to exercise the rights and powers vested in them by the PSA using "the same degree of care and skill . . . as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs." The other PSAs contain substantially similar provisions. *See* Ex. G § VI.

73.     Defendants breached their contractual obligations by: 1) failing to provide notice of defaults and events of default; 2) failing to act as a prudent person following defaults and

events of default; and 3) failing to act with due care and without negligence prior to an Event of Default.

## VI.    DEFENDANTS KNEW THAT TRUSTS SUFFERED FROM WIDESPREAD BREACHES OF REPRESENTATIONS AND WARRANTIES AND SHOULD HAVE TAKEN APPROPRIATE ACTION

74.    The trusts' loan pools contained large numbers of loans that materially breached the responsible parties' representations and warranties concerning the originators' compliance with underwriting guidelines, owner occupancy statistics, appraisal procedures, and other associated standards. By 2009 at the latest, Defendants knew of problems in the trusts based on the public evidence and evidence otherwise only available to trustees, demonstrating the widespread breaches of representations and warranties in the trusts, including: 1) general reports concerning originators' systematic abandonment of their underwriting standards and reports concerning the sponsors' pervasive disregard of prudent securitization standards; 2) specific reports concerning the originators of loans in the trusts abandoning their underwriting standards and sponsors of the securitizations failing to follow prudent practices; 3) the high number of borrower delinquencies and defaults on mortgages in the trusts' loan pools and enormous losses to the trusts; 4) the collapse of the certificates' credit ratings from high, investment-grade ratings when purchased to much lower ratings, including numerous "junk" ratings; and 5) the numerous lawsuits brought by and against Defendants and their affiliates alleging the systematic abandonment of originator underwriting guidelines.

### A.    General Reports Concerning Originators' Systematic Abandonment of their Underwriting Standards and Sponsors' Disregard of Prudent Securitization Standards

75.    By 2009, government reports, public and private investigations, and media reports concerning the collapse of the RMBS market put Defendants on notice of the massive problems

in the trusts such that a reasonable and prudent trustee would have taken upon itself the duty to carefully investigate these issues and take action as necessary. These reports and investigations identified the originators' pervasive abandonment of underwriting standards and sponsors' disregard of prudent securitization standards as the cause of the crisis.

76.    For example, the Office of the Comptroller of the Currency (the "OCC"), published a report in November 2008 listing the "Worst Ten" metropolitan areas with the highest rates of foreclosures and the "Worst Ten" originators with the largest numbers of foreclosures in those areas ("2008 'Worst Ten in the Worst Ten' Report"). In this report, the OCC emphasized the importance of adherence to underwriting standards in mortgage loan origination:

> The quality of the underwriting process—that is, determining through analysis of the borrower and market conditions that a borrower is highly likely to be able to repay the loan as promised—is a major determinant of subsequent loan performance. The quality of underwriting varies across lenders, a factor that is evident through comparisons of rates of delinquency, foreclosure, or other loan performance measures across loan originators.

77.    Despite the importance of sticking to underwriting standards, it was clear that originators were not following them. Chairman of the Federal Reserve Board, Benjamin Bernanke, spoke to the decline of underwriting standards in his speech before the World Affairs Council of Greater Richmond on April 10, 2008:

> First, at the point of origination, underwriting standards became increasingly compromised. The best-known and most serious case is that of subprime mortgages, mortgages extended to borrowers with weaker credit histories. To a degree that increased over time, these mortgages were often poorly documented and extended with insufficient attention to the borrower's ability to repay. In retrospect, the breakdown in underwriting can be linked to the incentives that the originate-to-distribute model, as implemented in this case, created for the originators. Notably, the incentive structures often tied originator revenue to loan volume, rather than to the quality of the loans being passed up the chain. Investors normally have the right to put loans that default quickly back to the originator, which should tend to apply some discipline to the underwriting process. However, in the recent episode, some originators had little capital at stake, reducing their exposure to the risk that the loans would perform poorly.

Benjamin Bernanke, Chairman, Federal Reserve Board, Speech to the World Affairs Council of

Greater Richmond, *Addressing Weaknesses in the Global Financial Markets: The Report of the President's Working Group on Financial Markets*, Apr. 10, 2008, *available at* http://www.federalreserve.gov/newsevents/speech/bernanke20080410a.htm.

78.    In November 2010, the Congressional Oversight Panel, which was established as part of the Emergency Economic Stabilization Act of 2008, issued a report entitled "Examining the Consequences of Mortgage Irregularities for Financial Stability and Foreclosure Mitigation." The report recounts widespread foreclosure abuses in connection with mortgages that have been securitized and the numerous federal and state investigations that have detailed this problem. The abuses identified in the report—including forged or back-dated mortgage assignments and "robo-signing" of false affidavits used in foreclosure actions—arise from failures in the documentation and transfer of mortgage loans from the originators to other entities in the securitization process, and ultimately into the trusts. As the report explains, irregularities in the chain of title between the originator and the trust can have significant legal consequences that damage the trusts and certificateholders. Cong. Oversight Panel, *Examining the Consequences of Mortgage Irregularities for Financial Stability and Foreclosure Mitigation*, Pub. L. No. 110-343 (2010)*, available at* http://www.gpo.gov/fdsys/pkg/CPRT-111JPRT61835/pdf/CPRT-111JPRT61835.pdf.

79.    Other reports reached similar conclusions. The Permanent Subcommittee on Investigations in the United States Senate ("PSI") issued a report detailing the causes of the financial crisis. Using Washington Mutual Bank as a case study, the PSI concluded through its investigation:

> Washington Mutual was far from the only lender that sold poor quality mortgages and mortgage backed securities that undermined U.S. financial markets. The Subcommittee investigation indicates that Washington Mutual was emblematic of a host of financial institutions that knowingly originated, sold, and securitized billions of dollars in high

risk, poor quality home loans. These lenders were not the victims of the financial crisis; the high risk loans they issued became the fuel that ignited the financial crisis.

Staff of S. Permanent Subcomm. on Investigations, 112th Cong., *Wall Street and the Financial Crisis: Anatomy of a Financial Collapse* 50 (Subcomm. Print 2011).

80.    The Financial Crisis Inquiry Commission ("FCIC") issued its final report in January 2011 that detailed, among other things, the collapse of mortgage underwriting standards and the subsequent collapse of the mortgage market and wider economy. *See* Fin. Crisis Inquiry Comm'n, Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States (2011) ("FCIC Report").

81.    The FCIC Report concluded that there was a "systemic breakdown in accountability and ethics." "Unfortunately—as has been the case in past speculative booms and busts—we witnessed an erosion of standards of responsibility and ethics that exacerbated the financial crisis." *Id*. at xxii. The FCIC found:

> [I]t was the collapse of the housing bubble—fueled by low interest rates, easy and available credit, scant regulation, and toxic mortgages—that was the spark that ignited a string of events, which led to a full-blown crisis in the fall of 2008. Trillions of dollars in risky mortgages had become embedded throughout the financial system, as mortgage-related securities were packaged, repackaged, and sold to investors around the world.

*Id*. at xvi.

82.    The FCIC Report also noted that during the housing boom, mortgage lenders focused on quantity rather than quality, originating loans for borrowers who had no realistic capacity to repay the loan, and noted "that the percentage of borrowers who defaulted on their mortgages within just a matter of months after taking a loan nearly doubled from the summer of 2006 to late 2007." *Id*. at xxii. A default in the first few months of a mortgage, known as an early payment default, is known in the mortgage industry as a significant indicator of pervasive disregard for underwriting standards. Not surprisingly, the FCIC Report noted that mortgage

fraud "flourished in an environment of collapsing lending standards." *Id*.

83.     In this lax lending environment, mortgage lenders went unchecked, originating

mortgages for borrowers in spite of underwriting standards:

> Lenders made loans that they knew borrowers could not afford and that could cause massive losses to investors in mortgage securities. As early as September 2004, Countrywide executives recognized that many of the loans they were originating could result in "catastrophic consequences." Less than a year later, they noted that certain high-risk loans they were making could result not only in foreclosures but also in "financial and reputational catastrophe" for the firm. But they did not stop.

*Id*.

84.     Lenders and borrowers took advantage of this climate, with borrowers willing to

take on loans and lenders anxious to get those borrowers into the loans, ignoring even loosened

underwriting standards. The FCIC Report observed: "Many mortgage lenders set the bar so low

that lenders simply took eager borrowers' qualifications on faith, often with a willful disregard

for a borrower's ability to pay." *Id*. at xxiii.

85.     The predominant RMBS securitization method involved an originate-to-distribute

("OTD") model where the originators of the loans do not hold the loans, but instead repackage

and securitize them. The OTD model created a situation where the origination of low quality

mortgages through poor underwriting thrived. The Financial Stability Oversight Council

("FSOC") found:

> In the originate-to-distribute model, originators receive significant compensation upfront without retaining a material ongoing economic interest in the performance of the loan. This reduces the economic incentive of originators and securitizers to evaluate the credit quality of the underlying loans carefully. Some research indicates that securitization was associated with lower quality loans in the financial crisis. For instance, one study found that subprime borrowers with credit scores just above a threshold commonly used by securitizers to determine which loans to purchase defaulted at significantly higher rates than those with credit scores below the threshold. By lower underwriting standards, securitization may have increased the amount of credit extended, resulting in riskier and unsustainable loans that otherwise may not have been originated.

Fin. Stability Oversight Council, Macroeconomic Effects of Risk Retention Requirements (2011) ("FSOC Report") at 11 (footnote omitted).

