**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------- x

NATIONAL CREDIT UNION
ADMINISTRATION BOARD, *et al.*,

              Plaintiffs,

      v.

U.S. BANK NATIONAL ASSOCIATION, *et al.*

            Defendants.

-------------------------------------------------------------------- X

No. 18-cv-11366 (LLS)

Hon. Louis L. Stanton

ECF CASE

## MEMORANDUM OF LAW IN SUPPORT OF U.S. BANK NATIONAL ASSOCIATION'S MOTION TO DISMISS <u>PLAINTIFFS' FIRST AMENDED COMPLAINT</u>

**TABLE OF CONTENTS**

                                                                      **Page**

TABLE OF AUTHORITIES .................................................................. iii

INTRODUCTION ............................................................................... 1

BACKGROUND ................................................................................ 4

      A.      The RMBS Securitization Process ......................................... 4

      B.      The Trusts At Issue And The Trustee's Limited Duties .......................................... 5

            1.      The trustee's duties before an Event of Default .......................... 6

            2.      The trustee's duties concerning Events of Default ..................... 6

      C.      Investors' Rights Under The Agreements ................................ 7

      D.      Plaintiffs, Plaintiffs' Allegations, And Prior Litigation ...................... 7

ARGUMENT ...................................................................................... 9

I.      PLAINTIFFS FAIL TO STATE A CLAIM FOR BREACH OF CONTRACT ON COUNT ONE .................................................... 9

      A.      Plaintiffs Fail To Satisfy Several Threshold Requirements For Bringing Suit .......................................... 9

            1.      Negating clauses bar Plaintiffs' claims in 37 trusts ................... 10

            2.      No-action clauses bar Plaintiffs' claims as to five additional trusts .......................................... 10

      B.      Plaintiffs Fail To Plead A Post-EOD Claim ......................... 12

            1.      Plaintiffs fail to plead an EOD based on servicer or master-servicer breaches .......................................... 12

                   (a)      Plaintiffs fail to plead the requisite written notice and cannot rely on the prevention doctrine ..................... 12

                   (b)      For at least 11 trusts, Plaintiffs do not plead the requisite breach ................................. 15

                   (c)      Plaintiffs fail to allege other types of EODs .................. 15

             2.      Plaintiffs fail to plead that U.S. Bank or a Responsible Officer received written notice or had actual knowledge of a servicer- or master-servicer Event of Default ..................... 16

i

| | | | |
|---|---|---|---|
| | (a) | Plaintiffs fail to allege written notice of an EOD | 16 |
| | (b) | Plaintiffs fail to plead actual knowledge of an EOD | 17 |
| C. | Plaintiffs Fail To Plead A Pre-EOD Claim | | 18 |
| | 1. | Plaintiffs' pre-EOD claims are untimely | 19 |
| | 2. | For many trusts, Plaintiffs fail to state a pre-EOD claim because their claims are based on duties U.S. Bank did not have | 22 |
| | (a) | Plaintiffs fail to state a pre-EOD claim relating to R&W breaches | 22 |
| | (b) | Plaintiffs fail to state a pre-EOD claim relating to the mortgage files | 23 |
| | (c) | Plaintiffs' other claims are impermissibly conclusory | 25 |

II. PLAINTIFFS' TORT CLAIMS MUST BE DISMISSED ...... 25

| A. | Plaintiffs' Tort Claims Are Duplicative Of Their Contract Claims And Barred By The Economic-Loss Doctrine | 25 |
|---|---|---|
| B. | Plaintiffs' Tort Claims Are Precluded by *NCUA I* | 28 |
| C. | Plaintiffs' Tort Claims Are Time-Barred | 28 |

III. THE COURT SHOULD STAY PLAINTIFFS' INDEMNIFICATION CLAIMS PENDING RESOLUTION OF THEIR PRINCIPAL, UNDERLYING CLAIMS ...... 29

| A. | Given The Possibility Of Duplicative Litigation And The Absence Of Any Prejudice To Plaintiffs, The Court Should Stay The Indemnification Claims | 29 |
|---|---|---|
| B. | *Hooper* Does Not Avoid The Need To Decide Whether The Trustee Engaged In Negligence Or Other Misconduct To Resolve The Indemnification Claims | 31 |
| | 1. *Hooper* does not apply | 32 |
| | 2. Even if *Hooper* applies, its requirements are satisfied | 33 |

CONCLUSION ...... 35

# TABLE OF AUTHORITIES

Page

CASES

*17 Vista Fee Assocs. v. Teachers Ins. & Annuity Ass'n of Am.*,
693 N.Y.S.2d 554 (1st Dep't 1999) .........................................................26

*AG Capital Funding Partners, L.P. v. State Street Bank & Tr. Co.*,
896 N.E.2d 61 (N.Y. 2008) ...................................................................5

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ...........................................................................25

*B & B Hardware, Inc. v. Hargis Indus., Inc.*,
135 S. Ct. 1293 (2015) .......................................................................28

*Bakal v. U.S. Bank Nat'l Ass'n*,
747 F. App'x 32 (2d Cir. 2019) ..........................................12, 13, 23, 24, 26

*Blackrock Balanced Capital Portfolio (FI) v. U.S. Bank Nat'l Ass'n*,
86 N.Y.S.3d 484 (1st Dep't 2018) .............................................13, 14, 26

*Blackrock Core Bond Portfolio v. U.S. Bank Nat'l Ass'n*,
165 F. Supp. 3d 80 (S.D.N.Y. 2016).....................................................7, 26

*Commerce Bank v. Bank of N.Y. Mellon*,
35 N.Y.S.3d 63 (1st Dep't 2016) .....................................................17, 18

*Commerzbank AG v. Deutsche Bank Nat'l Tr. Co.*,
234 F. Supp. 3d 462 (S.D.N.Y. 2017)...................................................10

*Commerzbank AG v. U.S. Bank Nat'l Ass'n*,
277 F. Supp. 3d 483 (S.D.N.Y. 2017)...................................................12

*Concord Real Estate CDO 2006-1, Ltd. v. Bank of Am. N.A.*,
996 A.2d 324 (Del. Ch. 2010)..............................................................5

*Cruden v. Bank of N.Y.*,
957 F.2d 961 (2d Cir. 1992)...............................................................11

*DDR Constr. Servs., Inc. v. Siemens Indus., Inc.*,
770 F. Supp. 2d 627 (S.D.N.Y. 2011)...................................................28

iii

*Dormitory Auth. v. Samson Constr. Co.*,
  94 N.E.3d 456 (N.Y. 2018) .................................................................25, 26, 27

*Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*,
  837 F. Supp. 2d 162 (S.D.N.Y. 2011) ..............................................................11

*Elliott Assocs. v. J. Henry Schroder Bank & Tr. Co.*,
  838 F.2d 66 (2d Cir. 1988) ...............................................................................5

*Fisher v. JPMorgan Chase Bank, N.A.*,
  740 F. App'x 745 (2d Cir. 2018) .................................................................28, 29

*Fixed Income Shares: Series M v. Citibank N.A.*,
  314 F. Supp. 3d 552 (S.D.N.Y. 2018) ..............................................................20

*Fixed Income Shares: Series M v. Citibank, N.A.*,
  69 N.Y.S.3d 288 (1st Dep't 2018) ...............................................................13, 14

*Homeward Residential, Inc. v. Sand Canyon Corp.*,
  298 F.R.D. 116 (S.D.N.Y. 2014) ......................................................................32

*Hooper Assocs., Ltd. v. AGS Computers, Inc.*,
  548 N.E.2d 903 (N.Y. 1989) .................................................................31, 32, 33, 34

*IDT Corp. v. Morgan Stanley Dean Witter & Co.*,
  907 N.E.2d 268 (N.Y. 2009) .........................................................................28, 29

*In re Bankers Tr. Co.*,
  450 F.3d 121 (2d Cir. 2006) .............................................................................13

*In re New York City Asbestos Litig.*,
  838 N.Y.S.2d 76 (1st Dep't 2007) ....................................................................33

*Knights of Columbus v. Bank of N.Y. Mellon*,
  2015 WL 4501196 (Sup. Ct. N.Y. Cnty. July 10, 2015) ......................................17

*Marcel Fashions Grp., Inc. v. Lucky Brand Dungarees, Inc.*,
  779 F.3d 102 (2d Cir. 2015) .............................................................................28

*Meckel v. Cont'l Res. Co.*,
  758 F.2d 811 (2d Cir. 1985) ...............................................................................6

*Nat'l Credit Union Admin. Bd. v. U.S. Bank Nat'l Ass'n*,
  898 F.3d 243 (2d Cir. 2018) ............................................................................8, 9

*Nat'l Credit Union Admin. Bd. v. U.S. Bank Nat'l Ass'n*,
  2016 WL 796850 (S.D.N.Y. Feb. 25, 2016)................................................9, 26, 28

*Phoenix Light SF Ltd. v. Bank of N.Y. Mellon*,
  2015 WL 5710645 (S.D.N.Y. Sept. 29, 2015)........................................................23

*Phoenix Light SF Ltd. v. Bank of N.Y. Mellon*,
  2017 WL 3973951 (S.D.N.Y. Sept. 7, 2017)........................................16, 17, 18

*Phoenix Light SF Ltd. v. Deutsche Bank Nat'l Tr. Co.*,
  172 F. Supp. 3d 700 (S.D.N.Y. 2016)................................................................10

*Policemen's Annuity & Ben. Fund of Chi. v. Bank of Am., N.A.*,
  2013 WL 5328181 (S.D.N.Y. Sept. 23, 2013)......................................................24

*Ret. Bd. of Policemen's Annuity & Ben. Fund of City of Chi. v. Bank of N.Y.
  Mellon*, 775 F.3d 154 (2d Cir. 2014) ..................................................................4, 5

*Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Tr. Co.*,
  2018 WL 3849840 (S.D.N.Y. Aug. 10, 2018)..................................................30, 31

*Royal Park Invs. SA/NV v. HSBC Bank USA, Nat'l Ass'n*,
  109 F. Supp. 3d 587 (S.D.N.Y. 2015)........................................................10, 20, 24

*Royal Park Invs. SA/NV v. U.S. Bank Nat'l Ass'n*,
  356 F. Supp. 3d 287 (S.D.N.Y. 2018)..............................................................30, 31