86.    The FSOC reported that as the OTD model became more pervasive in the mortgage industry, underwriting practices weakened across the industry. The FSOC Report found "[t]his deterioration was particularly prevalent with respect to the verification of the borrower's income, assets, and employment for residential real estate loans." *Id*. Similarly, the sponsors responsible for securitizing residential mortgages for trusts between 2004-2008 failed to conduct adequate due diligence reviews of the mortgage pools to ensure the mortgage loans were of the represented quality and also failed to ensure that the purported mortgaged property's appraised value was accurate.

87.    As the FCIC Report noted:

> The Commission concludes that firms securitizing mortgages failed to perform adequate due diligence on the mortgages they purchased and at times knowingly waived compliance with underwriting standards. Potential investors were not fully informed or were misled about the poor quality of the mortgages contained in some mortgage-related securities. These problems appear to have been significant.

FCIC Report at 187.

88.    Additionally, the evidence shows that sponsors, and the third party due diligence providers they hired, failed to analyze adequate sample sizes of the loan pools, sometimes reviewing as little as 2%-3% of the entire loan pools. More importantly, when the sponsors and their due diligence firms identified high percentages of mortgage loans in their sample reviews as defective, the sponsors often "waived in" mortgage loans in the interest of preserving their business relationships and their own profits.

89.    In sum, reports regarding the disregard of underwriting standards and poor securitization practices became common by 2009. Even prior to 2009, Defendants had exclusive

access to proprietary information and data demonstrating the systematic failure of underwriting standards that was not available to the public. If validated, those practices would have directly contributed to the sharp decline in the quality of mortgages that became part of mortgage pools underlying the RMBS, resulting in steep losses. By at least 2009, it was apparent to trustees that the originators and sponsors involved in the securitization of the trusts had engaged in problematic practices and a reasonable and prudent trustee would have taken upon itself the duty to carefully investigate these issues and taken action in connection with the trusts entrusted to their care.

**B.      Specific Reports Concerning the Originators of Loans in the Trusts Abandoning their Underwriting Standards and the Sponsors Disregarding Prudent Securitization Practices**

90.      The governing agreements for the trusts incorporated representations and warranties concerning title to the mortgage loans, the characteristics of the borrowers and the collateral for the mortgage loans, and the credit criteria and underwriting practices for the origination of loans.

91.      However, Defendants knew that those representations and warranties were false and should have taken action to address the problems concerning the defective mortgage loans in the trusts. Numerous investigations, lawsuits, and media reports have demonstrated that nearly all of the largest mortgage loan originators in the RMBS market between 2000 and 2008 systematically disregarded their stated underwriting guidelines in the pursuit of profit – recklessly originating loans without regard for the borrowers' ability to repay. In addition, investigations, lawsuits, and media reports have shown that the primary sponsors in the RMBS market ignored prudent securitization standards. Attached as Exhibit I are detailed allegations concerning the relevant originators and sponsors.

92.     The information in Exhibit I put Defendants on notice that the loans underlying the trusts did not comply with the representations and warranties in the governing agreements. As a result, Defendants should have carefully investigated those issues in the context of the trusts entrusted to their care, provided notice to certificateholders, and taken appropriate action to protect the trusts.

### C.     A High Number of Borrower Delinquencies and Defaults on Mortgages in the Trusts' Loan Pools and Enormous Trust Losses Are Further Evidence of the Originators' Systematic Disregard of Underwriting Standards

93.     There were various other indications that the trust's loan pools included large numbers of mortgage loans that materially breached the responsible party's representations and warranties, including: 1) the trusts' high default and delinquency rates; and 2) the trusts' enormous cumulative losses. A summary of the trusts' default and delinquency rates and the trusts' cumulative losses is attached as Exhibit J.

### 1.     The Trusts Suffered from High Delinquency and Default Rates

94.     Residential mortgages are considered delinquent if no payment has been received for over 30 days after payment is due. Residential mortgages where no payment has been received for over 90 days (or three payment cycles) are considered to be in default.

95.     By January 2009, Defendants and their responsible officers witnessed a significant rise in reported defaults and delinquencies in the loan pools backing the trusts with many defaults and delinquencies occurring within months of the loans' origination. As many commentators have noted, such rapid and numerous defaults indicate loans that should not have been made. For example, a November 2008 Federal Reserve Board study attributed the general rise in defaults, in part, to "[d]eteriorating lending standards," and posited that "the surge in early payment defaults suggests that underwriting . . . deteriorated on dimensions that were less readily

apparent to investors." Christopher J. Mayer et al., *The Rise in Mortgage Defaults*, at 15-16 Fed. Reserve Bd. Fin. & Econ. Discussion Series, Paper No. 2008-59.

96.     By 2009, these massive numbers of defaults and delinquencies, including early payment defaults, which automatically breach representations and warranties, put Defendants on notice that the loans sold into the trusts did not comply with the responsible parties' representations and warranties and Defendants should have taken action to address any issues. Loan pools that were properly underwritten and containing loans with the represented characteristics would have experienced substantially fewer payment problems and substantially lower percentages of defaults, foreclosures, and delinquency.

97.     These default and delinquency rates were communicated to Defendants monthly through the service reports and trustee remittance reports. By January 2009, 52 out of the 59 trusts were reporting default and delinquency rates of over 10%, with more than a quarter of all the trusts reporting delinquency rates of over 40%. The average default and delinquency rate of the trusts by January 2009 was over 31%. By January 2010, this average was over 43%.

98.      Properly underwritten loans would have experienced far fewer payment problems and substantially lower percentages of defaults, foreclosures, and delinquencies, even during an economic downturn.

### 2.     The Trusts Suffered Huge Losses

99.     Realized losses are the losses incurred regarding any liquidated mortgage loan or any mortgage loan charged off by the servicer. The realized losses equal the portion of the stated principal balance remaining unpaid after applying all net liquidation proceeds to the mortgage loan.

100.     By January 2009, the trusts' extraordinary losses should have raised a red flag to

the trustees that the mortgage loans sold to the trusts did not comply with the responsible parties' representations and warranties. In particular, large realized losses are indicative of severe deficiencies in the appraisal and valuation process. As an example, the MLMI 2006-RM2 trust was reporting cumulative losses in January 2009 of over $215 million, which equates to more than 22% of the trust's total original par value.

101.    By January 2009, the total combined cumulative losses for the trusts (with reported figures) exceeded $1.7 billion, with the trusts reporting an average loss of over $30 million. By January 2011, the total reported cumulative losses for the trusts were over $7.6 billion, with an average loss of over $128 million.

102.    The immense losses are strong evidence that the originators systematically disregarded the underwriting standards and that many mortgages in the pool were not written in adherence to the underwriting guidelines in breach of the representations and warranties.

**D.    The Collapse of the Certificates' Credit Ratings Is Further Evidence of Systematic Disregard of Underwriting Guidelines**

103.    The credit rating for an RMBS certificate reflects an assessment of the creditworthiness of that RMBS and indicates the level of risk associated with that RMBS.

104.    The vast majority of the certificates owned by the CCUs were initially rated triple-A at issuance. A Triple-A rated product "should be able to withstand an extreme level of stress and still meet its financial obligations." *Understanding Standard & Poor's Rating Definitions*, June 3, 2009, at 14. By the end of 2008, 38 of 88 certificates—a staggering 43%—had been downgraded to junk status by at least one credit rating agency. By 2009, this figure had increased to 100%. A complete list of the downgrades for the certificates is set forth in Exhibit K.

105.    The high initial credit ratings reflected the risk associated with properly originated

and underwritten mortgage loans and were based on the credit risk characteristics the responsible

parties represented and warranted to the credit rating agencies. Consequently, the total collapse

in the credit ratings of the RMBS certificates the CCUs purchased, typically from triple-A to

non-investment speculative grade, put Defendants on notice that they were required to notify

certificateholders of any defaults and take appropriate action.

## VII.    ADDITIONAL EVIDENCE SHOWS THAT DEFENDANTS KNEW OF ISSUES WITH THE TRUSTS

### A.    In Their Capacities as RMBS Servicers for Other Trusts, Defendants Discovered Extensive Responsible Party Breaches of Representations and Warranties

106.    Defendants and their affiliated entities also served as servicers and/or master

servicers for numerous other RMBS trusts. In their capacities as servicers and/or master

servicers, Defendants learned that many of the loans originated and sponsored by the same

parties involved in the trusts at issue in this complaint were performing poorly. For example, in

their capacities as servicers and/or master servicers for those trusts, one of Defendants' duties

was to prepare monthly reports for the trustees detailing the poor performance of the loans. Also,

as servicers and/or master servicers, Defendants knew that the credit rating agencies had

downgraded trusts as a result of the poor quality of the originators' and sponsors' loan pools

because they were responsible for communicating with the ratings agencies. As servicers and/or

master servicers, Defendants reviewed the loan files of the mortgage loans, discovering

systematic, widespread breaches of representations and warranties in the loan pools.

107.    As servicers for various trusts, Defendants were also responsible for modifying

loans and enforcing mortgages in foreclosure proceedings. Such tasks would have invariably led

to the discovery that title to a substantial number of mortgages was not perfected.

108.    Because of their experiences as servicers to other RMBS trusts, Defendants knew

that these same defective underwriting and securitization practices affected the trusts committed to their care, and had an obligation to investigate that issue carefully.