*Sagittarius Broad. Corp. v. Evergreen Media Corp.*,
  663 N.Y.S.2d 160 (1st Dep't 1997) ......................................................................34

*Square Mile Structured Debt (One), LLC v. Swig*,
  973 N.Y.S.2d 39 (1st Dep't 2013) ........................................................................34

*Sterling Fed. Bank, F.S.B. v. Bank of N.Y. Mellon*,
  2012 WL 3101699 (N.D. Ill. July 30, 2012)........................................................11

*Tang Capital Partners, LP v. Norton*,
  2012 WL 3072347 (Del. Ch. July 27, 2012)..........................................................5

*U.S. Fire Ins. Co. v. N.Y. Marine & Gen. Ins. Co.*,
  706 N.Y.S.2d 377 (1st Dep't 2000) ......................................................................34

*Wilder v. World of Boxing LLC*,
  310 F. Supp. 3d 426 (S.D.N.Y. 2018)..................................................................32

**STATUTES**

12 U.S.C. § 1787 ...................................................................................................21

12 U.S.C. § 1787(b)(14) .......................................................................................18

12 U.S.C. § 1787(b)(14)(A)(i) ..............................................................................21

12 U.S.C. § 1787(b)(14)(B) .............................................................................21, 29

**OTHER AUTHORITIES**

CPLR § 213(2) .................................................................................................18, 21

## INTRODUCTION

For five years, Plaintiffs, investors in residential mortgage-backed securities ("RMBS"), have been trying to plead viable claims against U.S. Bank National Association in its capacity as trustee of 50 RMBS trusts. The first suit was dismissed by Judge Forrest, and the Second Circuit affirmed. This latest suit should meet the same fate. As U.S. Bank already explained in moving to dismiss the opening complaint, Plaintiffs' claims fail on many independent grounds. The amended complaint does virtually nothing to address those deficiencies. Plaintiffs continue to err at each turn because they fundamentally misunderstand the role of an RMBS trustee like U.S. Bank. U.S. Bank's role is not to "police" their investments or to act as a fiduciary or guarantor. Its duties instead are limited to those specifically and expressly set forth in the contracts. And the duties Plaintiffs allege that U.S. Bank breached are found nowhere in these agreements.

*Contractual Bars to Suit.* Right from the start, Plaintiffs' claims fail as to 42 trusts because Plaintiffs fail to satisfy contractual prerequisites for bringing the lawsuit. First, for 37 trusts, "negating clauses" preclude Plaintiffs' contract claims. Those clauses limit who has authority to sue under the agreements. Because Plaintiffs are not among the parties authorized to sue, they lack standing to assert claims as to these trusts, as multiple courts in this district have held. Second, as to five more trusts, Plaintiffs' claims must be dismissed for failure to comply with the agreements' no-action clauses. Those clauses prohibit Plaintiffs from pursuing legal action relating to the agreement unless they provide written notice of an EOD or default to a specified party, assemble a specified percentage of holders, demand that a specified party sue, and offer indemnification for the suit. Plaintiffs do not allege they complied with the clauses, and, for at least five trusts, do not even try to allege a viable excuse for that failure. That alone compels dismissal of Plaintiffs' claims as to these five trusts before even reaching the merits.

*Post-Event of Default ("EOD") claims.*  Plaintiffs fare no better on the merits.  The thrust of Plaintiffs' suit remains that U.S. Bank should have taken wide-ranging actions as a prudent person to address other deal parties' breaches.  But the duty to act as a prudent person arises only if (1) a contractually defined EOD has occurred and (2) U.S. Bank received written notice or had actual knowledge of the EOD.  Plaintiffs allege neither.  The EODs alleged in the Amended Complaint—servicer- or master-servicer-breach EODs—cannot occur unless the servicer or master servicer breaches, receives notice of the breach, and fails to cure.  Plaintiffs still do not attempt to allege that the requisite notice was received.  They instead rely on the "prevention doctrine."  But while the applicability of that doctrine might have been an open question five years ago when Plaintiffs first sued U.S. Bank, recent binding decisions make clear the doctrine cannot excuse a plaintiff's failure to allege the elements of an EOD.  Plaintiffs also fail to allege that U.S. Bank received written notice or had actual knowledge of any EODs.  For written notice, Plaintiffs' theory is not that U.S. Bank received notice of *actual* EODs, but instead that it received notice of events that *could become* EODs.  For actual knowledge, Plaintiffs' theory is not that U.S. Bank *actually* knew of an *EOD*, but instead that it *should have* known about *breaches* that could lead to EODs.  Under binding authority, these theories come nowhere near alleging that U.S. Bank had actual knowledge or written notice of an actual EOD.

*Pre-Event of Default claims.*  Plaintiffs offer two purported pre-EOD duties that U.S. Bank allegedly breached—duties concerning (i) sellers' breaches of representations and warranties ("R&Ws") relating to mortgage loans, and (ii) incomplete or defective documentation.  The bulk of these claims must be dismissed for two reasons.  First, many of them are time-barred.  Plaintiffs say U.S. Bank had a duty to take action as to R&W breaches when it "discovered" them, which under Plaintiffs' own theory—despite their transparent

2

attempt to avoid the admissions in their opening complaint—purportedly occurred by 2009. The duties on which Plaintiffs base their document-defect claims would have been triggered soon after the trusts closed, no later than 2008. Yet Plaintiffs did not file this suit until more than a decade later, after the limitations period had expired.

Second, even if not time-barred, many of these claims arose out of alleged duties that the agreements do not "specifically" and "expressly" assign to U.S. Bank. Plaintiffs assert that U.S. Bank failed to provide notice to other deal parties that sellers of the mortgages breached R&Ws and failed to enforce sellers' obligations to repurchase the affected loans. But U.S. Bank did not have these duties in many of the trusts. The same goes for the alleged duties relating to document defects (a missing or defective mortgage note, assignment, title insurance, or the like): For many trusts U.S. Bank had no duty to take action or was not trustee when any duty arose. Nearly all of Plaintiffs' pre-EOD contract claims should therefore be dismissed.

*Tort claims*. Plaintiffs' claims for negligence, gross negligence, and breach of fiduciary duty likewise fail for multiple reasons. They are duplicative of Plaintiffs' contract claims and barred by the economic-loss doctrine. As the court held the first time Plaintiffs filed this suit, while framed in terms of tort principles, the claims involve the same manner of injury and same damages as Plaintiffs' contract claims. That holding is not just persuasive and correct; it is also binding as a matter of collateral estoppel. Even if Plaintiffs could somehow surmount these obstacles, the three-year statute of limitations independently bars these claims.

*Indemnification claims*. Plaintiffs' final claims are for breach of contract and declaratory judgment relating to U.S. Bank's contractual right to indemnification from the trusts for expenses and costs incurred in this litigation. These claims, however, should be stayed pending resolution of whatever underlying claims might survive this motion, if any. Every court to

address these sorts of claims against a trustee has stayed them (or dismissed them). And for good reason: U.S. Bank's right to indemnification is likely to turn on whether the losses for which it was indemnified (*i.e.*, the losses incurred in defending this lawsuit) resulted from negligence or other misconduct. As Plaintiffs themselves recognize, resolving the principal claims in this case "would necessarily" answer that question. The Court should therefore stay Plaintiffs' indemnification claims.

In sum, the Court should dismiss all of Plaintiffs' breach-of-contract claims (Count One) and tort claims (Counts Two and Three) and stay Plaintiffs' indemnification claims (Counts Four and Five).[1]

## BACKGROUND

### A.     The RMBS Securitization Process.

This case involves 50 RMBS trusts issued more than a decade ago, between 2005 and 2007. *See* First Amended Complaint, ECF No. 44 ("Am. Compl.") Ex. A. An RMBS securitization involves bundling mortgage loans together and selling interests in the resulting revenue streams to investors ("certificateholders"). *Id.* ¶¶ 2, 43; *see also Ret. Bd. of Policemen's Annuity & Ben. Fund of City of Chi. v. Bank of N.Y. Mellon*, 775 F.3d 154, 156 (2d Cir. 2014) ("*BNYM*"). In each securitization, a "sponsor" or "seller" creates a loan pool from mortgages. Am. Compl. ¶¶ 46, 48. The sponsor or seller transfers the loan pool to a "depositor," which segments the loans in the pool according to their levels of risk. *Id.* ¶ 48; *BNYM*, 775 F.3d at 156. The segmented loan pool is conveyed to a trust, which issues securities ("certificates"). Am.

---

[1] Exhibit A to the accompanying Declaration of David Adler ("Adler Decl.") contains a chart summarizing the bases for dismissing the contract claims with respect to each of the 50 trusts at issue in this litigation. Unless otherwise specified, all references in this brief to Exhibits A through Z refer to Exhibit A through Z to the Adler Decl.

Compl. ¶¶ 49-50.  After an underwriter sells the securities to investors, a "servicer" (sometimes overseen by a "master servicer") collects payments on the underlying mortgage loans and sends the funds to a trustee, which passes on the payments to investors.  *Id.* ¶¶ 52, 56; *see BNYM*, 775 F.3d at 156.

## B.    The Trusts At Issue And The Trustee's Limited Duties.

U.S. Bank is the current trustee for all 50 trusts.  For 33 of those trusts, however, it was not the original trustee—it succeeded to that position later, for most, according to Plaintiffs, in 2009 or 2010.  Am. Compl. ¶ 2 n.1.  All of the trusts are governed by Pooling and Servicing Agreements ("PSAs") or like agreements, under which the pooled loans are conveyed to the trustee, which holds legal title to the assets for the benefit of the certificateholders.  *Id.* ¶¶ 54, 215.  Of the 50 trusts, 26 are New York common-law trusts, and the remaining 24 are Delaware statutory trusts with a similar structure to the New York common-law trusts, except they are governed by Delaware law.[2]  Am. Compl. ¶ 43; *e.g.*, Ex. B § 10.05 (WAMU 2006-AR11).