### B. Defendants Received Written Notice of Systematic, Widespread Breaches of Representations and Warranties from Monoline Insurers

109.    Monoline insurance is credit enhancement that involves purchasing insurance to cover losses from any defaults. Many RMBS trusts were insured by monoline insurers. The responsible parties made representations and warranties concerning the underwriting standards of the loans in the governing agreements for the insured RMBS, and the governing agreements for the insured RMBS transactions have a repurchase procedure through which the monoline insurers must provide notice of a breach of representation and warranty to the responsible party and the other parties to the agreement, including the trustee.

110.    Monoline insurers have filed many complaints against responsible parties for representations and warranty breaches in connection with other RMBS trusts to which Defendants serve or served either as master servicers, servicers, or trustees. Prior to filing suit against the responsible parties, the monoline insurers often obtained and carried out forensic loan level reviews of the loans at issue.

111.    In *Syncora Guarantee Inc. v. Countrywide Home Loans, Inc., et al.*, No. 650042/2009 (N.Y. Sup. Ct. Jan. 28, 2009), the monoline insurer Syncora sued Countrywide Home Loans, Inc.—which had been acquired by Bank of America—and its affiliates, alleging that its review of loan files securitized by the defendants revealed breaches in 75% of the loans reviewed, with an aggregate principal balance in excess of $187 million.

112.    In *Ambac Assurance Corp., et al. v. Countrywide Home Loans, Inc., et al.*, No. 651612/2010 (N.Y. Sup. Ct. Sept. 28, 2010), the monoline insurer Ambac sued Countrywide Home Loans, Inc. and its affiliates including Bank of America, alleging that its review of loan

files securitized by the defendants revealed breaches of representations and warranties, including an extraordinarily high incidence of material deviations from the underwriting standards that defendants represented would be followed. Of the 6,533 loans reviewed across twelve transactions, 6,362 or over 97% contained one or more breaches of the mortgage loan representations.

113.     In *MBIA Ins. Co. v. Countrywide Home Loans, Inc.*, No. 602825/2008 (N.Y. Sup. Ct. Sept. 30, 2008), the monoline insurer MBIA sued Countrywide Home Loans, Inc.—which had been acquired by Bank of America—and its affiliates, alleging that Countrywide "developed a systematic pattern and practice of abandoning its own guidelines for loan origination: knowingly lending to borrowers who could not afford to repay the loans, or who committed fraud in loan applications, or who otherwise did not satisfy the basic risk criteria for prudent and responsible lending that Countrywide claimed to use." The parties settled the case in 2013.

114.     Because of the monoline insurers' breach notices and lawsuits, Defendants knew that these same defective underwriting and securitization practices affected other trusts containing loans originated and securitized by these same originators and sponsors. Furthermore, discovery will likely demonstrate that monoline insurers provided loan-by-loan breach notices for certain trusts in this action.

**C.     Global RMBS Repurchase Investigations and Settlements Alerted Defendants to Systematic, Widespread Breaches of Representations and Warranties**

115.     RMBS certificateholders have initiated numerous mortgage repurchase directions, compelling trustees to demand that responsible parties repurchase the mortgage loans due to breaches of representations and warranties. Defendants were trustees in many of the RMBS subject to these directions.

116.    For example, in 2011 Bank of America entered into an $8.5 billion settlement with The Bank of New York Mellon concerning Bank of America's exposure on Countrywide-issued RMBS repurchase demands. The Article 77 proceeding concerning the settlement concluded in 2014.

117.    In addition, Bank of America paid $1.4 billion to Freddie Mac in 2011 to settle RMBS repurchase exposure, and approximately $10 billion to Fannie Mae in 2013 to settle RMBS repurchase exposure.

118.    U.S. Bank has also been involved in global RMBS repurchase settlements. On December 16, 2011, for example, several institutional mortgage investors in hundreds of RMBS trusts sponsored by J.P. Morgan or its affiliates issued written instructions to U.S. Bank, Wells Fargo, BNYM, HSBC, and Deutsche Bank National Trust Company, as trustees, to open investigations into large numbers of ineligible mortgages in the loan pools backing the trusts and deficient loan servicing practices. The notices covered over $95 billion of RMBS sponsored by J.P. Morgan from 2005 to 2007.

119.    As trustees, Defendants have received many breach notices from institutional investors, indicating widespread and systemic violations of representations and warranties by the responsible parties. Defendants knew similar issues likely affected the other RMBS trusts committed to their care, and had an obligation to investigate that issue carefully.

**D.    Defendants Have Been Involved in Repurchase Litigation Against Responsible Parties**

120.    Defendants were also involved in many repurchase claims for other RMBS trusts that involved the same originators, sponsors, sellers, and servicers as the trusts. In many instances, these actions were initiated by certificateholders who provided notices of breaching loans to the Defendants on a loan-by-loan basis and then directed the Defendants to bring suit.

Based on their involvement in these repurchase actions, which alleged widespread, systematic breaches of representations and warranties, Defendants had an obligation to protect all trusts committed to their care and take action as appropriate.

121.    In fact, U.S. Bank sued Bank of America in connection with repurchase claims against Countrywide Home Loans and its affiliates. Complaint, *U.S. Bank Nat'l Ass'n, as Trustee for HarborView Mortgage Loan Trust, Series 2005-10 v. Countrywide Home Loans, Inc., et al.*, No. 652388/2011 (N.Y. Sup. Ct. Aug. 29, 2011). In the complaint, U.S. Bank alleged that in a sample of 786 loans, 66% of the loans breached one or more representation or warranty. *Id.* ¶ 5. U.S. Bank also alleged that it served notice on Countrywide, through its successor-in-interest— Bank of America. *Id.* ¶ 6.

122.    Similarly, U.S. Bank, as the indenture trustee of GreenPoint Mortgage Funding Trust 2006-HE1, sued GreenPoint to force it to repurchase the loans that it had contributed to the trust. U.S. Bank alleged that GreenPoint "pervasive[ly] fail[ed] to follow its underwriting guidelines during the origination of the Loans." Complaint, *U.S. Bank Nat'l Ass'n v. GreenPoint Mortg. Funding, Inc.*, No. 600352/2009, ¶ 35 (N.Y. Sup. Ct. Feb. 5, 2009) (alleging pervasive misrepresentations of borrowers' income, assets, employment, intent to occupy the property, inflated appraisal values, and violations of GreenPoint's underwriting guidelines regarding credit scores, debt-to-income ratios, and loan-to-value ratios).

123.    U.S. Bank based its allegations on a forensic analysis of GreenPoint-originated loans. Of 1,030 randomly sampled loans, 93% violated GreenPoint's underwriting guidelines. *See id.* ¶ 2.

124.    Additionally, as the trustee of the Morgan Stanley Mortgage Loan Trust 2007-2AX, U.S. Bank filed repurchase claims against Morgan Stanley Mortgage Capital, Inc. and

GreenPoint, alleging that a forensic review of certain loan files from the trust established

extensive breaches of the defendants' representations and warranties. Complaint, *U.S. Bank Nat'l*

*Ass'n v. Morgan Stanley Mortgage Capital Holdings LLC et al.*, No. 650339/2013 (N.Y. Sup. Ct.

July 8, 2013). A forensic analysis of 56 mortgage loan files revealed that 100% or all 56 loans

breached the representations and warranties. A separate loan-level analysis of 758 other loans in

the trust revealed that the principal originators of the mortgages "failed to adhere to the industry-

standard and reasonable underwriting guidelines in an extremely high percentage of cases." *Id.*

¶ 5. The Morgan Stanley Mortgage Loan Trust 2007-2AX is one of the offerings at issue in this

Complaint.

125.    Defendants' involvement in repurchase litigation, particularly the forensic

reviews conducted in connection with that litigation, shows that Defendants knew that such

widespread, systemic breaches of representations and warranties likely affected all of the trusts

committed to their care. Furthermore, discovery will likely demonstrate that individual investors

provided loan-by-loan breach notices on certain trusts in this action.

## VIII.  DEFENDANTS FAILED TO PRUDENTLY ADDRESS MASTER SERVICER AND/OR SERVICER DEFAULTS

### A.    Defendants Breached the Governing Agreements and Their Common Law Obligations By Failing to Fulfill Their Duties After Defaults and Events of Default Triggered By Master Servicer and Servicer Misconduct

126.    The master servicers and/or servicers failed to prudently service the mortgage

loans underlying the trusts. The governing agreements require that the master servicers and/or

servicers administer the mortgage loans for and on behalf of the certificateholders, and do so

(consistent with the terms of the governing agreements): (i) in the same manner in which they

service and administer similar mortgage loans for their own portfolios or for other third parties,

giving due consideration to customary and usual standards of practice of prudent institutional

mortgage lenders servicing similar loans; (ii) to maximize the recoveries regarding such mortgage loans on a net present value basis; and (iii) without regard to the right of the master servicers and/or servicers to receive compensation or other fees for their services under the governing agreements, the obligation of the master servicers and/or servicers to make servicing advances under the governing agreements, and the master servicers' and/or servicers' ownership, servicing or management for others of any other mortgage loans. The master servicers and servicers did not adhere to these requirements.

127.    The master servicers and/or servicers failed to meet their obligations by: (i) failing to timely and accurately apply payments made by borrowers and failing to maintain accurate account statements; (ii) charging excessive or improper fees for default-related services; (iii) failing to properly oversee third-party vendors involved in servicing activities on behalf of the banks; (iv) providing false or misleading information to borrowers; (v) failing to properly deliver loan documentation; and (vi) failing to maintain appropriate staffing, training and quality control systems.

128.    Sometimes the master servicers and/or servicers modified mortgage loans held by the trusts. In that process, because the loan modification process involves analysis of the underlying origination and mortgage loan files and any supplemental information provided by the borrower, the master servicers and/or servicers were put on notice of breaches of representations and warranties. The master servicers and/or servicers failed to notify the applicable parties or take action based on these breaches as required by the governing agreements.