Despite the misnomer "trustee," an RMBS trustee "has very little in common with the ordinary trustee."  *AG Capital Funding Partners, L.P. v. State Street Bank & Tr. Co.*, 896 N.E.2d 61, 66 (N.Y. 2008).  An RMBS trustee's duties are "strictly defined and limited to the terms of" the governing agreements.  *Elliott Assocs. v. J. Henry Schroder Bank & Tr. Co.*, 838 F.2d 66, 71 (2d Cir. 1988).  Thus, an RMBS trustee is neither "subject to the ordinary trustee's duty of

---

[2] Delaware courts likely would construe the contracts as New York courts have, given that courts "strive to give indenture provisions a consistent and uniform meaning." *Concord Real Estate CDO 2006-1, Ltd. v. Bank of Am. N.A.*, 996 A.2d 324, 331 (Del. Ch. 2010). Thus, with respect to Plaintiffs' contract-based claims, U.S. Bank focuses on New York law. *See Tang Capital Partners, LP v. Norton*, 2012 WL 3072347, at *5 n.15 (Del. Ch. July 27, 2012) (interpreting indenture and stating that "[n]either party has cited and I am not aware of any case law indicating that the principles of contract interpretation under New York law, so far as relevant to this case, differ materially from those under Delaware law").

undivided loyalty," nor "has historic common-law duties imposed beyond those in the trust agreement." *Meckel v. Cont'l Res. Co.*, 758 F.2d 811, 816 (2d Cir. 1985).

### 1. The trustee's duties before an Event of Default.

The agreements provide that, before a contractually defined EOD, U.S. Bank's duties are "determined solely by the *express* provisions of th[e] Agreement," and include "only such duties as are *specifically* set forth in th[e] Agreement." *E.g.*, Ex. C § 9.01 (ARMT 2007-2) (emphases added). They also say that U.S. Bank's rights "shall not be construed" as duties, *id.*, and that "no implied covenants or obligations shall be read" into the agreements against U.S. Bank, *e.g.*, *id.* § 9.01(a). Thus, if the governing agreements do not expressly and specifically impose a duty on U.S. Bank, then U.S. Bank cannot have that duty.

The duties that U.S. Bank does have before an EOD include performing certain ministerial tasks—things like processing payments to investors. The trustee has no pre-EOD duty to investigate suspected breaches absent direction and indemnification from a specified percentage of investors. *E.g.*, Ex. C § 9.02(a)(v). If U.S. Bank "discover[s]" a material breach of a seller's or originator's mortgage-loan R&Ws, it may have additional, non-ministerial duties (including, for some trusts, to enforce repurchase obligations). *E.g.*, Ex. D § 2.05(a) (MSM 2006-15XS).

### 2. The trustee's duties concerning Events of Default.

As relevant here, EODs arise under the agreements when a servicer or master servicer (depending on the agreement) materially breaches its obligations, receives written notice from a specified party or the certificateholders, and fails to cure in a specified time. *E.g.*, Ex. C § 8.01(b); *see also* Am. Compl. ¶ 87. Even if an EOD occurs, U.S. Bank's post-EOD duties, if any, arise only when U.S. Bank or a U.S. Bank Responsible Officer has actual knowledge or written notice of the EOD (depending on the agreement), at which point U.S. Bank must act as a

prudent person, provide notice to investors, and, potentially, terminate the master servicer or servicer. *E.g.*, Ex. E § 6.14(a) (GPMF 2006-AR8). But absent actual knowledge or written notice, "the Trustee may conclusively assume there is no" EOD. *E.g.*, Ex. F § 9.01(d)(iv) (MLCC 2005-3); *Blackrock Core Bond Portfolio v. U.S. Bank Nat'l Ass'n*, 165 F. Supp. 3d 80, 86 (S.D.N.Y. 2016).

### C.  Investors' Rights Under The Agreements.

Recognizing these investments were intended to be investor-controlled, the PSAs grant investors like Plaintiffs numerous rights to protect their investments. For instance, for most trusts, if investors determine the servicer breached its duties in a specific, material way, they may provide written notice of the breach and demand that the servicer cure it. *E.g.*, Ex. C § 8.01(b). The servicer's failure to cure within a specified period can trigger an EOD, at which point those same investors may instruct the trustee or another party to terminate and replace the servicer. *See id.* § 8.01. Likewise, if investors become concerned that a trust may hold breaching loans, they have a remedy. If they provide adequate indemnification, they can instruct the trustee to investigate the matter and then, if justified, to file repurchase litigation on behalf of the trust. *E.g.*, Ex. C § 9.02(a)(iii), (v).

### D.  Plaintiffs, Plaintiffs' Allegations, And Prior Litigation.

Plaintiff NCUA is an independent federal agency that regulates credit unions. Am. Compl. ¶ 18. Various credit unions that had purchased RMBS certificates from 2005-2007 went into involuntary liquidation, with NCUA as their liquidating agent. *See id.* ¶¶ 3, 24. In that role, NCUA acquired the credit unions' rights in the RMBS certificates. *Id.* ¶ 25. NCUA held on to some of the credit unions' certificates. For other certificates, though, NCUA resecuritized them by establishing the NGN Trusts. *Id.* ¶ 27. To do so, NCUA transferred all of its interests in the certificates to the NGN Trusts. *Id.* The NGN Trusts then transferred all of their interests in the

certificates (including the right to bring claims on those certificates) to the NGN Trusts' indenture trustee, Bank of New York Mellon ("BNYM"). *Id.* ¶¶ 29-31. Thus, only BNYM as indenture trustee may assert claims on resecuritized certificates. *See id.* ¶¶ 31, 34; *Nat'l Credit Union Admin. Bd. v. U.S. Bank Nat'l Ass'n*, 898 F.3d 243, 245 (2d Cir. 2018). BNYM, however, declined to bring the claims, so in 2016 it appointed Graeme W. Bush as "Separate Trustee" for the NGN Trusts, transferring its right to bring the claims to Mr. Bush as Separate Trustee. *See* Am. Compl. ¶ 35. Together, in their roles as investors in the RMBS trusts, Plaintiffs NCUA and the Separate Trustee assert claims as to the 50 RMBS trusts at issue in this case.

Plaintiffs assert U.S. Bank breached its limited duties in various ways. Plaintiffs allege that U.S. Bank failed to (i) take possession of complete mortgage loan files, *see* Am. Compl. ¶¶ 68, 96, (ii) give notice of document-delivery failures and enforce sellers' repurchase obligations with respect to those failures, *id.* ¶¶ 72, 76, 84, 97-100, (iii) give notice of R&W breaches and enforce sellers' repurchase obligations with respect to R&W breaches, *id.* ¶ 76, 84, (iv) exercise the same skill and care as a prudent person in the same circumstances upon EODs, ¶¶ 93, 166, 176, and (v) avoid conflicts of interests, *id.* ¶¶ 95, 198-202. Based on these allegations, Plaintiffs assert causes of action for breach of contract (Count One), negligence and gross negligence (Count Two), and breach of fiduciary duty (Count Three). Separately, Plaintiffs assert causes of action for declaratory judgment (Count Four) and breach of contract (Count Five) concerning U.S. Bank's right to seek reimbursement or indemnification from the trust funds for its litigation expenses in lawsuits filed against the trustee by certificateholders. *See id.* ¶¶ 215-237.

This is not the first case in which Plaintiffs have brought these claims. Save for Plaintiffs' indemnification claims, Plaintiffs made virtually all of these allegations in a suit they filed against U.S. Bank in 2014. *See* Compl., *Nat'l Credit Union Admin. Bd. v. U.S. Bank Nat'l*

*Ass'n*, No. 14-cv-9928 (S.D.N.Y. Dec. 16, 2014) ("*NCUA I*").  Plaintiffs, however, ran into

multiple problems there.  The district court rejected the contract claims for lack of standing and

dismissed their breach-of-fiduciary duty claims as barred by the economic-loss doctrine.  *NCUA*

*I*, 2016 WL 796850, at *11 (S.D.N.Y. Feb. 25, 2016).  Plaintiffs then moved to substitute

Graeme W. Bush, as Separate Trustee, as a new plaintiff to assert the claims dismissed for lack

of standing.  The district court denied that motion.  Op. & Order at 6-7, *NCUA I* (S.D.N.Y. May

11, 2016), ECF No. 141.  Plaintiffs appealed to the Second Circuit, but lost there, too.  *Nat'l*

*Credit Union Admin. Bd. v. U.S. Bank Nat'l Ass'n*, 898 F.3d 243, 245 (2d Cir. 2018).

More than four years after they brought their first suit, and more than a decade after the

last of the trusts closed, Plaintiffs tried again, filing this suit in December 2018.  After U.S. Bank

moved to dismiss, *see* ECF No. 34, Plaintiffs amended their complaint, dropping ten trusts from

the case and adding another.  For the reasons discussed below, this most recent attempt at

pleading claims against U.S. Bank fares no better.

## ARGUMENT

## I.     PLAINTIFFS FAIL TO STATE A CLAIM FOR BREACH OF CONTRACT ON COUNT ONE.

Plaintiffs again try to plead three types of contract claims under Count One:  (i) post-

EOD claims; (ii) pre-EOD claims concerning alleged seller R&W breaches, and (iii) pre-EOD

claims based on allegedly incomplete mortgage files.  These claims fail on several grounds.

### A.     Plaintiffs Fail To Satisfy Several Threshold Requirements For Bringing Suit.

For many trusts, Plaintiffs must overcome two contractual bars to suit:  negating clauses

and no-action clauses.  Because Plaintiffs cannot do so, their claims must be dismissed before

even getting to the merits.

### 1. Negating clauses bar Plaintiffs' claims in 37 trusts.

In 37 of the 50 trusts, "negating clauses" expressly limit those who may enforce the PSAs. Ex. G (Chart 2). Typically, these clauses allow only parties to the agreement and, depending on the trust, "Holders of the Certificates" or "Certificateholders" to bring suit. *E.g.*, Ex. D § 11.11 ("Nothing in this Agreement or in the Certificates, express or implied, shall give to any Person, other than the parties to this Agreement and their successors hereunder and the Holders of the Certificates, any benefit or any legal or equitable right, power, remedy or claim under this Agreement.").