129.    In addition, in the course of fulfilling their duties to service the loans, and particularly when required to foreclose on certain mortgage loans when appropriate, the master

servicers and servicers also became aware of breaches of representations and warranties but failed to notify the trustee.

130.    The master servicers and/or servicers failed to (1) notify parties to the governing agreements upon the discovery of mortgages in violation of the representations and warranties; (2) enforce repurchase obligations; (3) properly respond to denial of mortgage insurance claims based on originator misrepresentations; (4) foreclose upon properties when appropriate under applicable law; and (5) conduct foreclosures in a lawful fashion.

131.    Much of this conduct constituted Events of Default under the governing agreements. These failures have been confirmed by governmental investigations, published reports, and public and private litigation that have described the master servicers' and/or servicers' pervasive deviation from customary and lawful servicing practices.

132.    Under the governing agreements, any failure of the master servicers and/or servicers to observe or perform any of the covenants or agreements under the governing agreements, after notice and lapse of time, constitutes a default.

133.    These defaults ripened into Events of Default under the governing agreements for the trusts. Defendants had an obligation to provide notice of such defaults, which would have resulted in additional Events of Default, but it failed to do so.

134.    Defendants breached the governing agreements, their duties, and violated the law after becoming aware of such breaches, defaults and/or Events of Default by failing to: provide notice of such breaches, defaults and/or Events of Default to the master servicers and/or servicers; protect the interests of the certificateholders in the trusts; enforce repurchase obligations; and make prudent decisions concerning remedies after breaches, defaults and/or Events of Default.

135.    Defendants failed to exercise the same skill and care as a prudent person in the same circumstances in enforcing their rights and powers under the governing agreements upon learning of the above breaches, defaults and/or Events of Default.

**B.    Specific Servicer Misconduct**

136.    Most of the trusts' loans are or were serviced by the following servicers and their affiliates: Countrywide Home Loans Servicing LP and Countrywide Home Loans, Inc.; Wells Fargo Bank, N.A.; Washington Mutual Bank; JPMorgan Chase Bank, N.A.; GMAC Mortgage Corporation or Mortgage LLC; Saxon Mortgage Servicers, Inc.; PHH Mortgage Corp.; Aurora Loan Services LLC and Loan Services, Inc.; Select Portfolio Servicing, Inc.; SunTrust Mortgage, Inc.; GreenPoint Mortgage Funding, Inc.; IndyMac Bank, F.S.B.; National City Mortgage Co. and Home Loan Services; Bank of America, N.A.. Attached as Exhibit L are detailed allegations concerning these servicers and the illegal acts and practices they engaged in regarding the servicing of mortgage loans.

**C.    The Master Servicers and Servicers Defaulted on Their Duty to Notify the Trustees of Breaches of the Mortgage Loan Representations and Warranties**

137.    Under the governing agreements and prudent servicing standards, master servicers and servicers are generally required to notify the trustee, among others, upon discovery of a breach of representations and warranties with respect to a mortgage loan that materially and adversely affects the loan or the interests of the certificateholders in the loans.

138.    For example, the MABS 2006-WMC4 PSA states:

In addition, upon the discovery by the Depositor, the NIMS Insurer, the Servicer or the Master Servicer of a breach of any of the representations and warranties made by the Seller or the Originator in the Assignment Agreement or the Originator Master Agreement, respectively, in respect of any Mortgage Loan which materially adversely affects such Mortgage Loan or the interests of the related Certificateholders in such Mortgage Loan, the party discovering such breach shall give prompt written notice to the other parties.

40

PSA Section 2.02. The governing agreements for the other trusts similarly require such

notification. *See* Ex. G § V.

139.    PSA Section 7.01 states:

(a) "Servicer Event of Default," wherever used herein, means any one of the following
events:
…
(ii) other than with respect to clause (vi) below, any failure on the part of the Servicer
duly to observe or perform in any material respect any other of the covenants or
agreements on the part of the Servicer contained in this Agreement, or the breach by
the Servicer of any representation and warranty contained in Section 2.05, which
continues unremedied for a period of 30 days (or if such failure or breach cannot be
remedied within 30 days, then such remedy shall have been commenced within 30
days and diligently pursued thereafter; …
…
(b) "Master Servicer Event of Default," wherever used herein, means any one of the
following events:
…
(ii) the Master Servicer fails to observe or perform in any material respect any other
material covenants and agreements set forth in this Agreement to be performed by it,
which covenants and agreements materially affect the rights of Certificateholders, and
such failure continues unremedied for a period of 60 days after the date on which
written notice of such failure, properly requiring the same to be remedied, shall have
been given to the Master Servicer by the Trustee or the NIMS Insurer or to the Master
Servicer and the Trustee by the Holders of Certificates evidencing not less than 25%
of the Voting Rights; …

140.    As alleged above, in the course of their duties, the master servicer and servicers to

the trusts became aware of widespread problems with the underlying mortgage loans and failed

to abide by their covenants to prudently service the loans.

**D.    Defendants Knew That the Trusts Suffered from Widespread Master
Servicer and/or Servicer Defaults**

141.    Defendants, as trustees, knew of the servicing misconduct (and Events of Default)

alleged, which has been the subject of high profile government investigations and private and

public lawsuits. In the aftermath of the financial crisis, servicing abuse has also received

widespread attention in the media. Thus, Defendants knew of the breaches, defaults, and events

41

of default alleged herein.

142.    Defendants, as prolific servicers, also knew that the master servicers and servicers were discovering breaches of representations and warranties and failing to notify the applicable parties.

143.    U.S. Bank, Bank of America and their affiliates acted as master servicer and servicer to numerous other RMBS trusts. In 2010, the Federal Reserve, the OCC, the FDIC, and the OTS conducted on-site reviews of foreclosure processing at fourteen federally regulated mortgage servicers, including U.S. Bank and Bank of America.

144.    In April 2011, the investigating agencies issued a report titled "Interagency Review of Foreclosure Policies and Practices." The report found, among other things, that the servicers failed to evaluate "compliance with applicable laws and regulations, court orders, pooling and servicing agreements, and similar contractual arrangements." Based on the deficiencies identified in the report, the investigating agencies initiated enforcement actions against each of the servicers subject to the report. *Available at* http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47a.pdf.

145.    Ally/GMAC, Aurora Bank, Suntrust, Citibank, J.P. Morgan Chase, HSBC, OneWest, PNC and Wells Fargo were all subjects of the investigation. Along with Bank of America and its acquired company Countrywide Financial, these entities and their affiliates acted as master servicer and servicer to the overwhelming majority of the trusts.

146.    Thus, Defendants knew – based on an investigation that they were subject to – that servicers failed to implement proper quality control, audit and compliance standards and thus failed to adhere to the notification requirements in the governing agreements.

147.    This failure by the master servicer and servicers to prudently service the loans,

42

notify Defendants of defective loans, and other associated problems constituted Events of Default, yet rather than adhere to their contractual obligations upon such a default, Defendants ignored the master servicer and servicer misconduct.

148.    Defendants and their responsible officers also received servicing reports and monthly remittance reports that revealed widespread modifications, large losses and write-downs, and poor loan quality. Through these reports, Defendants, based on their roles in the RMBS, knew that there were widespread breaches of representations and warranties that the master servicers and servicers had discovered but failed to give the required notification.

149.    In addition to the Events of Default discussed above, on July 21, 2011, the Association of Mortgage Investors notified U.S. Bank that "substantial evidence [] has emerged of abuses in the servicing and monitoring of" RMBS. The letter set forth in detail the publicly available evidence demonstrating that there was widespread evidence, including some of the evidence referenced in this complaint, that loan originators had systemically breached representations and warranties provided to securitization trusts, and that the parties servicing loans underlying securitization trusts had systemically breached their obligations under applicable servicing agreements. The letter cautioned, "[y]ou cannot be negligent in ascertaining the pertinent facts regarding the underlying collateral;" "[u]pon discovery of representation or warranty breaches, you have to notify the appropriate parties;" "you must comply with your obligations . . . to take action to remedy the servicer Events of Default in the best interests of the Certificateholders." The AMI sent similar letters to all major RMBS trustees.

150.    Defendants breached the governing agreements, their duties and applicable law after becoming aware of all of the foregoing breaches, defaults, and/or Events of Default by failing to do the following: provide notice of such breaches, defaults, and/or Events of Default to

the master servicers and/or servicers; protect the interests of the certificateholders in the trusts;

enforce repurchase obligations; and make prudent decisions concerning remedies after breaches,

defaults and/or Events of Default.

## IX.    DEFENDANTS FAILED TO ENSURE LOAN FILES WERE PROPERLY CONVEYED TO THE TRUSTS AND FAILED TO REMEDY ANY DEFECTS

### A.    Defendants Failed to Take Possession of Complete Mortgage Loan Files

151.    To ensure that the rights, title and interest in the mortgage loans were perfected

and properly conveyed to the trusts, the governing agreements imposed upon Defendants, or

their agents, a duty to take physical possession of the mortgage files, ensure that the note and

mortgage were endorsed and assigned to Defendants, ensure that key documents for the loans

were included in the mortgage files and to create an exception report identifying those mortgage

loans for which the mortgage files were incomplete. *See* Ex. G §§ I, II, III, IV. The sponsors or

depositors were required to substitute compliant loans for the loans with incomplete files or

repurchase the loans. *See* Ex. G § V. Defendants, however, failed to act prudently and with due

care and systematically disregarded their contractual and fiduciary duties to enforce their rights

on behalf of certificateholders to ensure that mortgage loans lacking complete mortgage files

were removed from the mortgage pools underlying the Certificates. If Defendants had met their

contractual duties with respect to the non-compliant loans, Plaintiffs would not have incurred

their very significant losses attributable to the default of many of the defective loans. And if

Plaintiffs had been aware of these Events of Default or defaults they would not have continued to

invest in RMBS throughout 2005-2007.