Plaintiffs are neither parties to the PSAs nor "Holders" of the "Certificates." Plaintiffs claim they are "third party beneficiaries" to the agreements. Am. Compl. ¶ 246. And although investors like Plaintiffs are often referred to as "certificateholders," they are not "Holders" of the "Certificates" as those terms are defined in the PSAs—Plaintiffs do not allege that they are the "registered owner[s] of any Certificate as recorded on the books of the Certificate Registrar." *See* Ex. D Art. I (Definitions). Thus, as multiple courts have held in identical circumstances, Plaintiffs lack standing to assert claims as to these trusts. *See Royal Park Invs. SA/NV v. HSBC Bank USA, Nat'l Ass'n*, 109 F. Supp. 3d 587, 606-07 (S.D.N.Y. 2015); *Commerzbank AG v. Deutsche Bank Nat'l Tr. Co.*, 234 F. Supp. 3d 462, 476 (S.D.N.Y. 2017); *Phoenix Light SF Ltd. v. Deutsche Bank Nat'l Tr. Co.*, 172 F. Supp. 3d 700, 711-12 (S.D.N.Y. 2016). Plaintiffs' claims for these 37 trusts must be dismissed.

### 2. No-action clauses bar Plaintiffs' claims as to five additional trusts.

Plaintiffs' claims for five additional trusts must be dismissed for failure to allege compliance with yet another contractual prerequisite, the PSAs' no-action clauses. No-action clauses exist "to protect the securitizations—and in turn other certificateholders—from the expense of litigating an action brought by a small group of certificateholders that most investors

10

would consider not to be in their collective economic interest." *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 184 (S.D.N.Y. 2011). They therefore require that Plaintiffs (who purport to sue as certificateholders), as a condition to pursuing legal action relating to the agreements, to provide written notice of an EOD or a default to a specified party, assemble support of a specified percentage of holders, demand that a specified deal party initiate the suit, and offer indemnification. *E.g.*, Ex. C § 12.07. Plaintiffs do not allege that they satisfied any of these conditions.

Instead, Plaintiffs once again insist that the no-action clauses do not apply because "[t]he PSAs expressly permit suits against the trustee," relying on the agreements' proviso that nothing "shall be construed to relieve the trustee" of liability for negligence. Am. Compl. ¶ 211. Plaintiffs are confused. No-action clauses do not "relieve the trustee" of liability. Nor do they preclude suits against the trustee. To the contrary, they assume that investors will "institute[] . . . suit[s]" and impose certain prerequisites for investor suits. That Plaintiffs failed to satisfy these conditions precedent and so are *themselves* barred from bringing claims does not somehow transform no-action clauses into impermissible liability-relieving provisions.

Nor can Plaintiffs rely on *Cruden v. Bank of New York*, 957 F.2d 961 (2d Cir. 1992) to excuse their non-compliance with the no-action clause. *Cruden* held that "it would be absurd to require the [investors] to ask the Trustee to sue itself." *Id.* at 968. But for five trusts, the trustee is not even a demand party—instead, the demand party is the securities administrator or trust administrator. Ex. H (Chart 3). And "there is nothing 'absurd' about asking [a] Trust Administrator to sue [the] Trustee." *Sterling Fed. Bank, F.S.B. v. Bank of N.Y. Mellon*, 2012 WL 3101699, at *2 (N.D. Ill. July 30, 2012). "Because the trust administrators and the securities administrators are not the Trustees, [Plaintiffs had] to make a demand on [those parties] to

initiate suit." *Commerzbank AG v. U.S. Bank Nat'l Ass'n*, 277 F. Supp. 3d 483, 496 (S.D.N.Y. 2017). Plaintiffs' failure to do so compels dismissal.

### B. Plaintiffs Fail To Plead A Post-EOD Claim.

Even setting aside the contractual bars set forth above, Plaintiffs' claims fail. The crux of Plaintiffs' suit is that U.S. Bank failed to fulfill its duty to act as a prudent person. As Plaintiffs recognize, however, that duty does not arise absent a contractually defined EOD. *See* Am. Compl. ¶ 87. Even then, the duty arises only when U.S. Bank or a U.S. Bank Responsible Officer receives written notice or has actual knowledge of an EOD. Plaintiffs do not plead either of these elements. For all 50 trusts, then, the post-EOD claims should be dismissed.

#### 1. Plaintiffs fail to plead an EOD based on servicer or master-servicer breaches.

Plaintiffs assert that EODs occurred based on servicer or master-servicer breaches, triggering U.S. Bank's post-EOD duties. *E.g.*, Am. Compl. ¶¶ 166-72. To plead that this EOD occurred, Plaintiffs must allege that (i) a servicer (for some trusts) or a master servicer (for other trusts) breached; (ii) that any of several designated deal parties, including certificateholders, gave the servicer or master servicer written notice of the breach; and (iii) that the servicer or master servicer failed to cure within a specified time. *E.g.*, Ex. C § 8.01(b). As the Second Circuit earlier this year confirmed, if Plaintiffs "fail[] to plead facts that plausibly suggest the occurrence of an [EOD]," they have no claim for breach of post-EOD "obligations under the PSA[s]." *Bakal v. U.S. Bank Nat'l Ass'n*, 747 F. App'x 32, 36 (2d Cir. 2019). That is the case here.

##### (a) Plaintiffs fail to plead the requisite written notice and cannot rely on the prevention doctrine.

Plaintiffs still do not plead that the servicer or master servicer received the requisite notice of any breach. That should be the end of the matter. For all 50 trusts, absent "notice . . .

12

given by any of [the designated] parties," the "alleged failures of the [servicer or master servicer] [do] not ripen into an [EOD]." *Bakal*, 747 F. App'x at 35.

Plaintiffs again try to evade this result by alleging that, even though a contractually defined EOD did not occur, it should be deemed to have occurred based on the "prevention doctrine." The prevention doctrine precludes a contracting party from relying on the non-performance of a condition precedent when that "non-performance has been caused by that party." *Blackrock Balanced Capital Portfolio (FI) v. U.S. Bank Nat'l Ass'n*, 86 N.Y.S.3d 484, 486 (1st Dep't 2018). Plaintiffs' theory is that U.S. Bank is one of the parties that could have given written notice to the servicer or master servicer, so it cannot now point to the absence of notice to argue that no EOD occurred. *See* Am. Compl. ¶¶ 175-76.

While the viability of Plaintiffs' prevention-doctrine theory might have been an open question five years ago when they first sued U.S. Bank, recent binding decisions have definitively resolved the issue: The prevention doctrine "is not applicable" here. *Blackrock*, 86 N.Y.S.3d at 486; *see also Fixed Income Shares: Series M v. Citibank, N.A.*, 69 N.Y.S.3d 288, 290 (1st Dep't 2018); *Bakal*, 747 F. App'x at 35 (affirming dismissal of post-EOD claims for lack of an EOD despite plaintiffs' heavy reliance on the prevention doctrine, Br. of Appellants, 2018 WL 3109456, at *34-35).

To invoke the prevention doctrine, Plaintiffs must allege that the trustee either (i) had a duty to give the servicer or master servicer notice of breach to trigger an EOD, or (ii) engaged in "active conduct" that "prevent[s]" another party from sending the required notice. *In re Bankers Tr. Co.*, 450 F.3d 121, 128 (2d Cir. 2006). Plaintiffs allege neither.

As for notice, for 40 of the trusts, *see* Ex. I (Chart 4), U.S. Bank had no duty to give notice of breaches to the servicer or master servicer. Plaintiffs assert that under "Section 7.01 of

13

the PSAs," which provides that an EOD may occur if a breach is not cured within a certain amount of time after written notice "shall have been given" by the trustee, the trustee "had an obligation" to provide such notice to the servicer. Am. Compl. ¶¶ 87, 175. But that argument is foreclosed—the First Department has twice rejected it. The "shall have been given" language of Section 7.01, the First Department has explained, does "not *require* U.S. Bank to send a notice to cure, but merely designate[s] it as one of the parties that is *permitted* to send such a notice." *Blackrock*, 86 N.Y.S.3d at 485; *see also Fixed Income*, 69 N.Y.S.3d at 290 ("[S]ection 7.01(ii) does not require defendant to give that notice to cure; it merely defines 'Event of Default.'"). And the agreements are clear that, when it comes to the trustee, "permitted" "shall not be construed" as "required." *E.g.*, Ex. C § 9.01.

That leaves "active conduct" preventing the servicer or master servicer from receiving notice. Plaintiffs, however, nowhere allege that U.S. Bank engaged in that kind of conduct. While Plaintiffs allege that U.S. Bank failed to give notice, it is settled that failing to give notice "is not 'active conduct' within the meaning of the prevention doctrine." *Blackrock*, 86 N.Y.S.3d at 486; *Fixed Income*, 69 N.Y.S.3d at 290. Thus, for these 40 trusts, the prevention doctrine does not excuse Plaintiffs from pleading all the elements of an EOD.

"In any event," even for the 10 trusts for which U.S. Bank could have a duty to give notice (and as to nearly all other trusts as well), "the Holders of Certificates entitled to at least 25% of the Voting Rights could have sent notice of the servicers' failure." *Fixed Income*, 69 N.Y.S.3d at 290; *e.g.*, Ex. J § 8.01(b) (BAFC 2005-H). Plaintiffs thus cannot allege that U.S. Bank *caused* the servicer or master servicer not to receive the requisite notice. *See Fixed Income*, 69 N.Y.S.3d at 290. Plaintiffs' failure to plead this causation element independently bars them from relying on the prevention doctrine.

14

Stripped of the prevention doctrine, Plaintiffs fail to allege a servicer or master-servicer EOD.

### (b) For at least 11 trusts, Plaintiffs do not plead the requisite breach.

Independently requiring dismissal of the post-EOD claims for at least 11 trusts, Plaintiffs fail to plead the predicate master-servicer breach. For these trusts, only a *master-servicer* EOD triggers the trustee's post-EOD duties. Ex. K (Chart 5). Yet nowhere do Plaintiffs identify master servicers' duties in the governing agreements or how master servicers allegedly breached these duties. Plaintiffs cannot simply repurpose their allegations of servicer breaches as master-servicer breaches by referring to "master servicers and/or servicers," or otherwise attempt to attribute servicer duties to master servicers. *See, e.g.*, Am. Compl. ¶¶ 55, 166. As the PSAs for these trusts make clear, the master servicers and servicers have different obligations. The servicers service and administer the mortgage loans. *E.g.*, Ex. J § 3.01. The master servicer in these trusts, by contrast, gives the trustee information on the underlying mortgages so that the trustee can report to certificateholders, *e.g.*, Ex. E § 4.03(a), "remit[s] amounts to the Securities Administrator" to distribute to holders, *e.g.*, Ex. J § 8.01(a), and supervises or monitors the servicers' performance, *e.g.*, *id.* §§ 3.01 & 3.02. Conspicuously missing still are any facts regarding master-servicer failures or how those failures led to servicer breaches. And having failed to allege the requisite breach for these 11 trusts, Plaintiffs also fail to allege an EOD.