152.    Certificateholders did not receive or have access to any loan or mortgage files that

they could check to make certain that their contractual rights were being protected. Rather, such

investors were dependent upon Defendants to police the deal and protect their contractual and

other legal rights.

153.    Defendants' failure to take physical possession of the key mortgage loan documents, and their failure to review the mortgage files for missing documents or irregularities and then assure that identified irregularities were corrected, was not a mere technicality, as explained by Georgetown Law School Professor Adam Levitin in his testimony before the House Financial Services Committee in November 2010. Problems in Mortgage Servicing from Modification to Foreclosure: Hearing Before S. Comm. on Banking, Housing, and Urban Affairs (2010) (statement of Adam Levitin, Associate Professor of Law, Georgetown University Law Center). Professor Levitin described the implications of the failure by a securitization trustee to take physical possession of the key documents in the loan file:

> If mortgages were not properly transferred in the securitization process, then mortgage-backed securities would in fact not be backed by any mortgages whatsoever. The chain of title concerns stem from transactions that make assumptions about the resolution of unsettled law. If those legal issues are resolved differently, then there would be a failure of the transfer of mortgages into securitization trusts.
> . . .
> Recently, arguments have been raised in foreclosure litigation about whether the notes and mortgages were in fact properly transferred to the securitization trusts. This is a critical issue because the trust has standing to foreclose if, and only if, it is the mortgagee. If the notes and mortgages were not transferred to the trust, then the trust lacks standing to foreclose.

**B.    Defendants Knew That the Loan Files Were Incomplete**

154.    That the original mortgage note was missing from the loan file, or there was a missing link in the chain of endorsements from the originator to Defendants, or there was no duly executed assignment of the mortgage to Defendants, or the original lender's title policy was missing would have been obvious to a reasonably competent trustee performing its contractual duties with due care.

155.    Numerous reports, litigation, and investigations have revealed the widespread

misconduct of servicers to the trusts at issue here to cover-up the systemic failure of depositors
and sponsors to properly assign the underlying mortgage loans to issuing trusts, including
through the use of robo-signers. *See, e.g.*, Interagency Review of Foreclosure Policies and
Practices (2011), *available at*
http://www.federalreserve.gov/boarddocs/rptcongress/interagency/interagency.htm; Wall Street
and the Financial Crisis: Anatomy of a Financial Collapse (2011), *available at*
http://www.hsgac.senate.gov//imo/media/doc/Financial_Crisis/FinancialCrisisReport.pdf?attemp
t=2; *In re Citibank, N.A.*, Consent Order, No. AA-EC-11-13 (Apr. 13, 2011), *available at*
http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47c.pdf; *In re Ally Fin.
Inc., Ally Bank & GMAC Mortgage, LLC*, Consent Order, No. 11-20-B-HC, No. 11-020-B-DEO
(Apr. 13, 2011), *available at*
http://www.federalreserve.gov/newsevents/press/enforcement/enf20110413a3.pdf; *In re HSBC
Bank USA, N.A.*, Consent Order, No. AA-EC-11-14 (Apr. 13, 2011), *available at*
http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47d.pdf; *In re OneWest
Bank, FSB*, Consent Order, No. WN-11-011 (Apr. 13 2011), *available at*
http://www.occ.gov/static/ots/misc-docs/consent-orders-97665.pdf; *In re JPMorgan Chase Bank*,
Consent Order, No. AA-EC-11-15, (Apr. 13, 2011), *available at* http://www.occ.gov/news-
issuances/news-releases/2011/nr-occ-2011-47e.pdf; *In re PNC Bank, N.A.*, Consent Order, No.
AA-EC-11-17 (Apr. 13, 2011), *available at* http://www.occ.gov/news-issuances/news-
releases/2011/nr-occ-2011-47i.pdf; *In re Wells Fargo Bank, N.A.*, Consent Order, AA-EC-11-19
(Apr. 13, 2011), *available at* http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-
2011-47k.pdf; *In re Aurora Bank FSB*, No. NE-11-16 (April 13, 2011), *available at*
http://www.occ.gov/static/ots/misc-docs/consent-orders-97661.pdf.

156.    Enforcement actions with similar allegations have been brought against Defendants and thus they clearly knew of the master servicer and servicer failures. *See In re Bank of Am., N.A.*, Consent Order, No. AA-EC-11-12 (Apr. 13, 2011), *available at* http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47b.pdf; *In re U.S. Bank, N.A.*, No. AA-EC-11-18 (April 13, 2011), available at http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47j.pdf.

## X.    DEFENDANTS HAD CONFLICTS OF INTEREST

157.    Defendants failed and unreasonably refused to take action to protect the trusts and certificateholders against originator breaches and servicer violations because it would have revealed that Defendants were engaged in the same misconduct in their role as servicers and originators for other mortgages and RMBS trusts.

158.    Many of the same banks or their affiliate entities that act as originators, sponsors, and servicers to the trusts were parties to trusts that included loans originated by Defendants. Accordingly, because Defendants faced enormous repurchase liability for loans sold in breach of representations and warranties, including loans in RMBS trusts sponsored by the same sponsors of the trusts, or trusts where the warrantors at issue here acted as trustee or servicer, Defendants were disincentivized to take any action to protect the trusts because they would benefit from similarly lenient treatment from other trustees.

159.    Defendants knew that these entities, acting as sponsor, trustee or servicer, were aware of trusts with massive number of loans with breaches of representations and warranties where Defendants were the responsible parties.

160.    Defendants also failed to take appropriate action due to their, and their affiliates, economic intertwinement with the parties they were supposed to police. Defendants'

highly profitable securitization business was dependent upon the good graces of originators, servicers, and sponsors. Strictly enforcing repurchase obligations would have harmed important business relationships and cut off the supply of mortgage loans to Defendants' securitization arms.

161.     Defendants thus turned a blind eye to breaches of R&Ws in the hopes that counterparties would later return a favor. Defendants benefited from their decision not to act with regard to mortgage file deficiencies, R&W breaches, and events of default, and was economically beholden to sellers and servicers because Defendants faced repurchase liability for the sale and securitization of their own loans if Defendants took action against them. Defendants refused to act against sellers and servicers because doing so would have exposed Defendants' misconduct as originators, warrantors, sellers, or servicers for other RMBS trusts in which these same entities served as either trustee or servicer. Further, this conflict was exacerbated by Defendants' ongoing business relationships with the originators, warrantors, sellers, servicers and related companies, the servicers' payment of Defendants' trustee fees, and Defendants' economic disincentive to declare EODs.

162.     As mentioned above, during the fourth quarter of 2010, banking regulators reviewed the adequacy of controls and governance over Defendants' foreclosure processes. The reviews uncovered significant problems in Defendants' foreclosure processing, including "critical weaknesses" in Defendants' foreclosure practices and oversight of default services vendors. Interagency Review of Foreclosure Policies and Practices, *available at* http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47a.pdf.

163.     In addition, the OCC entered into consent orders with Defendants and other servicers. In the OCC Consent Order with Bank of America, the government found, among

other things, that beginning in 2009 Bank of America filed false or otherwise defective affidavits in connection with foreclosure proceedings and failed to exercise adequate oversight, internal controls, policies, and procedures, compliance risk management, internal audit, third party management, and training for its foreclosure-related services. *See In re Bank of Am., N.A.*, Consent Order, AA-EC-11-12 (Apr. 13, 2011), *available at* http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47b.pdf.

164.     U.S. Bank also consented to an order finding that it failed to document mortgage loans properly and attempted to cover-up this failure, filed or caused to be filed affidavits by its employees in which the affiant represented the assertions in the affidavit were made based on personal knowledge when they in fact were not, filed or caused to be filed affidavits that were not properly notarized, and failed to devote adequate oversight and internal controls, policies, and procedures to its foreclosure processes. *In re U.S. Bank N.A. and U.S. Bank N.A. ND*, Consent Order, AA-EC-11-18 (Apr. 13, 2011), *available at* http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47j.pdf.

165.     Despite pledging to reform its servicing misconduct and foreclosure abuses four years ago, U.S. Bank has still failed to comply with applicable federal regulatory standards. On June 17, 2015, the OCC announced that it was imposing further restrictions on the mortgage servicing operations of U.S. Bank and five other banks for failing to meet the requirements of the prior consent orders and "continu[ing] to engage in unsafe and unsound practices" in violation of the prior consent orders. *See* Press Release, Office of Comptroller of Currency, OCC to Escheat Funds from the Foreclosure Review, Terminates Orders Against Three Mortgage Servicers, Imposes Restrictions on Six Others (June 17, 2015), *available at* http://www.occ.gov/news-issuances/news-releases/2015/nr-occ-2015-85.html. Among other penalties imposed under the

amended consent orders, U.S. Bank is prohibited from: (i) acquiring new servicing rights on existing securitizations; (ii) entering into new contracts to perform residential mortgage servicing for other parties; (iii) outsourcing or sub-servicing new residential mortgage servicing activities to other parties; (iv) off-shoring new residential mortgage servicing activities; and (v) making any new appointments of senior officers responsible for residential mortgage servicing or residential mortgage servicing risk management and compliance.