### (c) Plaintiffs fail to allege other types of EODs.

Plaintiffs' first complaint in this case alleged only one type of EOD—a servicer or master-servicer breach EOD. Perhaps recognizing their pleading deficiencies, however, Plaintiffs now lob out the allegation that "additional Events of Default" occurred, "including, for example, events of default related to collateral performance and other downgrades." Am.

Compl. ¶ 173.  Beyond this one conclusory sentence, Plaintiffs say nothing.  They do not define

these purported EODs.  For example, Exhibit H, in which Plaintiffs set forth the relevant

provisions of the governing agreements, does not include provisions defining EODs "related to

collateral performance and other downgrades."  Nor do Plaintiffs allege any facts to explain how

these EODs allegedly occurred.  Plaintiffs therefore fail to plead any "additional Events of

Default."

### 2. Plaintiffs fail to plead that U.S. Bank or a Responsible Officer received written notice or had actual knowledge of a servicer- or master-servicer Event of Default.

Even if Plaintiffs had properly pleaded an EOD, their post-EOD claims still fail.  The

trustee does not have any post-EOD duties unless it received written notice or had actual

knowledge of the EOD (depending on the PSA).  *See* Ex. L (Chart 6); Ex. M (Chart 7).  Once

again, Plaintiffs come nowhere near pleading these prerequisites.

### (a) Plaintiffs fail to allege written notice of an EOD.

For five trusts, the agreements provide that "the Trustee shall not be deemed to have

actual knowledge of an Event of Default until a Responsible Officer of the Trustee shall have

received written notice thereof."  *E.g.*, Ex. N § 8.02(a)(viii) (MLMI 2007-HE3); Ex. L (Chart 6).

Thus, absent "written notice of an Event of Default, the Trustee lacks 'knowledge' and is not

[required to act as] a prudent person."  *Phoenix Light SF Ltd. v. Bank of N.Y. Mellon*, 2017 WL

3973951, at *16 (S.D.N.Y. Sept. 7, 2017).

Plaintiffs' allegations of written notice are inadequate.  The only written notice of

purported EODs to U.S. Bank that Plaintiffs identify—a July 21, 2011 letter from the

Association of Mortgage Investors, Am. Compl. ¶ 196—falls short for two reasons.  First, it does

not even purport to give notice of an EOD.  The July letter cites only "*potential* servicer Events

of Default."  Ex. O at 12 (July 21, 2011 Letter) (emphasis added).  As both First Department

precedent and common sense dictate, a notice of servicer breaches that could potentially turn into an EOD is not notice of an EOD; rather, it is a "notice of events that, with time, might ripen into Events of Default." *Commerce Bank v. Bank of N.Y. Mellon*, 35 N.Y.S.3d 63, 65 (1st Dep't 2016). Second, it does not relate to breaches in any trusts here. Instead, it cites only general "publicly available" information about purported servicer breaches. Plaintiffs' failure to allege written notice of an EOD independently defeats their post-EOD claims for these five trusts. *See id.*; *Phoenix Light v. BNYM*, 2017 WL 3973951, at *17 (trustee's "actual knowledge" for written-notice trusts "is irrelevant").

### (b) Plaintiffs fail to plead actual knowledge of an EOD.

For many of the same reasons, Plaintiffs fail to allege that a U.S. Bank Responsible Officer had actual knowledge of an EOD. *See, e.g.*, Ex. B § 8.02(vi); Ex. M (Chart 7).

First, Plaintiffs allege not *actual* knowledge of an *EOD*, but at most *constructive* knowledge of servicing issues that conceivably could *become* an EOD upon investigation, determination that a breach had in fact occurred, issuance of a breach notice to the servicer or master servicer, and failure to cure. Under *Commerce Bank*, knowledge of events that could potentially turn into an EOD is not actual knowledge of an EOD. 35 N.Y.S.3d at 65.

Second, even if knowledge of servicer breaches that could turn into an EOD were the relevant inquiry (which it is not), Plaintiffs have not alleged U.S. Bank's *actual knowledge* of those breaches. In this respect, Plaintiffs rely on the same kinds of insufficient allegations rejected in *Commerce Bank*. The First Department there affirmed the trial court's conclusion that allegations of "systematic improper servicing and administration conduct . . . described in multiple government actions" and other public information were inadequate to plead actual knowledge. 35 N.Y.S.3d at 65; *see Knights of Columbus v. Bank of N.Y. Mellon*, 2015 WL 4501196, at *4 & n.2 (Sup. Ct. N.Y. Cnty. July 10, 2015) ("general knowledge through news

17

media reports, investigations and lawsuits" insufficient).  Courts in this district likewise have concluded that evidence of "pervasive breaches" does not show "actual knowledge of any Event of Default." *Phoenix Light v. BNYM*, 2017 WL 3973951, at *18 n.32.  That is because an RMBS trustee "does not have a duty to 'nose to the source'. . . to discover if Events of Default . . . occurred." *Commerce Bank*, 35 N.Y.S.3d at 65.  Yet all Plaintiffs offer are "high profile government investigations and private and public lawsuits," "widespread attention in the media," and similarly generalized evidence of purported servicer breaches. *E.g.*, Am. Compl. ¶ 188.  As in *Commerce Bank*, these allegations fall short.

Because Plaintiffs do not allege a contractually defined EOD, along with written notice to U.S. Bank or U.S. Bank's actual knowledge of it, all EOD-related claims must be dismissed.

### C.    Plaintiffs Fail To Plead A Pre-EOD Claim.

Plaintiffs face an uphill climb to show that U.S. Bank breached the contracts pre-EOD.  Before an EOD, a trustee has only those duties specifically and expressly set forth in the governing agreements, *e.g.*, Ex. C § 9.01, so Plaintiffs must point to a specific trustee duty to take action to have any chance of prevailing on their pre-EOD claims.  Plaintiffs offer two types of purported duties:  (i) duties concerning alleged R&W breaches, and (ii) duties based on allegedly incomplete mortgage files.  Many of these claims, however, are time-barred under the six-year limitations period for contract claims.  *See* CPLR § 213(2); 12 U.S.C. § 1787(b)(14).  Separately, many of Plaintiffs' claims fail because they rely on duties U.S. Bank did not have.

### 1.     Plaintiffs' pre-EOD claims are untimely.

Plaintiffs filed this case in December 2018, eleven years after the last of the trusts closed. Many of their pre-EOD claims—all except NCUA's claims as to 11 trusts[3]—are time-barred on the face of Plaintiffs' pleading.[4]

*Document-defect claims.*  Plaintiffs contend that U.S. Bank breached notice and enforcement duties relating to missing or defective loan documents.  *E.g.*, Am. Compl. ¶¶ 72, 76. These duties would have arisen and allegedly been breached, if at all, around the time the trusts closed—June 2007 for the last of these trusts.  Ex. P (Chart 8).  For example, U.S. Bank's alleged duty to "ensure that the trust received a complete, non-defective set of mortgage loan documents," Am. Compl. ¶ 102, and to give notice of any missing or defective documents, *id.* ¶ 97, arose when the trustee discovered the documentation problems.  *E.g.*, *id.* ¶ 104.  And the only time that could have happened was either during its review of the mortgage files (if it performed that task) or, at the latest, on delivery of the final certification, both of which generally occurred no later than a year after the trusts' closing.  *E.g.*, Ex. Q § 2.02 (MABS 2006-HE4) (final certification due "[p]rior to the first anniversary date of this Agreement"); Ex. B § 2.07 (trustee reviews mortgage files "within 45 days after the Closing Date").  Any duty to enforce repurchase rights for loans with missing or defective documents, *see, e.g.*, Am. Compl.

---

[3] The 11 trusts are: WAMU 2006-AR7, WAMU 2006-AR9, WAMU 2006-AR11, WAMU 2006-AR12, WAMU 2006-AR13, WAMU 2006-AR14, WAMU 2006-AR15, WAMU 2006-AR17, WAMU 2006-AR19, WMALT 2007-OA4, WMALT 2007-OA5.  While U.S. Bank does not now move to dismiss NCUA's claims as to these 11 trusts as time-barred, U.S. Bank reserves its right to raise its statute-of-limitations defenses at later stages of the case.  In any event, claims as to these trusts are barred by the trusts' negating clauses, as discussed above.

[4] To the extent Plaintiffs rely on a tolling agreement in opposition, the result would not change.  U.S. Bank has considered the parties' obligations under any tolling agreement in its statute-of-limitations arguments here.

¶¶ 74, 104, 109, would have arisen around the same time.  It is clear on the face of the pleading, then, that the six-year limitations period expired long ago.  *See Royal Park v. HSBC*, 109 F. Supp. 3d at 607-08.

*R&W breach claims*.  Plaintiffs also assert that U.S. Bank failed to provide notice of seller R&W breaches and to enforce sellers' obligations to repurchase affected loans.  U.S. Bank had these duties, if at all, only upon "discovery" of loan-specific breaches.  *E.g.*, Ex. D § 2.05(a).  So if U.S. Bank "discovered" these breaches outside of the limitations period, Plaintiffs' claims would be untimely.  *See Fixed Income Shares: Series M v. Citibank N.A.*, 314 F. Supp. 3d 552, 558 (S.D.N.Y. 2018) (claims "time barred if [the trustee] acquired knowledge of the alleged breaches [earlier than] six years before" filing).