166.    Because Defendants were engaging in the same illicit and improper acts as the servicers for the trusts, Defendants had a conflict of interest that caused them to fail to take action in response to the servicer violations, or even alert the certificateholders to the servicers' misconduct.

167.    In addition, Defendants, as originators for other RMBS trusts, sold billions of dollars of loans, many of which materially breached representations and warranties. As just one example, U.S. Bank paid $200 million following a DOJ investigation of U.S. Bank's origination practices. U.S. Bank knowingly originated and underwrote FHA-insured mortgage loans from 2006 through 2011 that did not meet the necessary underwriting requirements. Press Release, Dep't of Just., Justice Department, U.S. Bank to Pay $200 Million to Resolve Alleged FHA Mortgage Lending Violations (June 30, 2014), *available at* http://www.justice.gov/opa/pr/us-bank-pay-200-million-resolve-alleged-fha-mortgage-lending-violations. U.S. Bank also admitted that it failed to identify deficiencies in FHA-insured loans, failed to report deficient loans and did not take corrective action regarding the loans. *Id.*

168.    Defendants failed and unreasonably refused to take action to protect the trusts and certificateholders against warrantor breaches and servicer violations because doing so would have required the Defendants to take legal and policy positions contrary to their own

interests. In order to fulfill their obligation to enforce the repurchase of breaching loans in a non-negligent manner, Defendants would have had to advocate for an expansive interpretation of the repurchase obligation. Such an interpretation would conflict with positions Defendants sought to take in defending their own poor origination practices.

169.    Exhibits I and L contain additional details concerning Defendants' misconduct in servicing and originating residential mortgage loans.

## XI.    DEFENDANTS FAILED TO SATISFY THEIR PRE- AND POST-DEFAULT DUTIES AND BREACHED THE GOVERNING AGREEMENTS

170.    Defendants breached their contractual duties by: (1) failing to ensure that the rights, title and interest in the mortgage loans were perfected and properly conveyed to Defendants; (2) failing to enforce their rights on behalf of certificateholders to ensure that mortgage loans lacking complete mortgage files were removed from the mortgage pools underlying the Certificates; (3) failing to enforce repurchase rights; (4) failing to provide notice of defaults under the governing agreements; (5) failing to provide accurate certifications and remittance reports as required under the governing agreements and applicable federal law; (6) failing to protect the trusts due to conflicts of interest; (7) failing to properly oversee repurchase litigation initiated by monoline insurers; (8) failing to adequately protect the trusts before and after certain trust sponsors and originators filed for bankruptcy or otherwise became insolvent; and (9) after having notice of the master servicers' and servicers' numerous defaults and Events of Default under the governing agreements and breaches of representations and warranties by the sponsors and originators, failing to exercise due care to ensure that certificateholders' interests were adequately protected.

171.    Defendants also were aware of Events of Default but failed to provide notice, and to act prudently and with due care and good faith. These defaults and/or Events of Default

occurred and remained uncured for the requisite period. Thus, under the governing agreements, Defendants were obligated to exercise the rights and powers vested in it by the governing agreements, and to use the same care and skill as prudent persons would exercise or use under the circumstances in the conduct of their own affairs. A prudent person would have taken action to protect the trusts and certificateholders from the known responsible party breaches of representations and warranties by exercising all of its rights under the governing agreements to enforce the responsible parties' repurchase obligations, including conducting a timely, careful and prudent investigation to determine all of the materially breaching mortgage loans and suing the responsible parties for specific performance to compel their repurchase of those loans.

172.    By at least 2009, Defendants, based on their access to public information as well as information unavailable to the public, knew of the breaches of representations and warranties as well as information unavailable to the public, knew of breaches of representations and warranties and had a duty to carefully investigate circumstances suggesting that the trusts routinely contained loans that materially breached the responsible parties' representations and warranties, which adversely affected the value of those mortgage loans and the trusts' and certificateholders' interests in those mortgage loans and take appropriate action to address those defaults.

173.    Defendants had a duty under the governing agreements to exercise due care upon an Event of Default. Events of Default occurred under each of the governing agreements, but Defendants failed to take the required actions to protect the rights of the trusts. Although certain Events of Default require formal notice and an opportunity to cure, the trustee cannot escape their duty of care by failing to provide the required notice. Defendants were aware that the master servicers, servicers, depositors, and sponsors failed to provide notice of representation

and warranty violations that occurred in the trusts and engaged in other misconduct in contravention of the governing agreements. Defendants, however, did not provide notice of such defaults as it was required to do. Because these defaults would have seasoned into Events of Default if notice had been provided, Defendants had the duty to act prudently to enforce repurchase provisions once they learned of such defaults.

## XII.    THE "NO ACTION" CLAUSES DO NOT APPLY

174.    The "no action" clauses in the governing agreements do not apply to this lawsuit because the claims are brought against Defendants as trustees, not against a third party. The PSAs expressly permit suits against the trustee, stating that no provision of the agreements "shall be construed to relieve the trustee . . . from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct."

175.    Additionally, under New York law, "no action" clauses do not apply to an action against the trustee, as here, for their own wrongdoing. Defendants are not being asked to sue as trustee to enforce rights and obligations under the governing agreements. Rather, this action asserts claims against Defendants for breaching their contractual obligations.

176.    Compliance with the "no action" clauses' pre-suit requirements also would have been futile. The no action clauses (if they applied) would require Plaintiffs to demand that Defendants initiate proceedings against themselves and to indemnify Defendants for their own liability to the trusts, an absurd result that the parties did not intend. *See Cruden v. Bank of New York*, 957 F. 2d 961, 968 (2d Cir. 1992).

**XIII.  DEFENDANTS MAY NOT USE CERTIFICATEHOLDERS' TRUST FUNDS TO DEFEND AGAINST SUITS BY TRUST-BENEFICIARY INVESTORS**

    **A.  The Parties Entered Binding Agreements Conveying Beneficial Ownership of the Trusts to Certificateholders**

177.    The trusts are created under common law and pursuant to the terms of the PSA for each trust. As such, the trusts are non-juridical entities that cannot own property, enter contracts, or sue or be sued. Legal title to trust assets rests with the trustee, Defendants, and equitable title to those assets rests with the trusts' beneficiaries, including Plaintiffs.

178.    Certificateholders obtain a beneficial interest in the trusts via the certificates. The PSA provides that:  "The Depositor intends to sell pass-through certificates to be issued hereunder in multiple classes, which in the aggregate will evidence the entire beneficial ownership interest in each REMIC (as defined herein) created hereunder." Exh. H at 6, PSA Prelim. Statement.

179.    These certificates are binding contracts between the certificateholders and Defendants, as trustee. The certificates, in turn, incorporate the terms of the trusts' governing PSAs and mutually bind certificateholders and Defendants to the terms thereof.

180.    The PSAs were drafted with the final aim of selling certificates to investors. Indeed, without the sale of certificates to investors, the PSAs would have no purpose or function. Accordingly, the trustee and other parties to the PSAs drafted the certificates and attached them to each PSA as a Form of Certificate for each tranche to be sold from the RMBS trust then being created.

181.    The typical Form of Certificate relevant here acknowledges the applicable governing agreements, the parties thereto, and states that the holder of the certificate is bound by the terms of the PSAs. *See, e.g.*, Exh. H, PSA, Exhibit A-A-1, Form of Class A-1 Certificate.

182.    The CCUs, whose interests Plaintiffs assumed, entered into these binding contracts with Defendants and the other parties to the PSAs between 2005 and 2007, on the Trade Date(s) shown in Exhibit A.

183.    Certificateholders and the trustee therefore mutually agreed to and accepted the terms, provisions and conditions of the PSAs, becoming first parties to these contracts, upon acceptance of the certificates.

184.    The contracts between certificateholders and the Defendant trustees are subject to the firmly established American Rule against fee-shifting indemnities, and the rule that fee-shifting between litigation adversaries or first parties to contracts requires unmistakably clear contractual language to that effect. *See Hooper Assocs. v. AGS Computers, Inc.*, 74 N.Y. 2d 487 (1989). There is no clear (let alone unmistakably clear) contractual language authorizing Defendants to shift litigation expenses to their adversaries, who are first-parties to the contractual arrangement.

185.    At the time certificateholders were presented with contractual terms in the certificates and fully incorporated PSAs, the certificates and the PSAs had already been drafted by others, including Defendants, and were presented to investors (including Plaintiffs' predecessors) as contracts of adhesion. Plaintiffs and their predecessors did not participate in the drafting process.

### B.    Defendants' Limited Right to Indemnification from Certificateholders' Trust Funds Does Not Extend to Suits By Certificateholders

186.    The PSAs incorporated by reference in the investor certificates allow Defendants to draw indemnification from the trust funds in limited circumstances.

**SECTION 8.05   Trust Administrator's and Trustee's Fees and Expenses**

The Trustee, the Trust Administrator or any director, officer, employee or agent of any of them, shall be indemnified by the Trust Fund and held harmless against any loss, liability or expense (not including expenses and disbursements incurred or made by the Trustee or the Trust Administrator, including the compensation and the expenses and disbursements of its agents and counsel, in the ordinary course of the Trustee's or the Trust Administrator's performance in accordance with the provisions of this Agreement) incurred by the Trustee or by the Trust Administrator arising out of or in connection with the acceptance or administration of the obligations and duties of the Trustee or the Trust Administrator under this Agreement, other than . . . (ii) any loss, liability or expense incurred by reason of willful misfeasance, bad faith or negligence of the Trustee or of the Trust Administrator, as applicable, in the performance of its duties hereunder or by reason of the Trustee's or the Trust Administrator's, as applicable, reckless disregard of obligations and duties hereunder or as a result of a breach of the Trustee's or the Trust Administrator's, as applicable, obligations under Article X hereof.