Once again Plaintiffs' own allegations sink their claims.  Under Plaintiffs' theory, U.S. Bank discovered R&W breaches by January 2009.  In a thinly veiled attempt to avoid their own theory, Plaintiffs have deleted statements like "[b]y 2009 at the latest" and "by at least 2009" from their amended pleading.  But the rest of their allegations regarding U.S. Bank's alleged discovery remain the same.  Plaintiffs still allege, for example, that "[b]y January 2009, Defendants . . . witnessed a significant rise in reported defaults and delinquencies in the loan pools backing the trusts," which "put Defendants on notice that the loans sold into the trusts did not comply with the warrantors' representations and warranties and Defendants should have taken action to address any issues."  Am. Compl. ¶¶ 133-34; *see also id.* ¶ 138 ("By January 2009, the trusts' extraordinary losses should have raised a red flag to the trustees that the mortgage loans sold to the trusts did not comply with the warrantors' [R&Ws].").  Plaintiffs likewise still rely on reports, lawsuits, and publications from 2008 as the basis for U.S. Bank's

alleged discovery of R&W breaches and duty to act.  *E.g.*, *id.* ¶¶ 111, 114-15; *see id.* ¶ 130; *id.* Ex. I.

What is more, Plaintiffs now allege that U.S. Bank discovered breaches beginning well before 2009—indeed, soon after the trusts closed.  Am. Compl. ¶ 129 (alleging that information regarding "the shoddy practices" of originators and sponsors of the trusts "were available to Defendants dating from nearly the close of the trusts"); *id.* ¶ 112 ("Defendants discovered representation and warranty breaches and other issues with the at-issue trusts while preparing the [monthly] remittance reports yet failed to take action to enforce repurchases.").  Thus, it remains the case that, by Plaintiffs' own account, any duties with respect to R&W breaches arose by January 2009.  That means the limitations period expired on these claims by January 2015 at the latest.  *See* CPLR § 213(2).  Plaintiffs' action thus comes too late.

The result remains the same under the so-called "extender statute," applicable to claims brought by NCUA in its capacity as a conservator or liquidating agent.  *See* 12 U.S.C. § 1787.  That statute provides that contract claims are subject to a limitations period "the longer of" either "the 6-year period beginning on the date the claim accrues," or "the period applicable under State law."  *Id.* § 1787(b)(14)(A)(i).  The alternative limitations period (six years) is thus no longer than under New York law (six years).  Nor does the statute's alternative accrual rule help Plaintiffs.  Under the statute, claims accrue on the "later of" the "date of the appointment of the Board as conservator or liquidating agent" or the "date on which the cause of action accrues."  *Id.* § 1787(b)(14)(B).  The latest that NCUA was appointed as conservator was October 31, 2010.  Am. Compl. ¶ 24.  That is still outside the limitations period.  Thus, NCUA's claims would still be time-barred.

## 2. For many trusts, Plaintiffs fail to state a pre-EOD claim because their claims are based on duties U.S. Bank did not have.

Even if Plaintiffs' claims were timely, many of the pre-EOD claims must still be dismissed. They are based on duties that the agreements do not "specifically" and "express[ly]" assign to U.S. Bank. For some, the duty is expressly assigned to a party other than the trustee. For others, the agreements are silent as to which party has the duty. Either way, having not been specifically and expressly assigned these duties, U.S. Bank could not have breached them. *E.g.*, Ex. C § 9.01.

### (a) Plaintiffs fail to state a pre-EOD claim relating to R&W breaches.

Plaintiffs focus on two alleged duties: a duty to provide notice to other deal parties of R&W breaches and a duty to enforce sellers' obligations to repurchase the affected loans. For many trusts, U.S. Bank has neither duty. Start with the notice duty. For MABS 2006-HE4, the PSA imposes a notice duty, but that duty arises only if the trustee itself receives notice of the breach from one of several specified parties. *See* Ex. Q § 2.03(a). For seven more trusts, the same is true with respect to the trustee's duty to give notice of seller (though not originator) breaches. Ex. R (Chart 9). Plaintiffs nowhere allege the trustee received that notice, so for these eight trusts the trustee's duty never arose.

As for the duty to enforce sellers' obligations to repurchase affected loans, *e.g.*, Am. Compl. ¶¶ 76, 84, Plaintiffs' claim fails for 33 trusts for which the agreements impose no such duty on the trustee. For 23 of those 33 trusts, the agreements expressly assign the enforcement duty a party other than the trustee. Ex. S (Chart 10). For seven more, the agreements do not specify which party has the enforcement duty, Ex. T (Chart 11), and they are clear that the trustee undertakes only duties expressly and specifically assigned to it, *e.g.*, Ex. C § 9.01. And

for three others, Plaintiffs' claims fail because U.S. Bank's enforcement duty arises only upon receipt of written notice of a failure to cure, which Plaintiffs do not allege. Ex. U (Chart 12).

       **(b)**       **Plaintiffs fail to state a pre-EOD claim relating to the mortgage files.**

Plaintiffs' claims relating to the mortgage files are likewise based on duties U.S. Bank did not have for many trusts. Plaintiffs allege U.S. Bank breached a duty to enforce repurchase rights for loans with defective documentation. Am. Compl. ¶¶ 72, 76, 97-100. But U.S. Bank had no such duty for 33 trusts, because the agreements assign that duty to a different party, Ex. V (Chart 13), or do not specify the party with the duty, Ex. W (Chart 14). Plaintiffs' claim likewise fails as to three more trusts for which the trustee's enforcement duty arises only upon receipt of notice of a failure to cure, Ex. X (Chart 15)—a notice Plaintiffs once again do not allege.

The result is the same as to Plaintiffs' claims based on other purported mortgage-file duties. Plaintiffs allege U.S. Bank was required to "take physical possession" of the mortgage file. Am. Compl. ¶ 65. But U.S. Bank "never bore that responsibility"—"the PSA[s] do not obligate U.S. Bank to take possession of the operative documents." *Bakal*, 747 F. App'x at 36. The depositor has a duty to deliver the mortgage files, Am. Compl. ¶ 64, and the trustee simply "acknowledges receipt" and declares that it will hold the mortgage files delivered to it, *e.g.*, *id.* ¶ 60. Those provisions do not impose a trustee duty to ensure delivery of complete mortgage files. *See, e.g.*, *Phoenix Light SF Ltd. v. Bank of N.Y. Mellon*, 2015 WL 5710645, at *5 (S.D.N.Y. Sept. 29, 2015). As for the alleged duty to review mortgage files and prepare exception reports, Am. Compl. ¶ 67, for at least seven trusts, Plaintiffs acknowledge that the PSAs assigned those responsibilities to a custodian, not the trustee. *Id.* ¶¶ 65, 67; Ex. Y (Chart 16). To the extent Plaintiffs attempt to impose a duty based on an alleged duty to "properly oversee" the custodian and "ensur[e] all parties to the governing agreements (including the

custodial agreement) comply with their respective obligations," Am. Compl. ¶¶ 68, 70, they fare no better. Plaintiffs identify no contractual provision imposing those duties. In fact, the contracts say the opposite: They expressly state that the trustee "shall have no responsibility for any act or omission of . . . a Custodian, it being understood and agreed that the Trustee . . . and any Custodian are independent contractors and not agents, partners, or joint venturers." *E.g.*, Ex. C § 9.01(e). "[B]ecause the relevant contractual language states that these obligations belong to the Custodian, and not [U.S. Bank]," Plaintiffs' claims fail as to these seven trusts. *Royal Park v. HSBC*, 109 F. Supp. 3d at 608; *see Bakal*, 747 F. App'x at 36 (no trustee duty to "review the documents for defects" where, under the PSA, "defects in [the] documents [were] identified *by the Custodian*").

Separately, all of Plaintiffs' mortgage-file claims fail as to the 30 trusts for which Plaintiffs allege U.S. Bank became trustee in 2009 or 2010. Ex. Z (Chart 17); Am. Compl. ¶ 2 n.1. These claims are based on duties that terminated, if they arose at all, shortly after the trusts' closing—in 2007 at the latest. For example, any trustee duty to "take physical possession of mortgage files," to review each of the mortgage files, or to "create an exception report identifying those mortgage loans for which the mortgage files were incomplete," Am. Compl. ¶¶ 96-98, arose at the same time as, or a certain number of days after, the trusts' closing. *E.g.*, Ex. B § 2.07 (trustee or custodian agrees to review each Mortgage File and deliver a certification "within 45 days after the Closing Date"). According to Plaintiffs, U.S. Bank was not trustee when these duties arose, *see* Am. Compl. ¶ 2 n.1, and so U.S. Bank could not have breached any mortgage-file duties for these 30 trusts, *see Policemen's Annuity & Ben. Fund of Chi. v. Bank of Am., N.A.*, 2013 WL 5328181, at *3 (S.D.N.Y. Sept. 23, 2013).

**(c)    Plaintiffs' other claims are impermissibly conclusory.**

Plaintiffs include a throwaway allegation that U.S. Bank breached by "failing to properly monitor the servicers and master servicers." Am. Compl. ¶ 90. Plaintiffs, however, make no attempt to locate that duty in the contracts. Nor do they explain how U.S. Bank allegedly breached that duty. In any event, U.S. Bank generally did not have a duty to monitor or oversee servicers or master servicers. *See, e.g.*, Ex. C §§ 3.01, 3.03 (master servicer "shall oversee and enforce" the servicers' obligations); Ex. E § 6.01(c)(iii) (trustee "shall not be responsible for the acts or omissions of any Servicer . . . or the Master Servicer"). To the extent Plaintiffs intend to assert claims based on these allegations, they must be dismissed—"naked assertion[s]" and "conclusory statements" are insufficient. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## II.    PLAINTIFFS' TORT CLAIMS MUST BE DISMISSED.

Plaintiffs' tort claims—for negligence and gross negligence (Count Two) and breach of fiduciary duty (Count Three)—turn out no better. They are duplicative of the contract claims and the economic-loss doctrine bars them because, as the court held in *NCUA I*, the alleged injury and harm sound in the defendant's failure to take contractual actions. The court's holding in *NCUA I* is not just persuasive and correct authority—it bars Plaintiffs' tort claims as a matter of collateral estoppel. Even if Plaintiffs could overcome these obstacles, the statute of limitations independently bars any tort claims.