Exhibit H.

187.     The Trust Fund is a non-juridical entity, functioning essentially as a bank account, with legal title to the corresponding assets held by the trustee and equitable title to those assets held by the beneficiary certificateholders.[8] Accordingly, the true indemnitors, and the only cognizable entities that bear a burden when Trust Funds are depleted, are the beneficial owners of those funds, namely, the certificateholders, including Plaintiffs. In short, when Trust Funds are used to pay trustee defense costs, trust beneficiaries effectively pay the cost and bear the burden.

188.     That trust beneficiaries bear the cost of withdrawals of trust funds for litigation defense is also reflected in the distribution structure or payment "waterfall." To the extent the Trustee receives funds from the Trust Fund for its legal expenses, the extent of funds for certificateholders is directly reduced. Practically, then, the indemnitors under PSA § 8.05 again are the certificateholder beneficiaries that would otherwise receive any funds Defendants may

---

[8] Some of the relevant indemnification provisions provide for indemnification from the Distribution Account rather than the Trust Fund.  Whether drawn from the "Trust Fund" or the "Distribution Account," the indemnification comes from the functional equivalent of a bank account that is beneficially owned by investor beneficiaries.

withdraw for indemnification.

189.    Certificateholders, who are parties to the certificates and fully incorporated PSAs, are therefore the first-party indemnitors under the applicable PSA provisions, and Defendants are the first-party indemnitees under the same provision. Indeed, if certificateholders are not treated as the first-party indemnitors, then no one would be, as there is no other real, legally cognizable entity or party who could be said to provide the indemnity drawn from the "Trust Fund" or "Distribution Account."

190.    Nothing in the PSAs' indemnity provisions clearly or unmistakably demonstrates the parties' intent for certificateholders to indemnify the trustee in suits brought by certificateholders against the trustee. Such indemnitor-indemnitee suits are not explicitly referenced. Nor are such suits covered by implication, as there are myriad third-party claims that would not involve fee shifting (*i.e.*, claims by third-parties to the indemnity provision that would not be providing the indemnification as a legal or practical matter) for which Defendants arguably could draw indemnification from the certificateholders' Distribution Account or Trust Funds.

191.    For example, in its role as enforcer of warrantors' repurchase obligations, Defendants were required to incur legal costs, including the costs of pursuing repurchase litigation if necessary. To ensure that this critical remedy did not go unenforced, the trustee could seek indemnification from the certificateholders' Distribution Account or Trust Funds to cover such costs, if they were not otherwise indemnified by another source.[9]

----

[9] The governing agreements typically required the warrantor ultimately to bear the costs of repurchase litigation. For example, MABS 2006-WMC4 PSA § 1.01 defines the "Purchase Price" at which the warrantor must buyback defective or breaching loans from the trust explicitly to include "in the case of a Mortgage Loan required to be purchased pursuant to Section 2.03,

192.    RMBS trustees also faced suits by third parties (*i.e.*, parties not providing the indemnity) in the course of performing their trustee duties and arguably are allowed to use certificateholder trust funds for indemnification in such suits. For example, trustees were named as parties in foreclosure actions and faced numerous counterclaims in that capacity.[10] RMBS trustees also owned properties after foreclosing and faced liability from municipalities for harm caused by failure to maintain or control these trust-owned properties.[11] On information and belief, such trustees have taken the position that they are entitled to indemnification from trust funds for such third-party suits.

193.    Thus, to the extent § 8.05 arguably allows the trustee to draw indemnification from certificateholders' funds for certain third-party or non-indemnitor suits, it cannot be construed to cover first-party claims between investor certificateholders and the trustee. Nothing in § 8.05 would be rendered superfluous by construing § 8.05 as limited to such claims. On the other hand, certificateholder-beneficiaries will be economically disincentivized from vindicating their rights against Defendants when they breach their trustee duties if § 8.05 were construed to apply to suits brought by certificateholders against the trustee, contrary to the American Rule and the policies favoring open access to the courts that underlie the New York Court of Appeal's decision in *Hooper*.

---

expenses reasonably incurred or to be incurred by … the Trustee in respect of the breach or defect giving rise to the purchase obligation." Exh. H. Under such provisions, to the extent the trustee initially drew indemnification from the trusts for enforcement, it was required to recover any such indemnification from the warrantor, either directly or as part of the repurchase price.

[10] *See, e.g.*, *U.S. Bank Nat. Ass'n v. Sorrentino*, 118 A.3d 607, 610 (2015); *U.S. Bank Nat. Ass'n v. Capparelli*, 2014 WL 2807648, at *1 (S.D. Fla. June 20, 2014).

[11] *See, e.g.*, Jessica Garrison & Angel Jennings, "Second Bank Is Sued Over Blight," L.A. Times (7/17/12), *available at* http://articles.latimes.com/2012/jul/17/local/la-me-us-bank-slumlord-20120717.

**C.    Defendants Are Not Entitled to Judgment-Shifting Indemnification**

194.    If Defendants are deemed entitled to indemnity from certificateholders' Trust Funds they may not only attempt to cause certificateholders to bear the cost of their adversary's fees, win or lose, but also any judgment or settlement secured in this case or any other case by investors against their trustee. To the extent certificateholders must forego distributions from their Trust Funds to fund any recovery they obtain through proving Defendants' breach, they would be forced to pay their own recovery, while Defendants would pay nothing.

195.    Such a reading would be commercially unreasonable. Defendants would have incentives to breach their contractual obligations to certificateholders because certificateholders would have no recourse:  if investors sued and prevailed, they would recover only at the cost of depleting their own Trust Funds, diminishing payments on their investment. Certificateholders would therefore have no meaningful, enforceable rights under the contracts, rendering them illusory. Any construction that would authorize judgment shifting from a losing litigant to its successful adversary must be avoided pursuant to well-settled rules against absurd constructions.

**D.    Claims in this Litigation, If Proven, Would Necessarily Establish Defendants' Negligence, and Defendants Therefore Cannot Meet Their Burden of Proving Entitlement to Indemnification**

196.    As noted, Defendants are not entitled to indemnification under *Hooper* for fees, costs, and expenses incurred in this suit because of settled rules against fee-shifting between adversaries, regardless which party prevails or the culpability of a party's conduct.

197.    But, even if *Hooper* were deemed not to apply — *Hooper* does apply — then indemnification nevertheless would be impermissible because in all events the PSAs expressly preclude indemnification for fees, expenses, and liability incurred as a result of "willful malfeasance, bad faith or negligence." *See* Exh. H § 8.05. Notably, the plain terms of the PSAs

subject Defendants to liability in suits brought by any party based on simple negligence, including negligence in carrying out its contractual duties.

198.    In this suit, Plaintiffs allege that Defendants negligently failed to address mortgage loan document deficiencies and breaches of representations and warranties with respect to the loans, and that they failed to act reasonably following events of default, as required under the PSAs. Plaintiffs also allege that Defendants impermissibly acted under ongoing conflicts of interest and failed to carry out its ministerial duties with due care. Other investor suits against Defendants have plausibly alleged similar misconduct and have survived motions to dismiss.

199.    At a minimum, unless and until Defendants both (1) prove that *Hooper* does not apply (which Defendants cannot prove) and (2) successfully defends against these allegations, it cannot claim that the liability, fees, and expenses are indemnifiable. Defendants bear the burden of proof and would ordinarily be able to obtain indemnification from its adversary only through a motion and order at the end of a case.

### E.    Any Indemnification From Trust Funds Would Be Limited to Reasonable Fees and Expenses

200.    To the extent that Defendants have failed to provide certificateholders with adequate disclosure of funds it has withdrawn from the at issue trusts in other investor suits, Defendants have been acting in their own interest, to the detriment of certificateholders, rather than acting for the benefit of certificateholders as required.

201.    Plaintiffs therefore seek an order requiring Defendants to disclose any amounts they have billed with sufficient detail to ascertain the reasonableness of their indemnification withdrawals from the trusts to date (if it is entitled to any indemnification at all), and disgorgement of any amounts it cannot establish are reasonable. Plaintiffs will also seek this

information in the normal course of discovery.

## XIV.  CLAIMS FOR RELIEF

### <u>COUNT ONE – BREACH OF CONTRACT</u>

202.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

203.    NCUA Board, as liquidating agent for each of the CCUs, brings this count to recover damages arising at any time related to the NCUA Certificates.

204.    The Separate Trustee brings this count to recover damages arising at any time related to the Resecuritized Certificates.

205.    The PSAs are valid and binding contracts entered into between Defendants, each trust, the sponsors, the master servicers, the servicers, and depositors.

206.    The PSAs provide, among other things, the terms under which Defendants act as trustee for the trusts.

207.    As current holders of certificates issued by each trust, Plaintiffs are express, intended third party beneficiaries under the PSAs entitled to enforce the performance of the Trustee. Further, the certificates and the PSAs they incorporate are to be construed as one contract between the certificateholders and the trustee.