### A.    Plaintiffs' Tort Claims Are Duplicative Of Their Contract Claims And Barred By The Economic-Loss Doctrine.

Plaintiffs' negligence, gross negligence, and breach-of-fiduciary-duty claims must be dismissed as duplicative and barred by the economic-loss doctrine. "[W]here [the] plaintiff is essentially seeking enforcement of the bargain, the action should proceed under a contract theory." *Dormitory Auth. v. Samson Constr. Co.*, 94 N.E.3d 456, 461 (N.Y. 2018). The plaintiff

"may not sue in tort notwithstanding the use of familiar tort language in its pleadings." *17 Vista Fee Assocs. v. Teachers Ins. & Annuity Ass'n of Am.*, 693 N.Y.S.2d 554, 559 (1st Dep't 1999). This is true even where the plaintiff alleges a claim that "arise[s] from common law duties and not from the contractual agreements." *Blackrock Core Bond Portfolio v. U.S. Bank Nat'l Ass'n*, 165 F. Supp. 3d 80, 106 (S.D.N.Y. 2016). "To determine whether a tort claim lies," courts ask whether "the nature of the injury, how the injury occurred and the harm it caused" is the same as the contract claims. *Dormitory Auth.*, 94 N.E.3d at 460-61; *see also Blackrock*, 165 F. Supp. 3d at 106 ("'[T]he injury' and 'the manner in which the injury occurred and the damages sought persuade us that plaintiffs' remedy lies in the enforcement of contract obligations.'"). If the answer is yes, Plaintiffs' tort claims are barred.

The answer here is clearly yes, as the court already held in *NCUA I*. Addressing the same fiduciary-duty claims as to the same trusts, Judge Forrest held that the economic-loss doctrine barred Plaintiffs' claims because "'the injury' and 'the manner in which the injury occurred and the damages sought [showed] that plaintiff's remedy lies in the enforcement of contract obligations.'" 2016 WL 796850, at *11. The injuries alleged to have arisen from U.S. Bank's purportedly tortious conduct there, as here, was "defendants' failure to take contractual actions." *Id.* Thus, it does not matter that "the cause of action for breach of fiduciary duty may arise from common law duties and not from the PSA"; Plaintiffs' tort claims nevertheless must be dismissed. *Id.*; *see also Blackrock*, 86 N.Y.S.3d at 486 (affirming dismissal of tort claims virtually indistinguishable from those here); *Bakal*, 747 F. App'x at 37 (same).

Two years after Judge Forrest's ruling in *NCUA I*, the New York Court of Appeals confirmed these principles in *Dormitory Authority*. There, the complaint's negligence allegations were "merely a restatement, albeit in slightly different language" of the "contractual

26

obligations asserted in the cause of action for breach of contract." 94 N.E.3d at 461. Although "the negligence claim [was] framed in terms of [the] failure to comply with professional standards of care" rather than breach of contract, the complaint "fail[ed] to include a single allegation that contain[ed] any distinction between the damages applicable to either claim." *Id.* Nor was there any "injury alleged . . . that a separate negligence claim would include that is not already encompassed in [the] contract claim." *Id.* at 462. The tort claim was therefore barred.

The same is true here. Though Plaintiffs frame the tort claims in terms of a duty of due care and loyalty, their own complaint alleges that these duties are subsumed within the contracts. Their tort claims are based on breaches of duties to "provid[e] notice to certificateholders," Am. Compl. ¶ 258, to "exercise all powers under the PSAs prudently once an Event of Default occurred," *id.* ¶ 264, to act with "due care" and "without negligence," *id.* ¶¶ 256, 264, and to "avoid conflicts of interest," *id.* ¶ 257. Those are the same duties (allegedly) imposed by the contracts. *Id.* ¶¶ 93, 176-77.

Not only that, "the nature of the injury, how the injury occurred and the harm it caused" are the same. *Dormitory Auth.*, 94 N.E.3d at 460-61. Plaintiffs allege that as a result of U.S. Bank's purported negligence and conflicts of interest, U.S. Bank failed to address mortgage file deficiencies and R&W breaches, *e.g.*, Am. Compl. ¶ 236, which Plaintiffs say "caused losses in the value of Plaintiffs' certificates" and "impaired Plaintiffs' ability to fully collect the principal and interest due on their certificates," *id.* ¶¶ 259, 266. That is no different from the manner in which Plaintiffs say they were injured by U.S. Bank's contractual breaches, which purportedly caused the exact same damages. *See, e.g.*, *id.* ¶ 236 (alleging that the PSAs required U.S. Bank to address document deficiencies and breaches of representations and warranties); *id.* ¶ 249

(alleging that U.S. Bank's contractual breaches "caused Plaintiffs' losses on their certificates and diminished their value").

### B. Plaintiffs' Tort Claims Are Precluded By *NCUA I*.

*NCUA I*'s holding that the economic-loss doctrine bars Plaintiffs' tort claims is not just persuasive and correct—it is binding. Having already litigated and lost in *NCUA I*, under the doctrine of issue preclusion, Plaintiffs cannot re-litigate the applicability of the economic-loss doctrine to them here.

Issue preclusion, or collateral estoppel, "bars successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, even if the issue recurs in the context of a different claim." *Marcel Fashions Grp., Inc. v. Lucky Brand Dungarees, Inc.*, 779 F.3d 102, 108 (2d Cir. 2015). U.S. Bank argued, and the court in *NCUA I* determined, that Plaintiffs' tort allegations were "barred by the economic loss doctrine." 2016 WL 796850, at *11. That determination, moreover, was "essential": It was the only grounds on which the court dismissed the claims at issue. *See, e.g.*, *DDR Constr. Servs., Inc. v. Siemens Indus., Inc.*, 770 F. Supp. 2d 627, 649 (S.D.N.Y. 2011) (issue "necessary" where "its disposition was the basis for the holding with respect to the issue and not mere dictum"). As "losing litigant[s]," Plaintiffs "deserve[] no rematch after a defeat fairly suffered." *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 135 S. Ct. 1293, 1303 (2015). All of Plaintiffs' tort claims therefore must be dismissed.

### C. Plaintiffs' Tort Claims Are Time-Barred.

Plaintiffs' tort claims fail for still another reason—they are time-barred. New York imposes a three-year statute of limitations on negligence and fiduciary-duty claims. *See Fisher v. JPMorgan Chase Bank, N.A.*, 740 F. App'x 745, 746 (2d Cir. 2018) (summary order) (negligence); *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 907 N.E.2d 268, 272 (N.Y.

2009) (fiduciary-duty claims seeking monetary damages). In New York, negligence and fiduciary-duty claims accrue when the plaintiff "first suffered loss" caused by the defendant's breach. *IDT Corp.*, 907 N.E.2d at 273.[5] "It is irrelevant when a person discovers either her injury or the tortfeasor's wrongful conduct." *Fisher*, 740 F. App'x at 746.

Here, Plaintiffs first suffered the alleged losses well before the limitations period expired. Indeed, all of the losses that they allegedly suffered occurred in 2011 or earlier. *See* Am. Compl. ¶¶ 137-43; *id.* Exs. J & K. Plaintiffs' tort claims are therefore untimely.

## III. THE COURT SHOULD STAY PLAINTIFFS' INDEMNIFICATION CLAIMS PENDING RESOLUTION OF THEIR PRINCIPAL, UNDERLYING CLAIMS.

Plaintiffs claim that U.S. Bank "breached [the PSAs] by drawing indemnification from the Trust Funds for cases brought by investors against U.S. Bank for breach of its trustee duties," and seek a declaration that U.S. Bank is "prohibited from using Trust Funds as indemnification for any purpose associated with this case." Am. Compl. ¶ 279; *id.* at p. 77. Because resolution of Plaintiffs' primary claims will resolve issues likely to be critical to Plaintiffs' indemnification claims, Plaintiffs' indemnification claims should be stayed.[6]

### A. Given The Possibility Of Duplicative Litigation And The Absence Of Any Prejudice To Plaintiffs, The Court Should Stay The Indemnification Claims.

"Courts in this district routinely issue stays when 'awaiting the outcome of proceedings which bear upon the case, even if such proceedings are not necessarily controlling of the action

---

[5] As with Plaintiffs' contract claims, the alternative accrual date under the "extender statute" does not help Plaintiffs (even assuming it applies), because it is even earlier than under New York law, *see* 12 U.S.C. § 1787(b)(14)(B)—the latest that NCUA was appointed as conservator was on September 24, 2010, Am. Compl. ¶ 24. That is well outside the three-year limitations period.

[6] Alternatively, the Court should dismiss the indemnification claims without prejudice pending resolution of the underlying claims.

to be stayed.'" *Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Tr. Co.*, 2018 WL 3849840, at *2 (S.D.N.Y. Aug. 10, 2018). That description fits this case to a T.

Under the agreements, U.S. Bank "shall be indemnified by the Trust Fund and held harmless against any loss, liability or expense . . . incurred by the Trustee" "arising out of or in connection with the acceptance or administration of the obligations and duties of the Trustee" but not for "any loss, liability or expense incurred by reason of willful misfeasance, bad faith or negligence of the Trustee . . . in the performance of its duties hereunder." Am. Compl. ¶ 224. Whether U.S. Bank has a right to indemnification is therefore likely to turn on whether U.S. Bank engaged in negligence or other misconduct. That same question, however, as Plaintiffs themselves acknowledge, will "necessarily" be resolved in adjudicating Plaintiffs' underlying contract and tort claims. *Id.* at p. 70. Given even the "possibility" of "overlapping or duplicative litigation," a stay would "avoid[] the risks and inefficiencies associated with determining indemnification issues during ongoing litigation as opposed to at its conclusion." *Royal Park Invs. SA/NV v. U.S. Bank Nat'l Ass'n*, 356 F. Supp. 3d 287, 299 (S.D.N.Y. 2018).

A stay is particularly appropriate given "the negligible prejudice [Plaintiffs] would suffer from any delay." *Royal Park v. Deutsche Bank*, 2018 WL 3849840, at *3; *see also id.* at *2 (noting "prejudice to the plaintiffs" resulting from the delay is a factor courts weigh in deciding whether to stay a claim). No one would seriously argue, for example, that U.S. Bank might lack the financial resources to reimburse the withdrawn indemnity if the Court ultimately adopts Plaintiffs' view. *See id.* at *2 ("[E]ven assuming *arguendo* that the Court were to conclude that this billing were impermissible . . . Royal Park does not allege that Deutsche Bank would be unable to repay the Covered Trusts if the Court ordered such repayment."); *Royal Park v. U.S. Bank*, 356 F. Supp. 3d at 299 ("U.S. Bank is part of one of the largest banks in the United States,

and it maintains sufficient coffers to reimburse all legal expenses charged to the trusts if necessary"). Simply put, there is no urgency to deciding the indemnification question now.