208.    Defendants breached several obligations that they undertook on behalf of Plaintiffs as certificateholders including, without limitation, to perform or cause to be performed through its agents or custodians:

> (a)    take physical possession of the operative documents for the mortgage loans in the trusts;

> (b)    identify all mortgage loans for which there was missing, defective, or incomplete documentation on the final exception reports;

     (c)     make accurate representations in final certifications and exception reports;

     (d)     protect the interests of the beneficiaries of the trusts;

     (e)     provide notice of material defects and enforce warrantor duties to repurchase loans lacking adequate documentation pursuant to PSA § 2 or similar sections;

     (f)     provide notice of material breaches of warrantor representations and warranties relating to the mortgage loans upon its discovery or receipt of notice of such breaches pursuant to PSA § 2 or similar sections;

     (g)     make prudent decisions concerning the exercise of appropriate remedies following Events of Default under PSA § 7 or similar sections;

     (h)     enforce the repurchase obligations of the warrantors.

209.    The specific provisions breached by Defendants are further detailed herein and in the Exhibits hereto.[12]

210.    Defendants' breach of their duties set forth in the PSAs, as described above, caused Plaintiffs' losses on their certificates and diminished their value.

211.    Plaintiffs have performed their obligations under the PSAs.

212.    Defendants are liable to Plaintiffs for the losses they suffered as a direct result of Defendants' failure to perform their contractual obligations under the PSAs.

## COUNT TWO – NEGLIGENCE AND GROSS NEGLIGENCE

213.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

214.    NCUA Board, as liquidating agent for each of the CCUs, brings this count to recover damages arising at any time related to the NCUA Certificates.

---

[12] Full copies of each of the PSAs are publically available on the SEC EDGAR website. Due to the amount and length of the agreements, only the relevant portions have been attached hereto. Plaintiffs incorporate the full PSAs and governing agreement herein by reference.

215.    The Separate Trustee brings this count to recover damages arising at any time relating to the Resecuritized Certificates.

216.    As set forth in detail above, Defendants owed the certificateholders, including Plaintiffs, extracontractual duties under the PSAs and as trustee for the trusts to perform their duties and administer the trusts without negligence.

217.    Defendants negligently and with gross negligence failed to avoid conflicts of interest and thus failed to protect the interests of the certificateholders.

218.    Defendants negligently and with gross negligence failed to perform with due care their ministerial duties as trustee, including (1) acting in good faith; (2) providing notice to certificateholders when appropriate, including when using trust funds for indemnification of the Defendants, when Defendants were informed of or otherwise discovered representation and warranty breaches, and when warrantors failed to repurchase breaching loans; and (3) acting with undivided loyalty to certificateholders.

219.    Defendants' negligence and gross negligence damaged Plaintiffs, impaired Plaintiffs' ability to fully collect the principal and interest due on their certificates and caused losses in the value of Plaintiffs' certificates.

## COUNT THREE – BREACH OF FIDUCIARY DUTY

220.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

221.    NCUA Board, as liquidating agent for each of the CCUs, brings this count to recover damages arising at any time related to the NCUA Certificates.

222.    The Separate Trustee brings this count to recover damages arising at any time relating to the Resecuritized Certificates.

223.    Defendants owed Certificateholders, including Plaintiffs, a fiduciary duty following Events of Default to act in good faith, with due care and undivided loyalty, and without conflicts of interest, when performing the obligations set forth in the PSAs, and, in addition, to exercise all powers under the PSAs prudently once an Event of Default occurred.

224.    Defendants breached their post-Events of Default fiduciary obligations by failing to perform these obligations and by failing to avoid conflicts of interest and act with undivided loyalty.

225.    The violations by Defendants of their post-Events of Default fiduciary obligations impaired Certificateholders' ability to fully collect the principal and interest due on their certificates and caused losses in the value of Plaintiffs' certificates.

## COUNT FOUR – DECLARATORY JUDGMENT REGARDING RIGHT TO INDEMNIFICATION FROM THE TRUST FUNDS

226.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

227.    A valid and justiciable controversy exists between Plaintiffs and Defendants regarding any of Defendants' withdrawal of investor trust funds to fund its litigation defense of this and any similar suits brought by other investors, or to pay any judgment or settlement.

228.    Because investors, the beneficial owners of all trust funds and assets, are the indemnitors that would bear their adversary's defense costs and are first parties to the certificates pursuant to *Hooper*, Defendants may not use trust funds to pay their litigation costs or to fund any judgment in this or any similar suit brought by different investors.

229.    Plaintiffs therefore seek a declaration that Defendants are not permitted indemnification from the trusts for any loss, liability, expense (including attorney fees), or judgment associated with this case or any other case brought by an investor against Defendants

for breach of their trustee duties.

230.    Plaintiffs likewise seek a declaration that Defendants must disclose the amount of indemnification it has billed each trust for other litigation brought by an investor against Defendants for breach of their trustee duties.

231.    As a fallback, even if *Hooper* were deemed not to apply — *Hooper* does apply — then Defendants still would not be entitled to indemnification from the trusts for any loss, liability, expense, or judgment because the PSA carve-out precluding such indemnification for negligent, grossly negligent or willful conduct would apply. Plaintiffs therefore further contend, in the alternative, that Defendants are not entitled to advancement of legal fees from the trusts or indemnification from the trusts unless and until they have proven their entitlement to such relief.

232.    The requested declaratory judgment will serve a useful purpose in clarifying and settling the legal issue regarding the parties' relative burdens in this case and the stakes in this litigation.  The requested declaratory judgment will also serve a useful purpose in removing Defendants' distorted litigation incentives, which are presently based on an assumption of limitless litigation resources paid for by its adversaries.

## COUNT FIVE – BREACH OF CONTRACT REGARDING UNLAWFUL WITHDRAWALS FROM TRUST FUNDS AND DISGORGEMENT

233.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

234.    As set forth in detail above, the certificates and fully incorporated PSAs are enforceable contracts between the parties.

235.    These agreements do not permit Defendants to draw indemnification from the trusts for any purpose associated with this case or any other case brought by an investor against Defendants for breach of their trustee duties. And in all events the PSAs do not permit

Defendants to draw such indemnification before they have met their burden of proving entitlement to indemnification, including proving the reasonableness of the amounts withdrawn.

236.    Upon information and belief, Defendants have breached these agreements by drawing indemnification from the Trust Funds for cases brought by investors against Defendants for breach of their trustee duties and without meeting their burden of proving entitlement to indemnification, including proving the reasonableness of the amounts withdrawn.  Defendants' breaches deprived Plaintiffs of consideration and have caused Plaintiffs to suffer damages in the amount of all legal charges, fees, and expenses of any kind billed to the trusts to-date in relation to any case brought by an investor against Defendants for breach of their trustee duties.

237.    Defendants are liable to Plaintiffs for damages caused by their breach of contract and should be ordered to disgorge all funds impermissibly seized from the trusts.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A.    An award of all appropriate damages and/or equitable relief in favor of Plaintiffs against Defendants for breaches of their duties in an amount to be determined at trial, including any applicable pre- or post-judgment interest thereon;

B.    Compelling Defendants to provide an accounting of the legal fees and costs they have sought and/or received from the trusts associated with any case brought by an investor against Defendants for breach of their trustee duties;

C.    Providing declaratory relief in favor of Plaintiffs and pursuant to *Hooper* to establish that Defendants are prohibited from using Trust Funds as indemnification for any purpose associated with this case or any other case brought by an investor against Defendants for breach of their trustee duties;

D.      Disgorging any Trust Funds Defendants have improperly taken from the Trusts associated with any case brought by an investor against Defendants for breach of their trustee duties;

E.      Awarding Plaintiffs all reasonable costs and expenses incurred in this action, including attorney's fees, expert fees, and any other properly taxable costs and expenses;

F.      Any other relief that the Court deems just and proper.

## XV.   JURY DEMAND

Plaintiffs hereby demand a trial by jury of all issues properly triable.

Dated: December 5, 2018

David C. Frederick
Scott K. Attaway
Matthew M. Duffy
Frederick G. Hall
KELLOGG, HANSEN, TODD,
FIGEL & FREDERICK P.L.L.C.
Sumner Square
1615 M Street, N.W.
Suite 400
Washington, D.C. 20036
Phone: (202) 326-7900
Fax: (202) 326-7999
dfrederick@kelloghansen.com
sattaway@kelloghansen.com
mduffy@kelloghansen.com
fhall@kelloghansen.com

David H. Wollmuth
William A. Maher
Steven S. Fitzgerald
Ryan A. Kane
WOLLMUTH MAHER & DEUTSCH
LLP
500 Fifth Avenue
New York, New York 10110
Phone: (212) 382-3300
Fax: (212) 382-0050
dwollmuth@wmd-law.com

Of Counsel:
Michael J. McKenna, General Counsel
Alan R. Burch, Associate General
Counsel
NATIONAL CREDIT UNION
ADMINISTRATION
1775 Duke Street
Alexandria, Virginia 22314
mmckenna@ncua.gov
aburch@ncua.gov

By: _Steven S. Fitzgerald_

George A. Zelcs
John A. Libra
Max C. Gibbons
Matthew C. Davies
KOREIN TILLERY LLC
205 North Michigan Avenue
Suite 1950
Chicago, Illinois 60601
Phone: (312) 641-9760
Fax: (312) 641-9751
gzelcs@koreintillery.com
jlibra@koreintillery.com
mgibbons@koreintillery.com
mdavies@koreintillery.com

Stephen M. Tillery
KOREIN TILLERY LLC
505 North Seventh Street
Suite 3600
St. Louis, Missouri 63101-1625
Phone: (314) 241-4844
Fax: (314) 241-3525
stillery@koreintillery.com

*Attorneys for the National Credit Union
Administration Board as liquidating agent
and Graeme W. Bush as Separate Trustee*