For these reasons, every court that has addressed these indemnification claims—save one, which dismissed the claims, *see* So Ordered Tr. at 21, *PIMCO Absolute Return Strategy v. Wells Fargo Bank*, Index No. 654743/2017 (N.Y. Sup. Ct. Nov. 24, 2017), NYSCEF No. 65 ("*PIMCO* Tr.")—has stayed them pending adjudication of the underlying claims, *see Royal Park v. U.S. Bank*, 356 F. Supp. 3d at 299; *Royal Park v. Deutsche Bank*, 2018 WL 3849840, at *3; Order & Op. at 2, *Royal Park Invs. SA/NV v. HSBC Bank USA, Nat'l Ass'n*, No. 17-cv-7684 (S.D.N.Y. Aug. 2, 2018), ECF No. 64. This Court should do the same.

**B.**   ***Hooper* Does Not Avoid The Need To Decide Whether The Trustee Engaged In Negligence Or Other Misconduct To Resolve The Indemnification Claims.**

Against all this, Plaintiffs likely will invoke *Hooper Associates, Ltd. v. AGS Computers, Inc.*, 548 N.E.2d 903 (N.Y. 1989), *see* Am. Compl. ¶¶ 222-33, to argue that the negligence carve-out is ultimately irrelevant to whether indemnification is permitted, and so a stay is unwarranted. Plaintiffs are incorrect.

*Hooper* seeks to ensure that, when parties to a contract agree to indemnify each other for legal expenses, they are clear as to whether that indemnity applies when they sue each other. It thus requires that "a promise by one party to a contract to indemnify the other for attorney's fees incurred in litigation between them"—*i.e.*, "first-party" indemnification—be "unmistakably clear" or "clearly implied from the language and purpose of the entire agreement and the surrounding facts and circumstances." 548 N.E.2d at 905. Plaintiffs claim that, as to their suit against U.S. Bank here, trust-fund indemnification involves first-party indemnity, triggering *Hooper*'s "unmistakably clear" standard. According to Plaintiffs, the indemnity provision does

not meet this standard, indemnification is thus unavailable, and so whether U.S. Bank was

negligent so as to trigger the carve-out does not matter.  *See* Am. Compl. ¶ 228.[7]

But that same argument did not prevent stays in the other trustee-indemnification cases,

and for good reasons:  *Hooper* does not apply and, even if it did, it is satisfied, because

indemnification for investor suits is "clearly implied from the language and purpose of the entire

agreement."  548 N.E.2d at 905.  Thus, to resolve U.S. Bank's right to indemnification, the Court

very likely would need to address whether or not U.S. Bank was negligent (or worse), making a

stay appropriate.

### 1. *Hooper* does not apply.

The rule expressed in *Hooper* applies to disputes between the indemnification parties.

*Id.*; *see Homeward Residential, Inc. v. Sand Canyon Corp.*, 298 F.R.D. 116, 133 (S.D.N.Y.

2014) (*Hooper* applies to "claims between parties to the indemnity").  This is not such a dispute.

The indemnification parties are the "Trust Fund" and the trustee.  Am. Compl. ¶ 224.  The

dispute, by contrast, is between Plaintiffs as investors and the trustee.  Plaintiffs are not even

parties to the agreements that provide for the indemnity (the PSAs), as Plaintiffs admit.  *See id.*

¶ 246; *see also Homeward Residential*, 298 F.R.D. at 133 (explaining that "[a]n action where the

certificate holders sue the Trustee for failing to enforce the repurchase remedy" is a "third party"

action for purposes of *Hooper*).  *Hooper* thus does not apply.

---

[7] Plaintiffs insist, without legal support, that U.S. Bank must "prove[] that *Hooper* does not apply."  Am. Compl. ¶ 237.  But Plaintiffs have it backwards—whatever the parties' burdens at this stage, *Plaintiffs* have the burden of proving their breach-of-contract claims.  *See Wilder v. World of Boxing LLC*, 310 F. Supp. 3d 426, 451-52 (S.D.N.Y. 2018) ("[A]s the party claiming that the Wilder Parties breached the Escrow Agreement, WOB has the burden of proving its claim.").  *Hooper* is critical to Plaintiffs' position that the agreements do not permit indemnification for suits like this, and so the burden of proving it applies remains with Plaintiffs.

Plaintiffs try to avoid this fact by casting the Trust Fund as "the functional equivalent of a bank account" for investors, making Plaintiffs the "true indemnitors." Am. Compl. ¶ 225 & n.8. But the Trust Fund is nowhere near the functional equivalent of Plaintiffs' bank account—it is not, contrary to what Plaintiffs think, the "certificateholders' Trust Fund[]." *Id.* ¶ 232; *see also id.* at 64, 66. Plaintiffs do not own the Fund, or even a fractional share of it. They are simply entitled to certain principal and interest payments from that Fund, and only after the Trustee has first withdrawn certain expenses (like the Trustee's legal expenses) and only after the Trustee runs the remaining funds through a complex waterfall payment system. *See* Am. Compl. Ex. G Definitions ("Available Funds" to distribute to certificateholders is calculated after the subtraction of "any indemnification and reimbursement amounts owed to the Trust Administrator, the Trustee or the Custodian payable from the Distribution Account pursuant to Section 8.05"). Thus, while withdrawals from the Trust Fund may have some effect on some investors' distributions,[8] that does not transform investors into indemnitors. In sum, this case is not a dispute between indemnification parties. *Hooper* therefore "doesn't help" Plaintiffs here. *See PIMCO* Tr. at 14, 19 (explaining that investors "didn't execute the PSA" and so this was a "third-party action" for purposes of *Hooper*).

### 2. Even if *Hooper* applies, its requirements are satisfied.

Even assuming Plaintiffs are right that they are the "functional equivalent" of the Trust Fund, thus triggering *Hooper*'s rule for first-party indemnity, *Hooper* is satisfied here. Indemnification for investor suits is "clearly implied from the language and purpose of the entire agreement[s]." *Hooper*, 548 N.E.2d at 905. To start, the indemnification provision uses the

---

[8] For example, investors in so-called "zero balance" tranches, for which no further distributions are owed under the waterfall, would be unaffected by any indemnity payments.

broadest possible language, covering "any loss, liability, or expense . . . arising out of or in connection with" the administration of the trustee's duties.  Am. Compl. Ex. G § 8.05; *see In re New York City Asbestos Litig.*, 838 N.Y.S.2d 76, 79 (1st Dep't 2007) ("[B]road indemnification clauses purporting to apply to 'any and all liability' should be construed as meaning what they say."); *U.S. Fire Ins. Co. v. N.Y. Marine & Gen. Ins. Co.*, 706 N.Y.S.2d 377, 378 (1st Dep't 2000) ("[T]he words 'arising out of' . . . are deemed to be broad, general, comprehensive terms.").  And broad provisions like these encompass "intra-party disputes."  *Square Mile Structured Debt (One), LLC v. Swig*, 973 N.Y.S.2d 39, 40 (1st Dep't 2013).

What is more, the PSAs expressly contemplate coverage for certificateholder suits, extending indemnification to disputes arising from the trustee's performance of its "obligations and duties" under the agreements, Am. Compl. ¶ 224, duties Plaintiffs emphasize were "for the benefit of certificateholders," *id.* ¶ 60.  The carve-out reinforces this—a claim based on the trustee's negligence in performing its duties is "exactly the situation where the certificate holders would be suing."  *PIMCO* Tr. at 20.  Moreover, that the indemnification provision survives the termination of the trusteeship, Am. Compl. Ex. G § 8.05, is strong evidence that indemnification is not limited to situations where the trustee is "enforc[ing] . . . repurchase obligations" or taking other action "in the course of performing [its] trustee duties," as Plaintiffs claim.  Am. Compl. ¶¶ 229-30.  In light of these provisions, indemnification cannot "reasonably be interpreted as limited to third-party claims."  *Sagittarius Broad. Corp. v. Evergreen Media Corp.*, 663 N.Y.S.2d 160, 161 (1st Dep't 1997).  *Hooper* therefore provides Plaintiffs no traction.

Because resolving Plaintiffs' indemnification claim will require the court to evaluate whether the negligence carve-out precludes indemnification, the Court should stay the indemnification claim pending resolution of Plaintiffs' underlying claims.

## CONCLUSION

For the foregoing reasons, the Court should dismiss all of Plaintiffs' breach-of-contract claims (Count One) and tort claims (Counts Two and Three). The Court should stay Plaintiffs' indemnification claims (Counts Four and Five).

Dated:  May 3, 2019

Respectfully submitted,

/s/ David F. Adler

JONES DAY
David F. Adler (admitted *pro hac vice*)
Louis A. Chaiten (admitted *pro hac vice*)
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114-1190
(216) 586-3939; (216) 579-0212 (fax)
dfadler@jonesday.com
lachaiten@jonesday.com

Michael T. Marcucci (admitted *pro hac vice*)
100 High Street, 21st Floor
Boston, Massachusetts  02110-1781
(617) 960-3939; (617) 449-6999 (fax)
mmarcucci@jonesday.com

Albert J. Rota
2727 N. Harwood Street, Suite 500
Dallas, TX 75201-1515
(214) 220-3939; (214) 969-5100 (Fax)
ajrota@jonesday.com

Samuel L. Walling
90 South Seventh Street, Suite 4950
Minneapolis, Minnesota  55402
(612) 217-8800; (844) 345-3178 (fax)
swalling@jonesday.com

Andrew S. Kleinfeld
250 Vesey Street
New York, New York  10281-1047
(212) 326-3939; (212) 755-7306 (fax)
askleinfeld@jonesday.com

*Attorneys for Defendant U.S. Bank National Association*

<u>**CERTIFICATE OF SERVICE**</u>

I, David F. Adler, certify that on May 3, 2019, I caused the foregoing Memorandum in Support of U.S. Bank National Association's Motion to Dismiss Plaintiffs' First Amended Complaint to be served on all counsel of record by electronic delivery via the ECF system.

<u>/s/ David F. Adler</u>
    David F. Adler