**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------x

NATIONAL CREDIT UNION ADMINISTRATION
BOARD, as Liquidating Agent of U.S. Central Federal
Credit Union, Western Corporate Federal Credit Union,
and Southwest Corporate Federal Credit Union,

                             Plaintiffs,

           -against-

U.S. BANK NATIONAL ASSOCIATION,

                           Defendant.

------------------------------------------------x

Case No. 18-cv-11366

Hon. Louis L. Stanton

ECF Case

**FIFTH AMENDED
COMPLAINT**

**DEMAND FOR JURY TRIAL**

# TABLE OF CONTENTS

I.     **NATURE OF THE ACTION** ................................................................. 1

II.    **PARTIES** ............................................................................................. 7

      A.     Plaintiff NCUA Board as Liquidating Agent ................................. 7

      B.     Defendant U.S. Bank ................................................................... 14

III.   **JURISDICTION AND VENUE** .................................................... 15

IV.   **THE TRUSTS** ................................................................................. 16

V.     **DUTIES OF THE TRUSTEE UNDER THE CONTRACTS** .................. 16

      A.     RMBS Trusts ............................................................................... 16

      B.     The Trustee's General Duties ..................................................... 20

      C.     The Trustee's Duties Under the Pooling
            and Servicing Agreements ........................................................ 20

      D.     Duty to Review the Mortgage Loans Conveyed to the Trust ............. 21

      E.     Duty to Provide Notice of Incomplete or Defective Mortgage
            Files and Enforce Repurchase Rights with Respect to Mortgage
            Files that Cannot be Cured ........................................................ 24

      F.     Duty to Provide Notice of Document Defects and Representation
            and Warranty Breaches and to Enforce Repurchase Rights with
            Respect to Defective and Breaching Loans ............................... 25

      G.     Duties Under the Loan Transfer Agreements ............................. 26

      H.     Duties Regarding the Servicers ................................................. 28

      I.     The Trustee's Duties Upon Knowledge of an Event of Default ......... 29

VI.   **DEFENDANT FAILED TO PROVIDE NOTICE OF AND ENFORCE
       REMEDIES RELATED TO MORTGAGE FILE DOCUMENT DEFECTS** .......... 30

      A.     Defendant Failed to Provide Notice and Enforce Remedies
            Related to Incomplete or Defective Mortgage Loan Files ................ 30

      B.     Defendant Discovered or Knew the Mortgage Loan Files Were
            Incomplete ................................................................................. 32

VII.   DEFENDANT DISCOVERED OR RECEIVED NOTICE OF
       REPRESENTATION AND WARRANTY BREACHES AND MORTGAGE
       FILE DEFECTS ON A LOAN-BY-LOAN AND TRUST-BY-TRUST BASIS.........35

       A.    Publicly Filed 15Ga-1 Reports Confirm That Defendant
             Received Notice or Discovered Individual Breaching Loans in
             at Least 10Trusts ..................................................................35

       B.    Defendant Discovered or Had Notice of Loan-by-Loan Document
             Defects and Representation and Warranty Breaches from Final
             Exception Reports .................................................................40

       C.    Defendant Publicly Disclosed Its Knowledge of Representation
             and Warranty Breaches ..........................................................44

       D.    Defendant Plausibly Learned Of Loan-By-Loan Representation
             and Warranty Breaches As A Result Of Certificateholder
             Lawsuits or Investigations .....................................................45

       E.    Defendant's Actions in the Bankruptcy of Originators and
             Sponsors Demonstrates a Trust-By-Trust and Loan-By-Loan
             Awareness of Breaches in the Trusts........................................48

       F.    Defendant Discovered Loan-By-Loan Breaches Through Its
             Involvement in Individual Borrower Litigation .................................49

       G.    Defendant Likely Discovered or Received Loan-By-Loan
             Breach Notices Through Its Involvement with Credit Risk
             Monitors .............................................................................50

VIII.  DEFENDANT HAD ACTUAL KNOWLEDGE OR RECEIVED NOTICE
       OF EVENTS OF DEFAULT.................................................................50

       A.    Plaintiffs Believe Certificateholders Provided Notice to Defendant
             of Events of Default ..............................................................51

       B.    Defendant Knew of Failures by Master Servicers and Servicers
             That Should Have Resulted in Events of Default .................................52

IX.    DEFENDANT DISCOVERED OR RECEIVED NOTICE THAT THE
       TRUSTS SUFFERED FROM WIDESPREAD BREACHES OF
       REPRESENTATIONS AND WARRANTIES AND SHOULD HAVE
       TAKEN APPROPRIATE ACTION...........................................................56

       A.    General Reports Concerning Originators' Systematic
             Abandonment of their Underwriting Standards and Sponsors'
             Disregard of Prudent Securitization Standards...................................57

B.      Specific Reports Concerning the Originators of Loans in the Trusts Abandoning their Underwriting Standards and the Sponsors Disregarding Prudent Securitization Practices.....................................63

C.      A High Number of Borrower Delinquencies and Defaults on Mortgages in the Trusts' Loan Pools and Enormous Trust Losses Are Further Evidence of the Originators' Systematic Disregard of Underwriting Standards ...................................................64

      1.      The Trusts Suffered from High Delinquency and Default Rates.......................................................................64

      2.      The Trusts Suffered Huge Losses .........................................65

D.      The Collapse of the Certificates' Credit Ratings Is Further Evidence of Systematic Disregard of Underwriting Guidelines .........................66

E.      Additional Evidence Shows That Defendant Knew of Systemic Problems That Necessarily Would Result in Breaching and Defective Loans in the Trusts ...........................................................67

      1.      In Its Capacity as RMBS Servicers for Other Trusts, Defendant Discovered Extensive Warrantor Breaches of Representations and Warranties..........................................67

      2.      Defendant Received Written Notice of Systematic, Widespread Breaches of Representations and Warranties from Monoline Insurers .....................................68

      3.      Global RMBS Repurchase Investigations and Settlements Alerted Defendant to Systematic, Widespread Breaches of Representations and Warranties ...............................................................................70

      4.      Defendant Has Been Involved in Repurchase Litigation Against Warrantors ...............................................................71

X.      **DEFENDANT FAILED TO ACT PRUDENTLY FOLLOWING EVENTS OF DEFAULT**...........................................................................72

A.      Defendant Breached the Governing Agreements By Failing to Fulfill Its Duties After Defaults and Events of Default.......................72

B.      Specific Servicer Misconduct ...............................................................75

C.      The Master Servicers and Servicers Defaulted on Their Duty to Notify the Trustee of Breaches of the Mortgage Loan Representations and Warranties .......................................................76

     D.      Defendant Knew that the Trusts Suffered from Widespread
              Master Servicer and/or Servicer Defaults ...........................................................77

**XI.**     **DEFENDANT HAD CONFLICTS OF INTEREST** ..................................................80

**XII.**    **THE "NO ACTION" CLAUSES DO NOT APPLY** ...................................................83

**XIII. DEFENDANT MAY NOT USE CERTIFICATEHOLDERS' TRUST
       FUNDS TO DEFEND AGAINST SUITS BY TRUST-BENEFICIARY
       INVESTORS** ...........................................................................................................85

     A.      The Parties Entered Binding Agreements Conveying Beneficial
              Ownership of the Trusts to Certificateholders.....................................................85

     B.      Defendant's Limited Rights to Indemnification from
              Certificateholders' Trust Funds Does Not Extend to Suits by
              Certificateholders...............................................................................................86

     C.      Defendant Is Not Entitled to Judgment-Shifting Indemnification .......................89

     D.      Claims in this Litigation, If Proven, Would Necessarily
              Establish Defendant's Negligence, and Defendant Therefore
              Cannot Meet Its Burden of Proving Entitlement to
              Indemnification...................................................................................................90

     E.      Any Indemnification From Trust Funds Would Be Limited to
              Reasonable Fees and Expenses ..........................................................................91

**XIV.** **CLAIMS FOR RELIEF**.............................................................................................91

     COUNT ONE-BREACH OF CONTRACT..................................................................91

     COUNT TWO-DECLARATORY JUDGMENT REGARDING
     RIGHT TO INDEMNIFICATION FROM THE TRUST FUNDS.................................93

     COUNT THREE-BREACH OF CONTRACT REGARDING
     UNLAWFUL WITHDRAWALS FROM TRUST FUNDS AND
     DISGORGEMENT ....................................................................................................94

     PRAYER FOR RELIEF .............................................................................................95

**XV.**    **JURY DEMAND**.......................................................................................................96

The National Credit Union Administration Board ("NCUA Board"), acting in its capacity as Liquidating Agent for each of U.S. Central Federal Credit Union ("U.S. Central"), Western Corporate Federal Credit Union ("WesCorp"), and Southwest Corporate Federal Credit Union ("Southwest") (collectively, the "CCUs" or "Plaintiffs") bring this Fifth Amended Complaint against Defendant U.S. Bank, N.A. ("U.S. Bank" or "Defendant" or "Trustee"), and allege as follows:

## I.  NATURE OF THE ACTION

1.      Plaintiffs bring this action against Defendant to recover the damages they have suffered because of Defendant's violations of its contractual obligations.

2.      This action arises out of Defendant's role as trustee for the 20 trusts identified on Exhibit A that issued residential mortgage-backed securities ("RMBS").[1] Each trust consists of hundreds of individual residential mortgage loans that were pooled together and securitized for sale to investors. Investors purchased certificates issued by the RMBS trust that entitled the investors (or "certificateholders") to fixed principal and interest payments from the income stream generated as borrowers made monthly payments on the mortgage loans in the trusts.

---

[1] Of the 20 trusts at issue here, U.S. Bank was the original trustee for 11 trusts, LaSalle Bank, N.A. ("LaSalle") was the original trustee for 7 trusts, and Wachovia Bank, N.A. ("Wachovia") was the original trustee for 2 trusts. U.S. Bank acquired Wachovia's corporate trust and institutional custody businesses on December 30, 2005 and was subsequently appointed as successor trustee to Wachovia on those 2 trusts. In or about October 2007, Bank of America, N.A. ("Bank of America") acquired LaSalle through its acquisition of ABN AMRO North America Holding Company, thus becoming the trustee of the 7 trusts for which LaSalle was originally the trustee. Between February and April 2009, Bank of America resigned as trustee for certain trusts in which the CCUs invested, and U.S. Bank was appointed as the successor trustee for those trusts. U.S. Bank acquired Bank of America's securities trust administration business on or about December 31, 2010, and became the trustee of the remaining trusts thereafter. The NCUA Board is not asserting claims against Bank of America. The NCUA Board also is not asserting claims against U.S. Bank for acts, omissions, or breaches of contractual or other duties by Bank of America or any affiliate or predecessor thereof during the period that any such entity acted as trustee of any of the trusts at issue in this case.

3. The CCUs purchased the certificates in the trusts identified on Exhibit A at an original face value of approximately $2 billion at or near the time of the original offering.

4. The value of the certificates was dependent on the quality and performance of the mortgage loans in the trusts and swift correction of any problems with the loans. But, because of the structure of the securitizations, certificateholders do not have access to the mortgage loan files or the power to remedy or replace any defective loans. Instead, certificateholders must rely on the trustee to protect their interests.

5. Defendant, as the trustee for the trusts, had contractual duties to address and correct problems with the mortgage loans and to protect the trusts' and the certificateholders' interests. *See infra* Part V. The trustee for each trust typically has three primary duties. First, the trustee (whether itself or through a custodian or other agent) must take possession and acknowledge receipt of the mortgage files, review the documents in the mortgage files, identify any mortgage files that lack a complete chain of title or that have missing documents, and then certify that the mortgage files are complete and accurate. If the trustee identifies defects in the mortgage files, it must notify the appropriate parties and take steps to enforce the warrantor's obligation to cure, substitute, or repurchase any mortgage loans with defective mortgage files.

6. Second, if the trustee discovers or receives notice of a breach of the representations and warranties ("R&Ws") concerning the mortgage loans, including but not limited to representations concerning the characteristics of the mortgage borrowers, the collateral for the mortgage loans, and assurances that the mortgage loans were originated in accordance with applicable underwriting criteria, the trustee must notify the appropriate parties and take steps to enforce the warrantor's obligation to cure, substitute, or repurchase the defective mortgage loans. If the trustee fails to exercise this duty, then the trusts and the certificateholders

will suffer losses that should instead be borne by the warrantor responsible for defective loans.

7.     Third, the trustee must act to protect the interests of the trust and the certificateholders when it becomes aware of events of default concerning the trust. Thus, when the trustee discovers a default, or is notified by other parties, such as servicers, of defaults, the trustee must act prudently to investigate those defaults, notify certificateholders of the defaults, and take appropriate action to address the defaults.

8.     Here, Defendant obtained discovery or notice that many of the mortgage files had material defects (*infra* Part VI and VII), discovery or notice that many of the loans had material R&W breaches (*infra* Part VII and IX), and knowledge of events of default (*infra* Part VIII and X), yet failed to provide notice and enforce warrantor repurchase duties for such loans and otherwise to act as a prudent person in the management of its own property following events of default.

9.     More specifically, publicly available information shows that Defendant discovered or had notice of representation and warranty breaches and mortgage file defects on a loan-by-loan basis for most of the trusts and potentially all of the trusts (*infra* Part VII). Yet Defendant failed to take steps to preserve its rights or hold the warrantors accountable for the repurchase or substitution of defective mortgage loans in direct contravention of its obligations as trustee. This evidence comes from publicly available information demonstrating Defendant's knowledge including: 1) 15Ga-1 reports; 2) individual trust exception reports; 3) public disclosures by Defendant; 4) disclosures in lawsuits brought by other plaintiffs; 5) Defendant's filings in bankruptcy estates; 6) Defendant's involvement in individual borrower litigation; and 7) Defendant's interactions with credit risk monitors.

10.     However, most information about Defendant's knowledge or notice of these

issues is not public, and discovery is necessary to reveal the full scope of what Defendant's knew about the problems with the trusts.

11.     Similarly, other publicly available evidence shows that Defendant had actual knowledge or written notice of events of default in many of the trusts (*infra* Part VIII). This evidence includes: 1) actual notices distributed by Defendant of events of default; 2) notices distributed by Defendant of unresolved material instances of noncompliance by servicers; and 3) the very high likelihood of written notice from certificateholders and servicers informing Defendant of events of default. Despite Defendant's knowledge of these ongoing defaults and events of default, Defendant failed to act prudently to protect the interests of the trusts and the certificateholders.

12.     However, as with the information about Defendant's knowledge of representation and warranty breaches and mortgage file defects, complete information about Defendant's knowledge or notice of these issues is not public, and discovery is necessary to reveal the full scope of what Defendant's knew about the problems with the trusts.

13.     If Defendant had fulfilled its obligations, a significant percentage of the mortgage loans in the trusts would have been repurchased, and subsequent losses on those loans averted.

14.     The likelihood of additional loan-by-loan breaches notices existing in Defendant's files is well supported at the pleading stage of this case by the overwhelming available evidence of systemic problems with the trusts, separately or together and including but not limited to: (1) reports concerning originators' systematic abandonment of their underwriting standards and reports concerning the warrantors' pervasive disregard of prudent securitization standards; (2) reports concerning the originators of loans in the trusts abandoning their underwriting standards and sponsors of the securitizations failing to follow prudent practices; (3) the high number of

borrower delinquencies and defaults on mortgages in the trusts' loan pools and enormous losses to the trusts; (4) the collapse of the certificates' credit ratings from high, investment-grade ratings when purchased to much lower ratings, including numerous "junk" ratings; and (5) the numerous lawsuits brought by and against Defendant and its affiliates alleging the systematic abandonment of originator underwriting guidelines. Yet Defendant failed to take steps to preserve its rights or hold the warrantors accountable for the repurchase or substitution of defective mortgage loans in direct contravention of its obligations as trustee. In essence, Defendant was willfully blind to the serious problems plaguing the trusts which Plaintiffs believe were so serious as to raise an inference of implied actual knowledge on behalf of Defendant of the breaching loans.

15.    Defendant also failed to address servicer and/or master servicer defaults and events of default (among other types of events of default). Defendant knew that the master servicers and servicers were ignoring many of their duties, including their duty to notify other parties, including Defendant as trustee, upon the master servicers' and servicers' discovery of breaches of the mortgage loan representations and warranties. Defendant also knew of serious failures by master servicers and servicers to properly service the underlying loans. Despite Defendant's knowledge of these ongoing defaults and events of default, Defendant failed to act prudently to protect the interests of the trusts and the certificateholders.

16.    Defendant's failures resulted in the trusts and certificateholders suffering losses rightfully borne by the warrantors and other parties. Had Defendant adequately performed its contractual and common law obligations, breaching loans would have been repurchased from the loan pools underlying the certificates. Defendant's improper conduct directly caused losses to certificateholders like the Plaintiffs.

17.     Defendant further acted under a significant conflict of interest and failed to act at least in part because protecting the best interests of the trusts and the certificateholders would have conflicted with Defendant's own interests. *See infra* Part XI. As a participant in many roles in the securitization process, the Defendant was economically intertwined with the parties it was supposed to police. Further, Defendant had incentives to ignore other parties' misconduct in order to avoid drawing attention to its own. By enforcing repurchase of defective loans as plaintiff trustee, Defendant would have compromised its own selfish interests as a defendant securities underwriter, warrantor, or originator, among other RMBS roles. But a trustee cannot prefer its own interests over those of the trust beneficiaries for whom it agreed by contract to serve as trustee.

18.     Defendant was required to exercise its rights and powers to protect the trusts. Once Defendant became aware of the various failures discussed in this complaint, Defendant was required to use the same degree of care and skill as a prudent person in the management of its own property. But Defendant did not do so. Instead of protecting the trusts and the certificateholders, Defendant sat by as the trusts wasted away. Defendant's failure to act was in bad faith.

19.     Defendant's failure to perform its duties has damaged Plaintiffs, which now bring this action against Defendant for breach of contract, acting and failing to act based on significant conflicts of interest, and negligently and with gross negligence breaching its duties to Plaintiffs as trustee for many thousands of securitized mortgage loans.

20.     In addition, Plaintiffs seek declaratory relief regarding Defendant's unlawful use of trust funds as indemnification in this case, an accounting of the legal fees and costs it has sought and/or received from the trusts in this case or any other brought by investors for breach of

its duties, and disgorgement of any such trust funds. Defendant is impermissibly shifting the cost of its defense to its litigation adversaries, including Plaintiffs, by using trust funds, which are beneficially owned by investor beneficiaries including Plaintiffs, to finance its defense in this litigation. Defendant has diverted trust funds and intends to continue diverting trust funds that otherwise should flow and belong to investors, who are the beneficial owners of trust assets. *See infra* Part XIII.

21. Accordingly, Plaintiffs seek: (a) declaratory relief, to prevent Defendant from further looting the trusts in this case to fund its defense in this or any other investor action, (b) declaratory relief, to clarify that Defendant is not entitled to draw any judgment obtained in this or any other investor action from Plaintiffs' trust funds, and (c) disgorgement, to return trust funds Defendant has already seized to pay for this or any other investor action alleging trustee misconduct, so that those funds can flow properly, though the waterfall payment structures as set out in the governing trust agreements, to beneficiaries including Plaintiffs. Plaintiffs thus seek to ensure that throughout this litigation, they are not bearing the financial burden (through reduced bond payments and diminished value of their certificates) of their adversary's defense, which is an ongoing harm to Plaintiffs that should be stopped.

## II. PARTIES

### A. Plaintiff NCUA Board as Liquidating Agent

22. The National Credit Union Administration ("NCUA") is an independent agency of the Executive Branch of the United States Government that, among other things, charters and regulates federal credit unions, and operates and manages the National Credit Union Share Insurance Fund ("NCUSIF") and the Temporary Corporate Credit Union Stabilization Fund ("TCCUSF"). The TCCUSF was created in 2009 to allow the NCUA to borrow funds from the

United States Department of the Treasury ("Treasury Department") to stabilize corporate credit unions under conservatorship or liquidation, or corporate credit unions threatened with conservatorship or liquidation. NCUA must repay all monies borrowed from the Treasury Department for the purposes of the TCCUSF by 2021. The NCUSIF insures the deposits of account holders in all federal credit unions and the majority of state-chartered credit unions. NCUA has regulatory authority over state-chartered credit unions that have their deposits insured by the NCUSIF. The NCUA Board manages the NCUA. *See* Federal Credit Union Act ("FCU Act"), 12 U.S.C. §§ 1751, 1752a(a). Pursuant to 12 U.S.C. § 1787(a) and (b)(2)(A), the NCUA Board, in specified circumstances and in a distinct capacity, may close an insured credit union and appoint itself the liquidating agent for such credit union. As liquidating agent for a failed credit union, the NCUA Board succeeds to all rights, titles, powers, and privileges of the credit union, its members, accountholders, officers, and directors.

23.     U.S. Central was a federally chartered corporate credit union with its offices and principal place of business in Lenexa, Kansas.

24.     WesCorp was a federally chartered corporate credit union with its offices and principal place of business in San Dimas, California.

25.     Southwest was a federally chartered corporate credit union with its offices and principal place of business in Plano, Texas.

26.     As corporate credit unions, the CCUs provided investment and financial services to other credit unions.

27.     The NCUA Board placed U.S. Central and WesCorp into conservatorship on March 20, 2009, pursuant its authority under the FCU Act, 12 U.S.C. § 1786(h). On October 1, 2010, the NCUA Board placed U.S. Central and WesCorp into involuntary liquidation pursuant

to 12 U.S.C. § 1766(a) and 12 U.S.C. § 1787(a)(1)(A) and appointed itself liquidating agent. On September 24, 2010, the NCUA Board placed Southwest into conservatorship pursuant to the FCU Act. On October 31, 2010, the NCUA Board placed Southwest into involuntary liquidation, appointing itself liquidating agent.

28.     Pursuant to 12 U.S.C. § 1787(b)(2)(A), the NCUA Board as liquidating agent has succeeded to all rights, titles, powers, and privileges of the CCUs and of any member, account holder, officer or director of the CCUs, with respect to the CCUs and their assets, including the right to bring the claims asserted in this action. As liquidating agent, the NCUA Board has all the powers of the members, directors, officers, and committees of the CCUs, and succeeds to all rights, titles, powers, and privileges of the CCUs. *See* 12 U.S.C. §1787(b)(2)(A). The NCUA Board may also sue on the CCUs' behalf. *See* 12 U.S.C. §§ 1766(b)(3)(A), 1787(b)(2), 1789(a)(2). In addition, the NCUA Board as liquidating agent may "exercise all powers and authorities specifically granted to conservators or liquidating agents, respectively, under this chapter and such incidental powers as shall be necessary to carry out such powers; and (ii) take any action authorized by this chapter, which the Board determines is in the best interests of the credit union, its account holders, or the Board." *See* 12 U.S.C. §1787(b)(2)(J).

29.     The NCUA Board as liquidating agent brings this action with respect to the certificates at issue here held by the NCUA Board as liquidating agent as reflected on Exhibit A incorporated herein and are referred to in this Complaint as the "NCUA Certificates."

30.     In 2010, the NCUA and the NCUA Board as liquidating agent created the NCUA Guaranteed Notes Program (the "NGN Program") as a means of liquidating the distressed investment securities from the five failed corporate credit unions (the "Legacy Assets"), thereby stabilizing funding for the credit union system. The Legacy Assets consist of over 2,000

investment securities, secured by approximately 1.6 million residential mortgages, as well as commercial mortgages and other securitized assets. The NCUA Board as liquidating agent transferred certain Legacy Assets to the NGN Trusts (the "NGN Certificates"). The NGN Trusts then issued approximately $28.3 billion of NGNs, backed by the cash flows from the Legacy Assets.

31.     Each NGN Trust created under the NGN Program issued Notes pursuant to an Offering Memorandum and three key agreements: (i) NGN Indentures by and between the NGN Trusts, as Issuers, and The Bank of New York Mellon ("BNYM"), as Indenture Trustee; (ii) Trust Agreements by and among the NCUA Board in its Capacity as Liquidating Agent, as Seller, Wells Fargo Delaware Trust Company, N.A. ("Wells Fargo"), as Owner Trustee, and BNYM, as Certificate Registrar and the Certificate Paying Agent; and (iii) Guaranty Agreements by and among NCUA in its capacity as an Agency of the Executive Branch of the United States, as Guarantor, the NGN Trusts, as Issuer, and BNYM, as the Indenture Trustee. The NGN Indentures, NGN Trust Agreements, and NGN Guaranty Agreements are referred to collectively herein as the "NGN Agreements."[2]

32.     In short, the creation of the NGN Trusts involved the following steps: (i) the NCUA Board in its Capacity as Liquidating Agent (as Sellers) transferred the NGN Certificates to the NGN Trusts (as Issuers) pursuant to the NGN Trust Agreements, and Wells Fargo (as Owner Trustee) caused the Owner Trust Certificates (defined below) to be issued to the NCUA Board as Liquidating Agent (as Sellers); (ii) the NGN Trusts (as Issuers) pledged the Certificates and the other assets of the trust estates to BNYM (as Indenture Trustee) and caused the NGN

_____

[2] The NGN Agreements were substantially similar. Representative examples of an NGN Indenture, NGN Trust Agreement, and NGN Guaranty Agreement from the NCUA 2010-R3 Trusts are attached hereto as Exhibits B, C, and D.

Notes to be issued pursuant to the NGN Indentures; (iii) BNYM (as Indenture Trustee) delivered the Notes, or NGNs, to the Initial Purchasers for further sale to investors.

33.     Under the NGN Trust Agreements, the NCUA Board as liquidating agent transferred and assigned its rights, title, and interest to assert the claims at issue in this Fifth Amended Complaint related to the NGN Certificates to the NGN Trusts. Exh. C, NGN Trust Agreement § 3.01. In exchange, the NCUA Board received "Owner Trust Certificates" that represent a beneficial ownership interest in the NGN Trusts. *Id.* As the holder and beneficial owner of the Owner Trust Certificates, the NCUA Board as liquidating agent is entitled to payments from the NGN Trusts after the principal balance of the Notes issued by the various NGN Trusts has been reduced to zero; all accrued and unpaid interest on the Notes has been paid; all amounts owed to the Guarantor have been reimbursed; and the other parties to the NGN Agreements have been paid in full.

34.     Once the principal balance of the Notes issued by the any NGN Trust has been reduced to zero, all accrued and unpaid interest on the Notes has been paid, all amounts owed to the Guarantor have been reimbursed, any other parties to the NGN Agreements have been paid in full, and certain other conditions have been fulfilled, then the NGN Indenture is satisfied and discharged, permitting the NCUA Board as liquidating agent and Owner Trust Certificateholder to receive distribution of all remaining assets of the Trust Estate in accordance with written instructions provided to the Certificate Paying Agent. Exh. B, NGN Indenture Agreement § 3.01; Exh. C, NGN Trust Agreement § 8.01(a).

35.     Under the NGN Guaranty Agreements, the NCUA in its capacity as an agency of the Executive Branch of the United States Government (in such capacity, the "Guarantor") provided a guarantee, backed by the full faith and credit of the United States, of the timely

repayment of all principal and interest to the investors in the NGN Trusts. Exh. D, NGN Guaranty Agreement § 1.

36.     Under the NGN Indentures, BNYM was granted the right to take action against Defendant with respect to the NGN Certificates. Exh. B, NGN Indenture, Granting Clause (granting BNYM all right, title, and interest to "all present and future claims, demands, causes and choses in action in respect of the [NGN Certificates]"); *see also id*. § 5.01(a)(i) ("The Indenture Trustee shall have the full power and authority to do all things not inconsistent with the provisions of this Indenture that it may deem advisable in order to enforce the provisions hereof or to take any action with respect to a default or an Event of Default hereunder, or to institute, appear in or defend any suit or other proceeding with respect hereto, or to protect the interests of the Noteholders and the Guarantor").[3]

37.     On April 4, 2016, BNYM, in its capacity as the Indenture Trustee of the NGN Trusts, transferred all legal title, claims, powers, rights, authorities, and duties of BNYM, including the claims for the NGN Certificates at issue in the Fourth Amended Complaint to Graeme W. Bush, as the Separate Trustee ("The Separate Trustee"), and appointed the Separate Trustee for purposes of exercising any and all of the Indenture Trustee's powers, rights and authorities and/or fulfilling any and all of the Indenture Trustee's duties under each applicable Indenture with respect to the claims for the NGN Certificates at issue in the Fourth Amended Complaint, with any recoveries going to the NGN Trusts. Exh. F, Instrument of Appointment and Acceptance ("Separate Trustee Agreement").

38.     On November 12, 2019, CEDE & Co., as nominee of The Depository Trust

---

[3] By contrast, Wells Fargo, as the Owner Trustee, has no such rights under the Trust Agreement. *See generally* Exh. C, NGN Trust Agreement.

Company, provided written consent to Plaintiffs to commence, prosecute, or continue litigation that CEDE & Co. is or may be entitled to take, for the at-issue certificates in trusts containing negating clauses, where CEDE is the nominal holder. For the NGN Certificates, CEDE & Co. provided the consent to BNYM or its designee, and noted that it had been informed that BNYM has the right to designate a Separate Trustee to assert any claims on behalf of BNYM. Exh. M. The CEDE & Co. authorization provided to BNYM for the NGN Certificates is applicable to the Separate Trustee under the Separate Trustee Agreement.

39.     On March 4, 2020, CEDE & Co., as nominee of The Depository Trust Company, provided written consent to Plaintiffs to commence, prosecute, or continue litigation that CEDE & Co. is or may be entitled to take, for the at-issue certificates in trusts containing negating clauses, where CEDE is the nominal holder. For the NCUA Certificates, CEDE & Co. provided the consent to the NCUA Board, as liquidating agent. Exh. N.

40.     As of June 12, 2021, all NGN Trusts have unwound and all legal title, claims, powers, rights, authorities, authorizations, consents, and duties of BNYM, the NGN Trusts, and the Separate Trustee, including the Separate Trustee's claims for the NGN Certificates at issue in the Fifth Amended Complaint, were reconveyed to the NCUA Board in its capacity as Liquidating Agent. *See, generally*, Ex. B, NGN Trust Agreement § 8.01; Ex. C, NGN Indenture § 3.01. This reconveyance includes any rights, authorities, or powers granted by Cede & Co. pursuant to the Cede Authorization Letters. With the reconveyance, all certificates, including previously designated NGN Certificates, are now again held by the NCUA Board as liquidating agent are referred to herein as the NCUA Certificates.

### C.    Defendant U.S. Bank

41.    U.S. Bank is a national banking association organized and existing under the laws of the United States. U.S. Bank's principal place of business and principal place of trust administration is located in Minneapolis, Minnesota. U.S. Bank's main office is located in Cincinnati, Ohio. As trustee for the trusts, U.S. Bank owed certificateholders certain contractual duties with respect to the trusts. As of December 31, 2013, U.S. Bank's corporate parent, U.S. Bancorp, was the fifth largest commercial bank in the United States based on assets and the fourth largest in total branches. U.S. Bank is U.S. Bancorp's second largest subsidiary. U.S. Bank does business in and maintains offices in New York, including a corporate trust office at 100 Wall Street, New York, New York 10005.

42.    U.S. Bank, together with its affiliates, is involved in all aspects of the private-label RMBS market. U.S. Bank currently acts as trustee of more than $3 trillion in trust assets, operating 50 corporate trust offices across the country. U.S. Bank currently serves as trustee for thousands of RMBS trusts with assets of over $1 trillion in original face value. U.S. Bank is trustee for approximately 30% of all RMBS issued between 2004 and 2007.

43.    In addition, U.S. Bank, together with its subsidiary, U.S. Bank Home Mortgage, Inc., serves as a master servicer of residential mortgage loans. U.S. Bank's master servicing portfolio includes approximately 45,700 loans with an unpaid principal balance of approximately $6 billion as of January 2014.

44.    U.S. Bank Home Mortgage, Inc. has acted as a mortgage loan seller, selling over $400 million of loans in RMBS deals issued between 2004 and 2007.

## III.    JURISDICTION AND VENUE

45.    This Court has subject matter jurisdiction pursuant to the following statutes: (a) 12 U.S.C. § 1789(a)(2), which provides that "[a]ll suits of a civil nature at common law or in equity to which the [NCUA Board] shall be a party shall be deemed to arise under the laws of the United States, and the United States district courts shall have original jurisdiction thereof, without regard to the amount in controversy"; (b) 28 U.S.C. § 1345, which provides that "the district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States, or by any agency or officer thereof expressly authorized to sue by Act of Congress"; (c) 15 U.S.C. § 1331, providing for "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States"; (d) 28 U.S.C. § 1332, because there is complete diversity of citizenship of the parties and the amount in controversy, without interest and costs, exceeds $75,000; (e) 15 U.S.C. § 1367, providing for "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy;" and (f) 28 U.S.C. § 1348, providing that a national banking association shall, for purposes of all actions by or against them (except in other circumstances not applicable here but which would also provide for jurisdiction in this Court), be deemed a citizen of the State in which it is respectively located.

46.    Venue is proper in this District under Section 22 of the Securities Act, 15 U.S.C. § 77v(a), and/or 28 U.S.C. § 1391(b)(1), because Defendant is resident of and/or conducts business in this District. This Court has personal jurisdiction over Defendant because it is resident of and/or conducts business in this District and under N.Y. C.P.L.R. 301, New York's long-arm statute. The claims relate to Defendant's role as trustee over trusts created under New York law and/or administered at least in part in New York. In addition, Defendant has filed

foreclosure cases on behalf of the trusts in New York and in the course of such proceedings either discovered or should have discovered multiple defaults and representation and warranty breaches.

## IV.    THE TRUSTS

47.    The trusts identified on Exhibit A are 20 New York common law trusts or Delaware statutory trusts created in connection with residential mortgage-backed securitizations between 2005 and 2007.

48.    The trusts have a high concentration of loans originated or contributed by the following lenders and their affiliates: American Home Mortgage Corp. and American Home Mortgage Investment Corp.; Decision One Mortgage Co., LLC; DLJ Mortgage Capital, Inc.;; Bank of America, N.A.; Countrywide Home Loans, Inc. and Countrywide Home Loans Servicing LP; Credit Suisse Financial Corp.;; GreenPoint Mortgage Funding, Inc.; IndyMac Bank, F.S.B.;; OwnIt Mortgage Solutions, Inc.; Washington Mutual Bank; and Wells Fargo Bank, N.A. (collectively, the "originators").

49.    A significant portion of the trusts were sponsored by the following sponsors and their affiliates: DLJ Mortgage Capital, Inc.; Bank of America, N.A.; Morgan Stanley Mortgage Capital, Inc. and Morgan Stanley Mortgage Capital Holdings, LLC.; Merrill Lynch Mortgage Lending, Inc.; Washington Mutual Bank and Washington Mutual Mortgage Securities Corp.; Greenwich Capital Financial Products, Inc.; and UBS Real Estate Securities, Inc. (collectively, the "sponsors").

## V.    DUTIES OF THE TRUSTEE UNDER THE CONTRACTS

### A.    RMBS Trusts

50.    RMBS certificates are debt instruments issued to investors by an issuing trust that

holds one or more mortgage pools. The corpus of the trust – like the trusts at issue here – consists almost exclusively of the underlying mortgage loans. Certificateholders receive a portion of the income stream generated by the trust as borrowers make payments on their mortgage loans.

51.     Because residential mortgage loans are the assets underlying the RMBS, the origination of mortgages starts the process that leads to the creation of RMBS. Originators decide whether to loan potential borrowers money to purchase residential real estate through a process called mortgage underwriting. The originator applies its underwriting standards or guidelines to determine whether a particular borrower is qualified to receive a mortgage for a particular property.

52.     The securitization process begins with a sponsor who purchases loans in bulk from one or more originators. The sponsor transfers title of the loans to an entity called a depositor.

53.     The depositor transfers the loans to a trust called the issuing entity.

54.     The issuing entity then issues notes and/or certificates, providing certificateholders scheduled principal and interest payments derived from the cash flow from the mortgage pool underlying the securities (*i.e.*, the principal and interest generated as borrowers make monthly payments on the mortgages in the pool).

55.     The depositor files required documents (such as registration statements and prospectuses) with the U.S. Securities and Exchange Commission ("SEC") so the certificates can be offered to the public.

56.     One or more underwriters then sell the notes or certificates to investors.

57.     Figure 1 (*infra*) depicts a typical securitization process.

**Figure 1**
***Illustration of the Securitization Process***



58.     The establishment and administration of each trust is governed by an agreement called either a Pooling and Servicing Agreement ("PSA"), a Trust Agreement, or an Indenture and certain related agreements that the PSA references and incorporates (the "governing agreements"). All of the governing agreements are substantially similar, and impose the same duties on Defendant. *See* Exhibit H §§ I – IX. Accordingly, this Fifth Amended Complaint refers to the PSAs or the governing agreements when discussing the trustee's contractual obligations.

59.     Once the loans are deposited into a trust, borrowers begin making payments to the

trust through a master servicer. The master servicer is ultimately responsible for servicing the loans, but may use a designee, typically called a servicer or sub-servicer, to perform some or all of the mortgage servicing functions. The master servicer's duties include monitoring delinquent borrowers, foreclosing on defaulted loans, monitoring compliance with representations and warranties regarding loan origination, tracking mortgage documentation, and managing and selling foreclosed properties, and overseeing any sub-servicers.

60.　　When the master servicer collects loan payments from borrowers, it then transfers those payments, less allowable deductions, to the trustee. The trustee uses the payments, less allowable fees and expenses, to make scheduled principal and interest payments to certificateholders. The trustee also delivers monthly remittance reports to certificateholders describing the performance of underlying loans and compliance with the governing agreements. The contents of those reports are specified in the governing agreements and in Item 1121 of SEC Regulation AB. *See* 17 C.F.R. § 229.1121. The servicer provides data to the trustee to include in these remittance report. Each trust is administered primarily by two entities – the trustee and master servicer, under the oversight of the trustee. The trustee owes certificateholders certain duties set forth in the governing agreements.

61.　　The purpose of having a trustee in an RMBS securitization is to ensure there is at least one independent party to the governing agreements who, unlike the RMBS certificateholders, does not face collective action, informational, or other limitations, and as a result can protect the trusts and the interests of RMBS certificateholders. The governing agreements and the common law impose critical duties on trustees, and the trustees' adherence to those duties affects the value of the RMBS.

62.　　Defendant earned fees in connection with its role as trustee, typically an annual

fee based on the percentage of principal outstanding on the loans underlying the RMBS. Defendant also received significant benefits from the interest-free deposits maintained in its accounts when the servicing payments were remitted to its accounts. Defendant maintained accounts for thousands of trusts and earned enormous sums from the aggregate balances on these accounts. The RMBS trustee engagements further deepened Defendant's business relationships with the sponsors and underwriters of the RMBS, leading to more lucrative future engagements.

**B.     The Trustee's General Duties**

63.     The terms of the governing agreements are substantially similar, if not identical, and impose substantially the same, if not identical, duties and obligations on the trustee. *See* Exh. H §§ I – IX. Further, upon information and belief, Defendant employed the same general set of policies and procedures to oversee and manage the trusts regardless of any individual variations contained within the governing agreements, and to monitor for mortgage loan defects.

64.     Most importantly, Defendant has an absolute duty under the governing agreements and the common law to acquire and protect the trust corpus for the benefit of certificateholders. "The parties hereto acknowledge and agree that the form of endorsement attached hereto as Exhibit B-4 is intended to effect the transfer to the Trustee, for the benefit of the Certificateholders, of the Mortgage Notes and the Mortgages." PSA Section 2.01; *see also* Exh. H § II.[4]

**C.     The Trustee's Duties Under the Pooling and Servicing Agreements**

65.     The PSAs are contracts between, in addition to others, the depositor, the master

---

[4] Each PSA is several hundred pages long. All cites herein to "PSA Section ___" are to the Trust Agreement for the GreenPoint Mortgage Funding Trust 2007-AR1 ("GPMF 2007-AR1") offering, which, as alleged above, is substantially similar to the governing agreements for all of the trusts. A copy of the complete GMPF 2007-AR1 Trust Agreement is attached as Exhibit G.

servicer or servicer, and the trustee, which govern the trusts that issued the certificates. The PSAs for each of the trusts are substantially similar and memorialize the following events and conditions: (i) the transfer and conveyance of the mortgage loans from the depositor to the trust; (ii) the trust's issuance of beneficial certificates of interests in the trust to raise the funds to pay the depositor for the mortgage loans; and (iii) the terms of those certificates. *See* Exhibit H §§ I – IX.

66.     The PSAs also set forth Defendant's contractual duties and obligations, which are substantially similar for each trust. *See* Exhibit H §§ I – IX. Specifically, each PSA requires Defendant to oversee and enforce the depositors', the custodians', the servicers', sponsors' and the originators' obligations. In performing these contractual obligations, Defendant must act in the best interests of and for the protection of the trusts and the certificateholders. Certificateholders, unlike the trustee, have no direct contact with the other deal parties. Moreover, under the PSAs, certificateholders do not have the right to compel the trustee to enforce the warrantor's representations and warranties concerning the qualities of the loans,[5] absent satisfaction of the collective action provisions that individual certificateholders frequently cannot satisfy. Certificateholders must therefore rely on the Defendant to protect their interests.

**D.     Duty to Review the Mortgage Loans Conveyed to the Trust**

67.     The trusts must take title to the mortgages conveyed to them for due

---

[5] The governing agreements specify the party that is responsible for repurchasing any defective loan. Generally, they provide that, upon discovery and/or notice of a breach of a representation and warranty with respect to a mortgage loan that materially and adversely affects the interests of the certificateholders, the warrantor shall cure the breach or repurchase the affected mortgage loan at its purchase price, which is equal to the then-outstanding amount due on the mortgage loan. The warrantor is generally either the originator of the loans, the seller of the loans, or the sponsor of the securitization. These roles are frequently undertaken by the same or affiliated entities. For simplicity, this complaint uses "warrantor" to refer to the entity responsible for the repurchase of any defective loans.

consideration for the RMBS properly to be backed by mortgage loans. The PSAs establish the conveyance terms of the mortgage loans to the trust, and those terms are intended to ensure that the trustee, on behalf of the trusts, takes full title to the mortgage loans. *See* Exhibit H § I – III.

68.     The first part of this conveyance involves the depositor assigning to the trustee, among other things, its rights, title, and interest in the mortgage loans and the depositor's rights under the transfer agreement whereby the depositor acquired the mortgage loans. PSA Section 2.01 ("Creation and Declaration of Trust Fund; Conveyance of Mortgage Loans") provides in relevant part:

> Concurrently with the execution and delivery of this Agreement, the Depositor does hereby transfer, assign, set over, deposit with and otherwise convey to the Trustee, without recourse, subject to Sections 2.02, 2.04, 2.05 and 2.06, in trust, all the right, title and interest of the Depositor in and to the Mortgage Loans . . . . Concurrently with the execution and delivery of this Agreement, the Depositor does hereby assign to the Trustee all of its rights and interest under the Mortgage Loan Sale Agreement, including all rights of the Seller under the Servicing Agreements and each related Transfer Agreement (other than first payment date default or early payment date default rights against the Transferor) but, in each case, only to the extent assigned under the Mortgage Loan Sale Agreement. The Trustee hereby accepts such assignment and delegation, and shall be entitled to exercise all the rights of the Depositor under the Mortgage Loan Sale Agreement as if, for such purpose, it were the Depositor.

The other PSAs contain substantially similar provisions. *See* Exhibit H § I.

69.     Furthermore, the PSAs require the trustee, or its agents acting as custodians, to acknowledge receipt of the mortgage loans on behalf of the trust and to acknowledge that all mortgage pool assets—including the mortgage files and related documents and property—are held by it as trustee. Significantly, the trustee, or its agents, must take physical possession of the mortgage files, including the mortgage note and the mortgage, properly endorsed and assigned to the trustee. As set forth in PSA Section 2.02:

> The Trustee, by execution and delivery hereof, acknowledges receipt by it or by the Custodian on its behalf of the Mortgage Files pertaining to the Mortgage Loans listed on

the Mortgage Loan Schedule, subject to review thereof by the Trustee, or by the Custodian on behalf of the Trustee, under this Section 2.02.

The other PSAs contain substantially similar provisions. *See* Exhibit H §§ II, IV.

70.     Section 2.01 of the PSA also specifically sets forth the operative documents that must be contained in the mortgage file.

71.     Once the mortgage files are in the trustees' or their custodians' possession, trustees, or the custodian on the trustees' behalf, are required to review each mortgage file within a certain period after the "closing date" of the securitization and deliver to various deal parties a certification that all documents required have been executed and received, noting any exceptions – *i.e.*, any missing or defective mortgage file documents. Thus, the trustee or its agent, the custodian, prepares and/or receives a report identifying specific mortgage file document defects in the loans in each trust. As set forth in PSA Section 2.02:

> Within 45 days after the Closing Date, the Trustee or the Custodian on behalf of the Trustee, will, for the benefit of Holders of the Certificates and any NIMS Insurer, review each Mortgage File to ascertain that all required documents set forth in Section 2.01 have been received and appear on their face to contain the requisite signatures by or on behalf of the respective parties thereto, and shall deliver to the Trustee, the Depositor, the Master Servicer and any NIMS Insurer an Interim Certification in the form annexed hereto as Exhibit B-2 (or in the form annexed to the applicable Custodial Agreement as Exhibit B-2, as applicable) to the effect that, as to each Mortgage Loan listed in the Mortgage Loan Schedule (other than any Mortgage Loan prepaid in full or any specifically identified in such certification as not covered by such certification), (i) all of the applicable documents specified in Section 2.01(b) are in its possession and (ii) such documents have been reviewed by it and appear to relate to such Mortgage Loan . . . . Within 180 days following the Closing Date, the Trustee, or the Custodian, shall deliver to the Trustee, the Depositor, the Master Servicer and any NIMS Insurer a Final Certification substantially in the form attached as Exhibit B-3 (or in the form annexed to the Custodial Agreement as Exhibit B-3, as applicable) evidencing the completeness of the Mortgage Files in its possession or control, with any exceptions noted thereto.

The other PSAs contain substantially similar provisions. *See* Exhibit H § III.

72.     Defendant breached these contractual obligations by: 1) failing to adequately review the mortgage loan files and certify their completeness; and 2) failing to properly oversee

its custodians or agents.

**E.  Duty to Provide Notice of Incomplete or Defective Mortgage Files and Enforce Repurchase Rights with Respect to Mortgage Files that Cannot be Cured**

73.      If the trustee or the custodian identifies, discovers, or receives notice of any defect in a mortgage loan file (through its own review, through receipt of the exception report, or otherwise) for an underlying mortgage loan contained in a trust, the trustee must identify such defect and promptly provide notice to the relevant parties. As set forth in PSA Section 2.02:

> If in the course of the review described in paragraph (b) above the Trustee or the Custodian discovers any document or documents constituting a part of a Mortgage File that is missing, does not appear regular on its face (i.e., is mutilated, damaged, defaced, torn or otherwise physically altered) or appears to be unrelated to the Mortgage Loans identified in the Mortgage Loan Schedule (each, a "Material Defect"), the Trustee, or the Custodian on behalf of the Trustee, discovering such Material Defect shall promptly identify the Mortgage Loan to which such Material Defect relates in the Interim Certification delivered to the Trustee, the Depositor, the Master Servicer and any NIMS Insurer.

74.      Once incomplete mortgage files or loans with defective transfer documentation are identified, the parties to the governing agreements must work to remedy these deficiencies, and the trustee is ultimately responsible for enforcing the warrantor's obligation to remedy any deficiency or repurchase the defective loan (see Part F below). As set forth in PSA Section 2.02:

> Within 90 days of its receipt of such notice, the Transferor, or, if the Transferor does not do so, the Depositor shall be required to cure such Material Defect (and, in such event, the Depositor shall provide the Trustee with an Officer's Certificate confirming that such cure has been effected). If the applicable Transferor or the Depositor, as applicable, does not so cure such Material Defect, the Transferor, or, if the Transferor does not do so, the Depositor, shall, if a loss has been incurred with respect to such Mortgage Loan that would, if such Mortgage Loan were not purchased from the Trust Fund, constitute a Realized Loss, and such loss is attributable to the failure of the Depositor to cure such Material Defect, repurchase the related Mortgage Loan from the Trust Fund at the Purchase Price..

The other PSAs contain substantially similar provisions. *See* Exhibit H § V. The trustee also has the right and duty to protect the trusts by ensuring all parties to the governing agreements (including the custodial agreement) comply with their respective obligations.

75.    The trustee's sole remedy to protect the trust from such defective loans is to enforce the obligation of the warrantor to repurchase such loans, as set forth in PSA Section 2.02.

76.    Defendant breached these contractual obligations by: 1) failing to provide notice of incomplete or defective mortgage files; and 2) failing to enforce repurchase rights with respect to mortgage files that could not be cured.

F.    **Duty to Provide Notice of Document Defects and Representation and Warranty Breaches and to Enforce Repurchase Rights with Respect to Defective and Breaching Loans**

77.    The quality of the mortgage loans to which the trusts purportedly receive title is also critical to an RMBS securitization. For that reason, the governing agreements contain "representations and warranties" by the warrantor attesting to the characteristics of the borrower and collateral for the mortgage loans conveyed to the trusts, and that the loans were made in accordance with applicable underwriting guidelines.

78.    As in instances of missing documents or where the transfer of the mortgage was incomplete, the governing agreements also require the warrantor to cure, substitute, or repurchase any mortgage loans that materially breach the warrantor's representations and warranties concerning the quality of the mortgage loans conveyed to the trusts. Specifically, the governing agreements require the trustee, among others, to provide notice of the breaches and enforce the warrantor's repurchase obligations:

> Upon discovery by any of the Depositor, any NIMS Insurer, the Master Servicer or the Trustee of a breach of any of such representations and warranties that materially and

adversely affects the value of the related Mortgage Loan, the party discovering such breach shall give prompt written notice to the other parties . . . . In the event of discovery of a breach of any representation and warranty of a Transferor assigned to the Trustee, the Trustee shall enforce its rights under the applicable Transfer Agreement and the Mortgage Loan Sale Agreement for the benefit of Certificateholders.

PSA Section 2.04; *see also* Exhibit H § V. The trustee also has the right and duty to protect the trusts by ensuring all parties to the governing agreements comply with their respective obligations.

79.     To protect the trusts and all certificateholders, the governing agreements require Defendant to give prompt written notice to all parties to the governing agreements upon discovery or receipt of written notice of a breach of a representation or warranty made by the warrantor about the mortgage loans that materially and adversely affects the value of any mortgage loan or the interests of the certificateholders in any loan, and to take such action as may be necessary or appropriate to enforce the rights of the trusts regarding the breach.

80.     Defendant breached these contractual obligations by: 1) failing to provide notice of mortgage loans with document defects and/or representation and warranty breaches; 2) failing to enforce repurchase rights with respect to such mortgage loans; and 3) failing to ensure the warrantors abided by their contractual obligations.

### G.     Duties under the Loan Transfer Agreements

81.     Depending on the parties, there are several methods whereby the depositor acquires the loans for securitization. These include Mortgage Loan Purchase Agreements ("MLPAs"), Sale and Servicing Agreements ("SSAs"), Sale Agreements ("SAs"), and Assignment and Recognition Agreements (collectively, "loan transfer agreements"). These agreements are all substantially similar and govern the terms for transferring mortgage loans acquired for securitization from the originator to the depositor. These loan transfer agreements

are generally between either the originator and the depositor, or the sponsor and the depositor.

82.     The warrantor's typical representations and warranties in the loan transfer agreements include, *inter alia*, the following: (i) the information in the mortgage loan schedule is true and correct in all material respects; (ii) each loan complies in all material respects with all applicable local, state and federal laws and regulations at the time it was made; (iii) the mortgaged properties are lawfully occupied as the principal residences of the borrowers unless specifically identified otherwise; (iv) the borrower for each loan is in good standing and not in default; (v) no loan has a loan-to-value ("LTV") ratio of more than 100%; (vi) each mortgaged property was the subject of a valid appraisal; and (vii) each loan was originated in accordance with the underwriting guidelines of the related originator. *See generally* Exhibit H § IX. To the extent mortgages breach the warrantor's representations and warranties, the mortgage loans are worth less and are much riskier than represented.

83.     Under the loan transfer agreements, upon discovery or receipt of notice of any breach of the warrantor's representations and warranties that has a material and adverse effect on the value of the mortgage loans in the trusts or the interests of the certificateholders therein, the warrantor is obligated to cure the breach in all material respects.

84.     If a breach is not cured within a specified period, the warrantor is obligated either to substitute the defective loan with a loan of adequate credit quality, or to repurchase the defective loan.

85.     The repurchase provisions ensure that the trust need not continue to hold mortgage loans for which the warrantor breached its representations and warranties.

86.     Under the loan transfer agreements, the demanding party must merely show that the breach has a material and adverse effect on the value of the mortgage loans in the trusts or

the certificateholders' interests in the loans. The warrantor's cure, substitute, and repurchase obligations do not require any showing that the warrantor's breach of representations caused any realized loss in the related mortgage loan in the form of default or foreclosure, or require that the demanding party prove reliance on servicing and origination documents.

87.     Upon the sale of the mortgage loans to the trust, the rights under the loan transfer agreements, including the warrantor's representations and warranties concerning the mortgage loans, are generally assigned to the Defendant, as trustee, for the benefit of the trusts and all certificateholders, in accordance with the governing agreements.

88.     Defendant breached these contractual obligations by: 1) failing to enforce its contractual rights under the loan transfer agreements; 2) failing to enforce repurchase rights with respect to breaching and defective mortgage loans; and 3) failing to ensure the warrantors abided by their contractual obligations.

**H.     Duties Regarding the Servicers**

89.     Each PSA requires the master servicer or servicer to prudently service the loans underlying the trusts.

90.     Section 9.20 of the PSA states that:

The Master Servicer shall use its reasonable best efforts to, or to cause the applicable Servicer to, foreclose upon, repossess or otherwise comparably convert the ownership of Mortgaged Properties securing such of the Mortgage Loans as come into and continue in default and as to which no satisfactory arrangements can be made for collection of delinquent payments, all in accordance with the applicable Servicing Agreement . . . . In connection with such foreclosure or other conversion or action, the Master Servicer shall, consistent with Section 9.18, follow such practices and procedures as it shall reasonably determine to be in the best interests of the Trust Fund and the Certificateholders and which shall be consistent with its customary practices in performing its general mortgage servicing activities. "

The other PSAs contain substantially similar provisions. *See* Exhibit H § VII.

91.     Under the PSAs, Defendant, as trustee, has certain duties and obligations

regarding monitoring the master servicers and/or servicers. In particular, the PSAs set forth Defendant's obligations upon occurrence of an "event of default" which is defined as a specified failure of the servicer to perform its servicing duties and cure this failure within a specified time. Section 6.14 of the PSA identifies several types of failures by the servicer that may give rise to such an event. The other PSAs contain substantially similar provisions. *See also* Exhibit H § VIII. Such failures include a breach of servicer representations and warranties and failure to observe or perform in any material respect any other covenants or agreements, which continues unremedied after written notice of such failure shall have been given to the servicer by the trustee.

92.     Events of default can also be triggered by servicer downgrades, poor collateral performance, or failure of the servicer to remit required funds.

93.     The remedies for uncured servicer events of default include, among other things, termination of the master servicers and/or servicers. *See* Exhibit H § VIII.

94.     Defendant breached these contractual obligations by failing to properly monitor the servicers and master servicers and determine whether events of default had occurred. Defendant also failed to declare events of default when information available to Defendant's relevant employees warranted such action.

I.      **The Trustee's Duties upon Knowledge of an Event of Default**

95.     The PSAs impose additional obligations upon Defendant once it knows an event of default or a servicer event of termination has occurred. Within forty-five to ninety days after a default has occurred, Defendant must provide written notice to all certificateholders about that event, unless the default has been cured or waived. As set forth in PSA Section 6.17:

> The Trustee shall also, within 45 days after the occurrence of any Event of Default known to a Responsible Officer of the Trustee, give written notice thereof to any NIMS

Insurer and the Certificateholders, unless such Event of Default shall have been cured or waived prior to the issuance of such notice and within such 45 day period.

The other PSAs contain substantially similar provisions. *See* Exhibit H § VIII.

96.     Section 6.01 of the PSAs further requires Defendant to exercise the rights and powers vested in it by the PSA using "Trustee shall exercise such of the rights and powers vested in it by this Agreement and use the same degree of care and skill in their exercise as a prudent Person would exercise or use under the circumstances in the conduct of such Person's own affairs." The other PSAs contain substantially similar provisions. *See* Exhibit H § VI.

97.     Defendant breached these contractual obligations by: 1) failing to provide notice of defaults and events of default; 2) failing act as a prudent person in the management of its own property following defaults and events of default (including, without limitation, by failing to actively review loans for defects and breaches and enforcing repurchase obligations); and 3) failing to act with due care and without negligence prior to an event of default.

## VI.    DEFENDANT FAILED TO PROVIDE NOTICE OF AND ENFORCE REMEDIES RELATED TO MORTGAGE FILE DOCUMENT DEFECTS

### A.    Defendant Failed to Provide Notice and Enforce Remedies Related to Incomplete or Defective Mortgage Loan Files

98.     To ensure that the rights, title and interest in the mortgage loans were properly protected, the governing agreements imposed upon trustees, or their agents, a duty to take physical possession of the mortgage files, ensure that the note and mortgage were endorsed and assigned, ensure that key documents for the loans were included in the mortgage files and to create an exception report identifying those mortgage loans for which the mortgage files were incomplete. *See* Exhibit H §§ II, III. The trustee or its agent were further required to notify the warrantors and enforce their obligations to cure, repurchase, or substitute compliant loans for the loans with incomplete or defective files. *See* Exhibit H § V.

99.     Defendant, however, failed to act with due care and systematically disregarded its contractual duties to provide notice or enforce their rights on behalf of certificateholders to ensure that mortgage loans lacking complete or non-defective mortgage files were repurchased from the mortgage pools underlying the Certificates. If Defendant had met its contractual and common law duties with respect to the non-compliant loans, Plaintiffs would not have incurred their very significant losses attributable to the default of many of the defective loans.

100.     The governing agreements require that trustees, or their agent, take physical possession of the mortgage files and that the note and mortgage are endorsed and assigned to the trustee. *See* Exhibit H §§ I, II. Under the governing agreements, trustees, or the custodian on their behalf, was required to review each of the loan files and to certify that the documentation for each loan was accurate and complete. *See* Exhibit H § II, IV.

101.     Upon information and belief, Defendant accepted incomplete files without requiring the warrantors to cure document defects or substitute or repurchase loans.

102.     Defendant's failure to take possession of the mortgage loan documents, to notify the warrantors of document defects, and its failure to demand correction of the defects identified on the exception reports caused damage to Plaintiffs.

103.     Certificateholders did not receive or have access to any loan or mortgage files that they could check to make certain that their contractual rights were being protected, nor did they have access to the exception reports for the trusts. Rather, investors were dependent upon Defendant to police the deal and protect their contractual and other legal rights.

104.     Defendant's failure to perform its duties (including notifying other deal parties and enforcing warrantors' obligations) to ensure that the trust received a complete, non-defective set of mortgage loan documents was not a mere technicality, as explained by Georgetown Law

School Professor Adam Levitin in his testimony before the House Financial Services Committee in November 2010. Problems in Mortgage Servicing from Modification to Foreclosure: Hearing Before S. Comm. on Banking, Housing, and Urban Affairs (2010) (statement of Adam Levitin, Associate Professor of Law, Georgetown University Law Center). Professor Levitin described the implications of the failure by a securitization trustee such as Defendant to ensure delivery of the documents in the mortgage loan file:

> If mortgages were not properly transferred in the securitization process, then mortgage-backed securities would in fact not be backed by any mortgages whatsoever. The chain of title concerns stem from transactions that make assumptions about the resolution of unsettled law. If those legal issues are resolved differently, then there would be a failure of the transfer of mortgages into securitization trusts.
> . . .
> Recently, arguments have been raised in foreclosure litigation about whether the notes and mortgages were in fact properly transferred to the securitization trusts. This is a critical issue because the trust has standing to foreclose if, and only if, it is the mortgagee. If the notes and mortgages were not transferred to the trust, then the trust lacks standing to foreclose.

**B.  Defendant Discovered or Knew the Mortgage Loan Files Were Incomplete**

105.    That the original mortgage note was missing from the loan file, or there was a missing link in the chain of endorsements from the originator to the trust, or there was no duly executed assignment of the mortgage to the trust, or the original lender's title policy was missing, or that any other required mortgage file document was missing or defective, would have been obvious to a reasonably competent trustee performing its contractual duties with due care.

106.    The trustee or its agent reviewed these documents and prepared an exception report listing all of the missing or defective documents. And where the trustee's agent prepared the report, the trustee was generally required to directly receive a copy. Thus, the trustee and/or its agent obtained direct knowledge of mortgage file document defects.

107.    In instances were Defendant acted as the successor trustee, Plaintiffs believe that

copies of exception reports were provided to Defendant during the successor trustee appointment process. Plaintiffs also believe that Defendant likely requested updated exception reports after its appointment as successor trustee.

108.    In addition, numerous reports, litigation, and investigations have revealed the widespread misconduct of servicers to the trusts at issue here to cover-up the systemic failure of depositors and sponsors to properly assign the underlying mortgage loans to issuing trusts. *See, e.g.*, Interagency Review of Foreclosure Policies and Practices (2011), *available at* http://www.federalreserve.gov/boarddocs/rptcongress/interagency/interagency.htm; Wall Street and the Financial Crisis: Anatomy of a Financial Collapse (2011), *available at* http://www.hsgac.senate.gov//imo/media/doc/Financial_Crisis/FinancialCrisisReport.pdf?attempt=2; *In re Citibank, N.A.*, Consent Order, No. AA-EC-11-13 (Apr. 13, 2011), *available at* http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47c.pdf; *In re Ally Fin. Inc., Ally Bank & GMAC Mortgage, LLC*, Consent Order, No. 11-20-B-HC, No. 11-020-B-DEO (Apr. 13, 2011), *available at* http://www.federalreserve.gov/newsevents/press/enforcement/enf20110413a3.pdf; *In re HSBC Bank USA, N.A.*, Consent Order, No. AA-EC-11-14 (Apr. 13, 2011), *available at* http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47d.pdf; *In re OneWest Bank, FSB*, Consent Order, No. WN-11-011 (Apr. 13 2011), *available at* http://www.occ.gov/static/ots/misc-docs/consent-orders-97665.pdf; *In re JPMorgan Chase Bank*, Consent Order, No. AA-EC-11-15, (Apr. 13, 2011), *available at* http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47e.pdf; *In re PNC Bank, N.A.*, Consent Order, No. AA-EC-11-17 (Apr. 13, 2011), *available at* http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47i.pdf; *In re Wells Fargo Bank, N.A.*, Consent Order, AA-EC-11-19

(Apr. 13, 2011), *available at* http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47k.pdf; *In re Aurora Bank FSB*, No. NE-11-16 (April 13, 2011), *available at* http://www.occ.gov/static/ots/misc-docs/consent-orders-97661.pdf.

109.    Enforcement actions with similar allegations have been brought against Defendant and thus it clearly knew of the master servicer and servicer failures. *See In re U.S. Bank, N.A.*, No. AA-EC-11-18 (April 13, 2011), available at http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47j.pdf.

110.    Despite the existence of uncured Events of Default, Defendant did not adequately address the defaults and Events of Default. If Defendant had exercised due care, it would have exercised remedies to address the document delivery failures and numerous breaches of representations and warranties by the warrantors and caused them to repurchase or substitute the affected loans. Defendant's failure to do so damaged Plaintiffs.

111.    If Defendant had performed its duties as trustee, it would have enforced the obligations of the warrantors and caused them to buy back, or replace with non-defective loans, the vast majority, if not all, of the loans that ultimately defaulted and caused Plaintiffs' losses. And if Defendant had enforced these repurchase obligations, as it was required to do, the Certificates would have been more valuable.

112.    If Defendant had met its contractual duties to accept delivery of notes and mortgage loans files, inspect them, give notice as required, and issue accurate certifications, it would have caused the warrantors to repurchase all loans where the master servicers, servicers, sponsors, depositors, and originators failed to deliver required documentation to the Defendant or breached representations and warranties regarding the mortgage loans. This would have included numerous loans that had already suffered losses or would ultimately suffer losses.

## VII. DEFENDANT DISCOVERED OR RECEIVED NOTICE OF REPRESENTATION AND WARRANTY BREACHES AND MORTGAGE FILE DEFECTS ON A LOAN-BY-LOAN AND TRUST-BY-TRUST BASIS

113.    Evidence of the large number of loans with defective mortgage files or material breaches of the warrantors' representations and warranties is primarily in Defendant's possession and not generally available to certificateholders. However, publicly available information provides concrete examples of representation and warranty breaches and defective mortgage files in most of the trusts and also raises a strong, and certainly plausible, inference that Defendant's own files contain such evidence of loan-by-loan breaches for all of the trusts.

### A.    Publicly Filed 15Ga-1 Reports Confirm That Defendant Received Notice or Discovered Individual Breaching Loans in at Least 10 Trusts

114.    The Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank") was signed into law by President Obama on July 21, 2010. Section 943 of Dodd-Frank required the Securities and Exchange Commission ("SEC") to prescribe regulations on the use of representations and warranties in the market for asset-backed securities.

115.    On October 4, 2010, the SEC released its proposed rule pursuant to Section 943 of the Act. On January 21, 2011, the SEC issued its final rule (the "Final Rule"). Among other things, the Final Rule required "securitizers," as defined in Dodd-Frank, to publicly disclose all fulfilled and unfulfilled mortgage loan repurchase requests and required this to be done on a trust-by-trust basis.

116.    The Final Rule became effective March 27, 2011. Securitizers were required to file their first trust-by-trust Form ABS-15G on February 14, 2012, and quarterly thereafter.

117.    The disclosures made on Form ABS-15G are filed with the SEC on EDGAR. The form must be signed by the senior officer of the securitizer in charge of the securitization. The Final Rule requires asset-backed securities issuers to file with the SEC, in table or column

format, the history of the requests they received and repurchases they made relating to their outstanding ABS. Because disclosure is required of all repurchase requests, whether or not the repurchase is consummated, the rule provides for columns in Form ABS 15-G for repurchase requests that have not been satisfied, with columns for repurchase demands that have been disputed, withdrawn, or rejected.

118.    Publicly filed 15Ga-1 reports, therefore, contain direct evidence of loans in individual trusts where a deal party discovered or received notice of a loan with a representation and warranty breach and made a repurchase demand based upon that breach to the warrantor. Based on Plaintiffs' experience, these repurchase demands were made in most instances by the Defendant as trustee for the trusts, but even in instances where other deal parties were responsible for submitting the repurchase demands, the governing agreements required notice of such breaches, and copies of the repurchase demands, to be provided to Defendant as trustee.

119.    Because the trustee played a central role in the administration of a trust, securitizers generally relied heavily upon trustees to track and compile data on the status of repurchase demands for inclusion in the 15Ga-1 reports. Plaintiffs believe that much, if not all of the data, contained in the 15Ga-1 reports for the individual trusts here was first compiled by Defendant before being turned over to the securitizers for public disclosure.

120.    Plaintiffs have reviewed the publicly available 15Ga-1 reports for the at-issue trusts. The below chart lists the trust, the reporting entity, the number of loans in each trust subject to a repurchase demand identified in the 15Ga-1 report, and a link to the report on EDGAR.

| Trust Name | Reporting Entity | Report | Number of Loans |
|---|---|---|---|
| BAFC 2007-B | Banc of America Funding Corp. | https://www.sec.gov/Archives/edgar/data/934377/000093437712000003/c1_bafcabsint_revised.htm | 2 |
| BAFC 2007-D | Banc of America Funding Corp. | https://www.sec.gov/Archives/edgar/data/934377/000093437712000003/c1_bafcabsint_revised.htm | 1 |
| | | https://www.sec.gov/Archives/edgar/data/934377/000093437714000004/bafcabs1q14.htm | 1 |
| HEAT 2006-7 | DLJ Mortgage Capital, Inc. | https://www.sec.gov/Archives/edgar/data/1542381/000114420413008865/v334894_ex99-1.htm | 1,270 |
| HVMLT 2005-8 | RBS Financial Products Inc. | https://www.sec.gov/Archives/edgar/data/1541615/000089109212000948/e47347ex99.htm | 466 |
| HVMLT 2005-16 | RBS Financial Products Inc. | https://www.sec.gov/Archives/edgar/data/1541615/000089109213009397/e56220ex99_1.htm | 57 |
| HVMLT 2006-4 | RBS Financial Products Inc. | https://www.sec.gov/Archives/edgar/data/1541615/000089109212000948/e47347ex99-1.htm | 186 |
| MLMI 2006-RM2 | Merrill Lynch Mortgage Investors Inc. | https://www.sec.gov/Archives/edgar/data/809940/000080994015000002/mlmiabs4q14.htm | 118 |
| | | https://www.sec.gov/Archives/edgar/data/809940/000080994015000004/mlmiabs1q15.htm | 1,153 |
| MSM 2006-15XS | Morgan Stanley Mortgage Capital Inc. | https://www.sec.gov/Archives/edgar/data/1541557/000090514812001925/efc12-793_ex991.htm | 1 |
| MSM 2007-5AX | Morgan Stanley Mortgage Capital Inc. | https://www.sec.gov/Archives/edgar/data/1541557/000090514813000816/efc13-489_ex991.htm | 139 |

| Trust Name | Reporting Entity | Report | Number of Loans |
|---|---|---|---|
| WMALT 2006-AR4 | WaMu Asset Acceptance Corp. | https://www.sec.gov/Archives/edgar/data/1317069/00009296381200515/wamuasset_exhibit991.htm | 1 |
| | | https://www.sec.gov/Archives/edgar/data/1317069/00009296381200693/wamuastaceptcorp_40740-ex99.htm | 2,794 |

121.     Defendant almost certainly discovered or received notice of the representation and warranty breaches identified for these 10 trusts when it helped prepare the 15Ga-1 reports. At a minimum, Defendant discovered or received notice of the breaches when they were published on EDGAR.

122.     The 15Ga-1 reports, however, are not an exhaustive record of all representation and warranty breaches known to Defendant. 15Ga-1 reports are often incomplete or under-report breaches for several reasons.

123.     First, the trustees and other deal parties did not always keep accurate track of representation and warranty breaches or repurchase demands. This was especially true prior to the enactment of Dodd-Frank. This poor record keeping is explicitly acknowledged in the Final Rule which provided that, to the extent a securitizer was unable initially to complete information on Form ABS 15-G, securitizers could include a footnote in the form if they were unable to obtain all information with respect to investor demands that occurred prior to July 22, 2010. Consequently, it is likely that Defendant's files contain evidence of loan-by-loan representation and warranty breaches not found in the 15Ga-1 reports.

124.     Second, the 15Ga-1 reports only require disclosure of formal repurchase demands. Plaintiffs allege that Defendant routinely failed to make repurchase demands even when

presented with information sufficient to show a representation and warranty breach on a loan-by-loan basis. In many instances, Defendant simply ignored evidence of representation and warranty breaches or was willfully blind to such evidence. Most notably, 15Ga-1 reports rarely reflect repurchase demands based on exception reports, despite the fact that Defendant had full knowledge of the many loans found on the exception reports warranting repurchase.

125.    Plaintiffs are also aware of instances in which Defendant simply failed to accurately log or submit repurchase demands on breaching loans it admits it discovered or received notice of. For example, in the motion for summary judgment briefing in the *Phoenix Light* matter, Defendant admitted that "for 309 loans, U.S. Bank received a loan-specific notice asserting that there was a material R&W Breach, but U.S. Bank does not have a record of responding to the notice or notifying other deal parties of the notice." U.S. Bank N.A.'s Separate Statement of Undisputed Facts, *Phoenix Light SF DAC et al. v. U.S. Bank N.A. et al.*, 14-cv-10116 (S.D.N.Y. Apr. 3, 2018) (ECF 250), at 17-18. Such loans would not have appeared on a 15Ga-1 report.

126.    Plaintiffs are also aware of instances in which trustees required unreasonably detailed support before submitting repurchase demands. Plaintiffs assert that Defendant was negligent or willfully blind to loans with representation and warranty breaches that Plaintiffs assert constituted discovery or notice, but which Defendant ignored in direct contravention of the governing agreements.

127.    Finally, in at least two at-issue trusts (GPMF 2006-AR8 and GPMF 2007-AR1) the securitizer entered into bankruptcy prior to the enactment of Dodd-Frank and therefore no 15Ga-1 reports for those trusts were ever created or publicly disclosed.

128.    At a minimum, the publicly available 15Ga-1 reports demonstrate plausibly that

Defendant discovered or had notice of loan-by-loan breaches in the 10 trusts identified above. Discovery is necessary to determine whether Defendant's files contain evidence of loan-by-loan breaches for the remaining 10 trusts, but given the facts set forth in this complaint, it is likely and certainly plausible that they do.

129.     The fact that some of the 15Ga-1 reports occurred after the potential expiration of the statute of limitations is not dispositive. Loans reported as being subject to repurchase demands could plausibly have been discovered earlier, information that is uniquely in the trustee's possession. Further, Plaintiffs know that many RMBS trusts from this time period were subject to tolling agreements which extended the time to bring claims to enforce repurchase demands. This was especially common for trusts where Countrywide was the warrantor. While Plaintiffs cannot know absent discovery of the existence of tolling agreements, Plaintiffs believe that at least some of the at-issue trusts were subject to tolling. Such agreements would make the discovery and notice of breaching loans discussed in this section and those below timely.

**B.     Defendant Discovered or Had Notice of Loan-by-Loan Document Defects and Representation and Warranty Breaches from Final Exception Reports**

130.     For every trust at issue, either the trustee or the custodian created a final exception report listing loans with mortgage file exceptions and defects. As discussed in Part V.D above, the governing agreements explicitly require certain documents evidencing ownership and correct assignment of the mortgage loans such as original mortgage notes, title policies, and assignments.

131.     Final exception reports list required documents that are missing or defective on a loan-by-loan basis. In other words, the trustee or custodian reviewed each individual file and listed on the final exception report each missing or defective document. Such missing or defective documents triggered repurchase obligations under the terms of the governing

agreements. As described above, this repurchase requirement was usually found in section 2.02 and/or 2.03 of the PSAs and required the warrantor to repurchase loans with missing or defective documents.

132.    The final exception reports also routinely identified loans that breached loan level representation and warranties. In reviewing the loan files for completeness, many trustees (and custodians) also undertook additional checks including reviewing the contents of the loan files against the mortgage loan schedule. Final exception reports reviewed by Plaintiffs in the context of other litigation frequently identified discrepancies between the characteristics of the loan and the data on the mortgage loan schedule – an actionable representation and warranty breach.

133.    In addition, many trusts contain representations and warranties that cover the contents and transfer of the mortgage loan file. For example, the warrantor in the HEAT 2006-7 trust made a representation and warranty that the warrantor "has delivered or caused to be delivered to the Trustee or the Custodians on behalf of the Trustee the original Mortgage bearing evidence that such instruments have been recorded in the appropriate jurisdiction . . . (or, in lieu of the original of the Mortgage or the assignment thereof, a duplicate or conformed copy of the Mortgage . . . together with a certificate of receipt from the Seller or the settlement agent who handled the closing of the Mortgage Loan, certifying that such copy or copies represent true and correct copy(ies) of the originals)." HEAT 2006-7 PSA Schedule III § xii; *see also* id. § xiii. Consequently, a failure to deliver documents as reflected in the final exception report would also be a representation and warranty breach by the warrantor.

134.    Final exception reports are not publicly available, and are not generally even available to investors. Thus, the only way to determine the extent and number of defective mortgage files and breaches found on the final exception reports is through discovery.

135.     It is Plaintiffs' experience that every RMBS trust issued during the relevant time period had at least some loans identified on the final exception report with missing or defective documents. In many instances vast quantities of loans were identified with problems. Some trusts had more than 50% of all their loans appear on final exception reports.

136.     While not generally available, Plaintiffs have obtained final exception reports for some of the trusts here. Because other investors have already sued Defendant, copies of redacted final exception reports have been filed on public dockets as exhibits for a small subsection of the at-issue trusts.

137.     For example, the final exception report for the HEAT 2006-7 trust is publicly available. *Phoenix Light SF Dac, et al. v. U.S. Bank N.A., et al.*, 14-cv-10116, Dkt. 314.295 (S.D.N.Y.). In this trust comprised of 4,464 total loans, the final exception report shows 6,048 exceptions across 3,443 loans, with a defect rate of nearly 75%.

138.     A publicly available summary compiled by the *Phoenix Light* plaintiffs shows the outstanding exceptions at the time Defendant became successor trustee of the MSM 2007-5AX trust. *Phoenix Light SF Dac, et al. v. U.S. Bank N.A., et al.*, 14-cv-10116, Dkt. 324.869 (S.D.N.Y.). In this trust comprised of 1,604 total loans, the report shows 595 exceptions across 424 loans, with a defect rate of roughly 25%.

139.     Defendant was aware of and possessed copies of the final exception reports for the four trusts identified above.

140.     Plaintiffs believe that discovery will show that ALL at-issue trusts had multiple, and likely numerous, materially defective loan warranting repurchase listed on the trust's final exception report.

141.     For 13 trusts, Defendant, or its agent, produced the final exception reports and

circulated them to all deal parties. There can be no dispute that Defendant received copies of these reports and was aware of the material loan defects and representation and warranty breaches contained therein.

142.    For the 7 trusts where Defendant was the successor trustee, Plaintiffs allege, upon information and belief, that copies of the final exception reports were transferred along with the trust files at the time Defendant was appointed as successor trustee. Consequently, Defendant received copies of the final exception reports upon its acceptance of the successor trustee role.

143.    Plaintiffs also know that trustees routinely requested and received updated copies of exception reports well after the creation of the final exception report. Some trustees even made it a yearly practice to request and review updated exception reports. Others undertook efforts to "clear" open exceptions during the 2010-11 time frame in response to heightened scrutiny from the media and governmental regulators in response to the robo-signing scandal.

144.    Moreover, Plaintiffs are aware of at least one governmental investigation that investigated uncleared document exceptions. As part of this governmental inquiry, trustees were required to collect and produce copies of reports showing loans with outstanding document exceptions to this governmental agency.

145.    Plaintiffs believe that Defendant's files will reveal copies of the final exception reports, or subsequently generated reports, detailing loans with missing or defective documents for all 20 at-issue trusts.

146.    At an absolute minimum, Defendant had legal ownership of the custodial files. It had the right and ability to review the files for missing or defective documents at any time. Defendant also had the right and ability to request updated copies of the exception reports from the document custodians. While Plaintiffs believe it is highly likely that Defendant actually did

request and receive updated exception reports for all 20 trusts, if they did not it was their own willful blindness that prevented them from gaining knowledge of these document defects and representation and warranty breaches.

### C. Defendant Publicly Disclosed Its Knowledge of Representation and Warranty Breaches

147. Defendant rarely provided investors with information about the performance of the trusts or issues concerning the loans in the trusts.

148. However, in limited circumstances, and almost always at the behest of other investors, Defendant did publicly distribute informational notices to investors. These notices were primarily distributed through the Defendant's, or the securities administrators', websites.

149. Plaintiffs have identified three notices that provide evidence that Defendant knew of loan-by-loan representation and warranty breaches.

150. HVMLT 2005-8: On March 5, 2012, Defendant distributed a notice to all beneficial holders which stated that "at the direction and expense of certain Certificateholders, a forensic mortgage loan underwriting consultant was retained to review a sample of Loans." The re-underwriting expert identified 469 breaches of the warrantor's "representations and warranties, including alleged misrepresentation of income, debt obligations and occupancy." The notice goes on to state that after reviewing the results from the re-underwriting expert, Defendant requested the warrantor either cure or repurchase all 469 of the breaching loans.

151. HVMLT 2006-4: On August 22, 2012, Defendant distributed to all beneficial holders a notice that it had "received notice" of an unspecified number of mortgage loans in the trust with "alleged breaches of representation or warranties." Defendant demanded that such loans be repurchased, but the warrantor had not taken any action at the time the notice was distributed.

152.     Defendant clearly did not always provide notice to investors when it was aware of breaching loans. In fact, Plaintiffs are aware of two instances in which lawsuits were filed in an attempt to enforce the repurchase obligations of warrantors, but no notices like the ones noted above were made available to certificateholders.

153.     HEAT 2006-7:  On October 2, 2012, the FHFA, on behalf of the trust, filed a summons with notice in the Supreme Court of State of New York (Index No. 653467/2012) to enforce the repurchase obligations of DLJ Mortgage Capital Inc. FHFA alleged that "one or more mortgage loans [in the HEAT 2006- trust] breach R&Ws." No notice of this lawsuit was ever provided to investors. Defendant would surely have been made aware of the loan-by-loan allegations underlying the complaint, especially since the defendant in the repurchase action, DLJ Mortgage Capital Inc., was required under the PSA to provide notice to Defendant of any loans with representation and warranty breaches.

D.     **Defendant Plausibly Learned Of Loan-By-Loan Representation And Warranty Breaches As A Result Of Certificateholder Lawsuits Or Investigations**

154.     After the financial crisis, numerous certificateholders filed lawsuits against underwriters of RMBS trusts alleging violations of Sections 11 and 12(a)(2) of the Securities Act of 1933 ("Securities Act Cases").

155.     The primary allegations in the Securities Act Cases was that RMBS originators and underwriters misrepresented the characteristics of the loans underlying the RMBS. To prove these misrepresentations, plaintiffs in the Securities Act Cases examined individual loans to identify those which they believed did not comply with underwriting guidelines or whose characteristics were misrepresented.

156.     In order to conduct these loan reviews, plaintiffs in Securities Act Cases generally

used publicly available information, including the monthly loan level data distributed by trustees, to identify loans that likely did not conform to the representations found in the prospectuses and governing agreements.

157. Once plaintiffs had reviewed the loans and identified breaches, they filed publicly available complaints. In many instances, once complaints based on reviews of publicly available information were filed and survived motions to dismiss, the plaintiffs went back and conducted more detailed forensic reviews of loans using the individual loan files obtained during discovery.

158. While these publicly available complaints describe the general types of breaches uncovered and the rough percentage of loans in each trust the plaintiffs believe were breaching, it was exceedingly rare that the underlying analyses were made publicly available due to privacy concerns surrounding individual borrowers.

159. Plaintiffs reviewed publicly filed Securities Act Cases and have identified complaints and filings alleging loan-by-loan deviations from mortgage loan schedules and failure to comply with underwriting guidelines for the below trusts. A more detailed summary of the various complaints and allegations is attached as Exhibit O.

- HEAT 2006-7,
- HVMLT 2005-1,
- HVMLT 2005-2,
- HVMLT 2005-8,
- HVMLT 2005-16,
- HVMLT 2006-4,
- MLMI 2006-RM2,
- MLMI 2006-RM3,
- MSM 2006-15XS,
- MSM 2007-5AX,
- and WMALT 2006-AR4.

160. Absent discovery, Plaintiffs are unable to determine to what extent these loan-by-loan breach results were shared with or known by Defendant.

161.     In instances where the defendants in the underlying Securities Act Cases, or one of its affiliates, was a party to governing agreements, the Securities Act Case defendants may have been required to send notice of these loan-by-loan breaches to Defendant.

162.     Additionally, Plaintiffs believe that the plaintiffs in the Securities Act Cases may have also provided the results of their reunderwriting to trustees in an attempt to increase settlement pressure in their Securities Act Cases. Plaintiffs are aware of at least one Securities Act plaintiff who did just that.

163.     Finally, since plaintiffs in Securities Act Cases commonly used the trustee to gain access to the underlying loans files, it is possible that Defendant became aware of loan-by-loan representation and warranty breaches during their interactions with Securities Act plaintiffs.

164.     In addition to Securities Act Cases, many certificateholders also attempted to work with trustees to pursue repurchase actions. One such investor group was led by the law firm of Gibbs & Bruns.

165.     Gibbs & Bruns, representing certificateholders with 25% voting rights, directed U.S. Bank to investigate the following trusts where Morgan Stanley was the warrantor. *See* https://www.gibbsbruns.com/institutional-bondholders-issue-instructions-to-three-trustees-to-open-investigations-of-ineligible-mortgages-in-over-25-billion-of-morgan-stanley-issued-rmbs/.

- MSM 2006-3AR,
- MSM 2006-15XS,
- and MSM 2007-5AX.

166.     It is plausible that Defendant discovered loan-by-loan representation and warranty breaches in relation to the Gibbs & Bruns investigation. At a minimum, Defendant received explicit direction from the requisite percentage of holders to look for such breaching loans in these trusts.

**E.   Defendant's Actions in the Bankruptcy of Originators and Sponsors Demonstrates a Trust-By-Trust and Loan-By-Loan Awareness of Breaches in the Trusts**

167.    It was common for RMBS trusts to contain loans from multiple originators. This is true for many of the trusts at-issue. When the originators or sponsors filed for bankruptcy, Defendant routinely filed claims in the bankruptcy estate for these entities.

168.    While there is significant variability in the claims trustees filed in the bankruptcy estates of warrantors, at least some trustees included claims on a loan-by-loan basis.

169.    Under certain circumstances, trustees, including Defendant, also retained outside advisors to conduct forensic reviews of loan files to identify loan-by-loan breaches. For example, Defendant retained outside advisors to review loan files as part of the Lehman bankruptcy. Lehman was the sponsor for two at-issue trusts, although it is not clear from public filings if Defendant reviewed loans for the at-issue trusts as part of the Lehman bankruptcy.

170.    Plaintiffs believe that a review of Defendant's files will reveal instances of discovery or notice of loan-by-loan breaches in conjunction with Defendant's submission of claims in the bankruptcy estates for certain warrantors.

171.    At a minimum, Defendant provided notice to certificateholders that it had submitted claims based on document defects and representation and warranty breaches for the following trusts:

- GPMF 2006-AR8 – Lehman Brothers Holdings, Inc. (Sponsor and Seller);
- GPMF 2007-AR1 – Lehman Brothers Holdings, Inc. (Sponsor and Seller);
- MLMI 2006-RM2 – ResMAE Mortgage Corporation (Originator);
- MLMI 2006-RM3 – ResMAE Mortgage Corporation (Originator);
- MLMI 2007-HE3 – OwnIt Mortgage Solutions, Inc. (Originator);
- MSM 2006-15XS – American Home Mortgage Corp. and Residential Capital, LLC (Originators);
- and MSM 2007-5AX – American Home Mortgage Corp. (Originator).

172.    For those trusts where Defendant is the successor trustee, Plaintiffs believe that

Defendant was provided with copies of all bankruptcy claims and supporting documentation during the successor trustee appointment process. At a minimum, Defendant would have been tasked with overseeing any continued bankruptcy proceedings that extended beyond the appointment as successor trustee.

173.     As with other notices provided to certificateholders, Plaintiffs do not believe that all claims filed by Defendant in bankruptcy estates were publicly disclosed. Plaintiffs believe Defendant was aware of more representation and warranty breaches as a result of bankruptcy proceedings than for just the seven trusts identified above.

**F.     Defendant Discovered Loan-By-Loan Breaches Through Its Involvement in Individual Borrower Litigation**

174.     Plaintiffs believe that Defendant knew, or should have known, of loan level representation and warranty breaches as a result of its involvement in individual borrower litigation.

175.     There are three circumstances in which Defendant would have uncovered such loan level representation and warranty breaches.

176.     First, trustees, including Defendant, were frequently named as defendants in litigation by individual borrowers who alleged that they were the victims of mortgage loan fraud. In such instances, copies of the complaints alleging fraud or other defects were sent to Defendant for review. In some instances, the complaints even contained supporting documentation confirming representation and warranty breaches.

177.     It is likely that discovery will reveal that Defendant received copies of lawsuits from individual borrowers alleging that their loans were originated fraudulently and/or in violation of the representation and warranties.

178.     Second, as the titular owner of the mortgage loans, the trustee was in many

instances a party to foreclosure proceedings. Similar to stand alone litigation brought by borrowers, it was common for borrowers when faced with foreclosure to assert counterclaims or defenses sounding in fraud or misconduct by originators and servicers.

179.    Finally, in the course of foreclosure litigation it is also likely that servicers or agents of the trustee uncovered representation and warranty breaches. These breaches should have been reported to the Defendant and Plaintiffs are aware of instances in which servicers did as such.

### G.    Defendant Likely Discovered or Received Loan-By-Loan Breach Notices Through Its Involvement with Credit Risk Monitors

180.    It is plausible that Defendant received loan-by-loan notices of representation and warranty breaches from Credit Risk Managers ("CRM") or similar supervisory entities associated with HEAT 2006-7.

181.    CRMs were retained under the governing agreements and generally tasked with providing reports and recommendations concerning delinquent and defaulted Mortgage Loans. CRMs reviewed loan level data including loss and delinquency information and generated monthly CRM Reports. In essence, the CRM Reports identified loans with "red flags" for potential representation and warranty breaches.

182.    While the governing agreements did not usually require these CRM reports be sent to Defendant, Defendant had the right to review them. Absent discovery, it is impossible to know to what extent Defendant reviewed CRM reports.

## VIII.    DEFENDANT HAD ACTUAL KNOWLEDGE OR RECEIVED NOTICE OF EVENTS OF DEFAULT

183.    Under many of the governing agreements, Defendant must have "actual knowledge" of an event of default or have received written notice of such event of default. In

both instances, it is frequently required that a "responsible officer" of the Defendant had this knowledge.

184.     It is impossible for Plaintiffs to demonstrate the knowledge of a "responsible officer" of Defendant absent access to Defendant's files and employees. However, certain evidence strongly supports the conclusion, and certainly makes it plausible, that Defendant was fully aware of either actual events of default or conditions that would ripen into events of default.

A.     **Plaintiffs Believe Certificateholders Provided Notice to Defendant of Events of Default**

185.     Plaintiffs strongly suspect that discovery will show that Defendant received written notices of events of default from certificateholders for at least some of the at-issue trusts.

186.     Plaintiffs are aware of a wide-ranging effort by the FHFA to provide notice to RMBS trustees of events of default. While plaintiffs have yet to uncover any publicly available letters for the at-issue trusts, an example of the types of letters that FHFA sent out was filed in the *Phoenix Light* matter. *Phoenix Light SF Dac, et al. v. U.S. Bank N.A., et al.*, 14-cv-10116, Dkt. 314.263 (S.D.N.Y.).

187.     In its November 20, 2012 letter to Defendant, FHFA stated that is was the holder of more than 25% of the voting rights in the ABSHE 2006-HE7 trust. FHFA further stated that it was providing to Defendant written notice that an event of default had occurred in the ABSHE 2006-HE7 trust. *Phoenix Light SF Dac, et al. v. U.S. Bank N.A., et al.*, 14-cv-10116, Dkt. 314.263 (S.D.N.Y.).

188.     Again, while the ABSHE 206-HE7 trust is not at-issue in this litigation, Plaintiffs know that the FHFA sent almost identical letters to trustees on numerous trusts. Plaintiffs do not know the reasons why, but despite these letters informing trustees of events of default the trustees did not always declare formal events of default.

189.     Plaintiffs believe that for at least some of the at-issue trusts, discovery will likely show similar letters in Defendant's files.

**B.     Defendant Knew of Failures by Master Servicers and Servicers That Should Have Resulted in Events of Default**

190.     Plaintiffs have identified additional indirect evidence that Defendant knew of events of defaults. In particular, Defendant had actual knowledge of misconduct and failings by servicers and master servicers that would have ripened into events of default had Defendant taken the required actions.

191.     Under Regulation AB and the governing agreements, servicers are required to submit annual certifications of their compliance with the SEC's servicing criteria. If a particular servicer, or its auditors, determine that a servicer's procedures materially differ from those set forth in Item 1122(d) of Regulation AB, it must report those "material instances of noncompliance" to the trustee under the governing agreements.

192.     In a concession to ABS issuers, Reg AB only requires that servicers assess their servicing compliance at the "platform level" and not with respect to any individual deal. In other words, under Reg AB a servicer's conduct is assessed generally as opposed to on a trust-by-trust basis; however, servicers must provide notice of this general assessment to the trustee for every trust.

193.     Under the governing agreements, the trustee must collect and review these annual assessments of compliance with the servicing standards of Reg AB.

194.     According to Plaintiffs' review of Defendant's public disclosures, Defendant had actual knowledge of material instances of non-compliance associated with at least 8 trusts. For each of these trusts, the Defendant sent a notice to investors informing them that one of the trust's servicers "disclosed noncompliance with certain required criteria."

195.     For example, on the BAFC 2007-D trust, Defendant sent a notice to all certificateholders on December 15, 2014, stating that "Bank of America, National Association, in its capacity as Master Servicer or Servicer, is required to submit a 1122 Managerial Assertion/Attestation Report and/or a 1123 Certificate of Compliance (the "Report") to the Trustee for each Reporting Period. Bank of America, National Association submitted the Report on 2/25/2014 . . . In the Report, Bank of America, N.A. disclosed noncompliance with certain required criteria." Ex. E, December 15, 2014 Investor Notice.

196.     Plaintiffs believe that the acknowledged failure of Bank of America, N.A. to properly and prudently service the loans in the BAFC 2007-D trust would have resulted in an event of default had Defendant acted as required.

197.     Plaintiffs have identified almost identical notices for the following 8 trusts:

- BAFC 2005-F,
- BAFC 2007-B,
- BAFC 2007-D,
- GPMF 2007-AR1,
- HVMLT 2006-4,
- MLMI 2006-RM2,
- MLMI 2007-HE3,
- and WMALT 2006-AR4.

198.     In addition, according to publicly filed information in the *Phoenix Light* matter, it also appears that servicers may never have sent the required annual servicing certifications, or at least not in a timely fashion. According to the *Phoenix Light* plaintiffs in their motion for summary judgment briefing, "EODs occurred [in eight trusts] because servicers for the Trusts failed to timely deliver annual assessments of compliance." Plaintiffs' Memo. In Opp. To U.S. Bank's Mot. For Summary Judgment, *Phoenix Light SF DAC et al. v. U.S. Bank N.A. et al.*, No. 14-cv-10116 (S.D.N.Y. Jun. 19, 2018) (ECF 310).

199.    Finally, Plaintiffs know for a fact that the instances of non-compliance identified by Defendant and provided to certificateholders are woefully incomplete. Almost all of the material instances of noncompliance disclosed to investors occurred in 2014 and 2015; however, Plaintiff is aware of similar instances of noncompliance that occurred much earlier in time for at-issue servicers which Defendant did not provide to investors.

200.    For example, in February of 2010 Bank of America, N.A., in its capacity as servicer for a number of the at-issue trust, disclosed to Defendant that during the period January 1, 2009 to November 13, 2009 loan modifications were not made, reviewed, and/or approved in accordance with the provisions of the transaction agreements [for criterion 1122(d)(4)(vi)]." And "[f]or criterion 1122(d) (4)(vii), certain loss mitigation or recovery actions were not initiated, conducted or concluded in accordance with the required timeframes established under the transaction agreements." *Phoenix Light SF Dac, et al. v. U.S. Bank N.A., et al.*, 14-cv-10116, Dkt. 314.402 (S.D.N.Y.).

201.    Defendant cannot plead ignorance of the implications of such notices either. Again, Plaintiffs are limited to information that is publicly available, but documents filed in other litigation indicate that Defendant was fully aware that such conduct on the part of servicers could result in events of default.

202.    For example, in the *Phoenix Light* action, a December 24, 2009 letter from Defendant to Wells Fargo Home Mortgage as servicer was filed on the public docket. In that letter, Defendant informed Wells Fargo Home Mortgage as servicer that Defendant had become aware of servicing failures that "have or may have a detrimental impact on the Transactions." *Phoenix Light SF Dac, et al. v. U.S. Bank N.A., et al.*, 14-cv-10116, Dkt. 314.712 (S.D.N.Y.). Wells Fargo Home Mortgage was a servicer for multiple at-issue trusts.

203.     In addition, while Plaintiffs do not have access to Defendant's files, another publicly filed letter in *Phoenix Light* litigation demonstrates that Defendant may have received trust-by-trust and loan-by-loan notices of deficient servicing from the Credit Risk Monitors discussed above. For example, Defendant received an April 25, 2012 letter from Clayton Fixed Income Services Inc. ("Clayton") in its role as CRM titled "Notification of Breach of the Pooling and Servicing Agreement" for the CMLTI 2006-WF2 trust. *Phoenix Light SF Dac, et al. v. U.S. Bank N.A., et al.*, 14-cv-10116, Dkt. 314.414 (S.D.N.Y.).

204.     The letter identifies a specific loan and loss amount attributable to inappropriate servicing practices. Unless remedied, such failure by the servicer to properly remit the required funds would constitute an event of default. While the CMLTI 2006-WF2 is not at issue here, Plaintiffs believe similar letters may exist for the at-issue trusts in Defendant's files especially since the servicer identified in the CMLTI 2006-WF2 notices was also a servicer of at-issue trusts.

205.     The fact that some of the at-issue trusts may have master servicers as intermediaries between Defendant and individual servicers does not eliminate the fact that events of default occurred. In trusts with master servicers, an event of default is predicated upon misconduct or breaches by the master servicer. Master Servicers were directly tasked with overseeing servicers. If a master servicer obtained knowledge of a material instance of noncompliance or other servicer failure it was required to act. For example, the PSA for the GPMF 2007-AR1 states that the master servicer "for the benefit of the Trustee and the Certificateholders, shall use its reasonable best efforts to enforce the obligations of each Servicer under the related Servicing Agreement, and shall, upon obtaining actual knowledge of the failure of a Servicer to perform its obligations in accordance therewith, to the extent that such non-

performance of such obligations would have a material adverse effect on a Mortgage Loan, the Trust Fund or the Certificateholders, terminate the rights and obligations of such Servicer." Absent discovery, it is impossible to know what actions the master servicers took or if they provided appropriate notice to Defendant.

206.    Plaintiffs believe that evidence in Defendant's files will prove that Defendant was aware that the servicers and master servicers for the trusts had routinely abandoned industry standard servicing practices by foreclosing on properties without adequate documentation, or with fabricated documentation, by failing to maintain properties in default, failing to engage in timely loss mitigation and modification, and by making improper advances. Defendant knew this because the servicers themselves disclosed these problems under their Reg AB reporting requirements.

## IX.    DEFENDANT DISCOVERED OR RECEIVED NOTICE THAT THE TRUSTS SUFFERED FROM WIDESPREAD BREACHES OF REPRESENTATIONS AND WARRANTIES AND SHOULD HAVE TAKEN APPROPRIATE ACTION

207.    The trusts' loan pools contained large numbers of loans that materially breached the warrantors' representations and warranties concerning the originators' compliance with underwriting guidelines, owner occupancy statistics, appraisal procedures, and other associated standards. Discovery will likely show that Defendant discovered and received notice of loan-by loan and trust-by-trust evidence including but not limited to: (1) Defendant's internal tracking and correspondence regarding loan-by loan problems; (2) notices from entities, including monoline insurers, identifying loans with representation and warranty breaches; (3) information regarding specific breaching loans discovered by servicers; (4) failures by counterparties to cure; and (5) missing critical documents in loan and mortgage files for specific loans. This evidence was in the possession of and known to Defendant but not generally available to investors.

208.    That Defendant discovered or received notice of such evidence is further supported by evidence of widespread problems with the loans in the trusts, including, among other things: (1) general reports concerning originators' systematic abandonment of their underwriting standards and reports concerning the sponsors' pervasive disregard of prudent securitization standards (Part IX.A); (2) specific reports concerning the originators of loans in the trusts abandoning their underwriting standards and sponsors of the securitizations failing to follow prudent practices (Exhibit I); (3) the high number of borrower delinquencies and defaults on mortgages in the trusts' loan pools and enormous losses to the trusts (Part IX.C); and (4) the collapse of the certificates' credit ratings from high, investment-grade ratings when purchased to much lower ratings, including numerous "junk" ratings (Part IX.D).

209.    For trusts that closed in 2006 or later, SEC Regulation AB, 17 C.F.R. § 229 *et seq.* ("Reg. AB"), requires that Defendant distribute remittance reports to Certificateholders disclosing, among other things, "material breaches of pool asset representations or warranties or transaction covenants." 17 C.F.R. § 229.1121(a)(12). Defendant discovered representation and warranty breaches and other issues with the at-issue trusts while preparing the remittance reports yet failed to take action to enforce repurchases are required by the PSAs. Upon information and belief, Defendant also knew about other representation and warranty breaches, servicing violations, failures by warrantors to repurchase when required, and related breaches of the PSAs, but did not add that information to the remittance reports and disclose it to Certificateholders.

A.      **General Reports Concerning Originators' Systematic Abandonment of their Underwriting Standards and Sponsors' Disregard of Prudent Securitization Standards**

210.    Over the life of the trusts, government reports, public and private investigations, and media reports had surfaced concerning the collapse of the RMBS market and revealed the

potential for massive problems in the trusts such that a reasonable and prudent trustee would have taken upon itself the duty to carefully investigate these issues and to take action as necessary. These reports and investigations identified the originators' pervasive abandonment of underwriting standards and sponsors' disregard of prudent securitization standards as the cause of the crisis.

211.    For example, the Office of the Comptroller of the Currency (the "OCC"), published a report in November 2008 listing the "Worst Ten" metropolitan areas with the highest rates of foreclosures and the "Worst Ten" originators with the largest numbers of foreclosures in those areas ("2008 'Worst Ten in the Worst Ten' Report"). In this report the OCC emphasized the importance of adherence to underwriting standards in mortgage loan origination:

> The quality of the underwriting process—that is, determining through analysis of the borrower and market conditions that a borrower is highly likely to be able to repay the loan as promised—is a major determinant of subsequent loan performance. The quality of underwriting varies across lenders, a factor that is evident through comparisons of rates of delinquency, foreclosure, or other loan performance measures across loan originators.

212.    Despite the importance of sticking to underwriting standards, it was clear that originators were not following them. Chairman of the Federal Reserve Board, Benjamin Bernanke, spoke to the decline of underwriting standards in his speech before the World Affairs Council of Greater Richmond on April 10, 2008:

> First, at the point of origination, underwriting standards became increasingly compromised. The best-known and most serious case is that of subprime mortgages, mortgages extended to borrowers with weaker credit histories. To a degree that increased over time, these mortgages were often poorly documented and extended with insufficient attention to the borrower's ability to repay. In retrospect, the breakdown in underwriting can be linked to the incentives that the originate-to-distribute model, as implemented in this case, created for the originators. Notably, the incentive structures often tied originator revenue to loan volume, rather than to the quality of the loans being passed up the chain. Investors normally have the right to put loans that default quickly back to the originator, which should tend to apply some discipline to the underwriting process. However, in the recent episode, some originators had little capital at stake, reducing their exposure to the risk that the loans would perform poorly.

Benjamin Bernanke, Chairman, Federal Reserve Board, Speech to the World Affairs Council of Greater Richmond, *Addressing Weaknesses in the Global Financial Markets: The Report of the President's Working Group on Financial Markets*, Apr. 10, 2008, *available at* http://www.federalreserve.gov/newsevents/speech/bernanke20080410a.htm.

213.    In November 2010, the Congressional Oversight Panel, which was established as part of the Emergency Economic Stabilization Act of 2008, issued a report entitled "Examining the Consequences of Mortgage Irregularities for Financial Stability and Foreclosure Mitigation." The report recounts widespread foreclosure abuses in connection with mortgages that have been securitized and the numerous federal and state investigations that have detailed this problem. The abuses identified in the report—including forged or back-dated mortgage assignments and "robo-signing" of false affidavits used in foreclosure actions—arise from failures in the documentation and transfer of mortgage loans from the originators to other entities in the securitization process, and ultimately into the trusts. As the report explains, irregularities in the chain of title between the originator and the trust can have significant legal consequences that damage the trusts and certificateholders. Cong. Oversight Panel, *Examining the Consequences of Mortgage Irregularities for Financial Stability and Foreclosure Mitigation*, Pub. L. No. 110-343 (2010)*, available at* http://www.gpo.gov/fdsys/pkg/CPRT-111JPRT61835/pdf/CPRT-111JPRT61835.pdf.

214.    Other reports reached similar conclusions. The Permanent Subcommittee on Investigations in the United States Senate ("PSI") issued a report detailing the causes of the financial crisis. Using Washington Mutual Bank as a case study, the PSI concluded through its investigation:

Washington Mutual was far from the only lender that sold poor quality mortgages and mortgage backed securities that undermined U.S. financial markets. The Subcommittee investigation indicates that Washington Mutual was emblematic of a host of financial institutions that knowingly originated, sold, and securitized billions of dollars in high risk, poor quality home loans. These lenders were not the victims of the financial crisis; the high risk loans they issued became the fuel that ignited the financial crisis.

Staff of S. Permanent Subcomm. on Investigations, 112th Cong., *Wall Street and the Financial Crisis: Anatomy of a Financial Collapse* 50 (Subcomm. Print 2011).

215. The Financial Crisis Inquiry Commission ("FCIC") issued its final report in January 2011 that detailed, among other things, the collapse of mortgage underwriting standards and the subsequent collapse of the mortgage market and wider economy. *See* Fin. Crisis Inquiry Comm'n, Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States (2011) ("FCIC Report").

216. The FCIC Report concluded that there was a "systemic breakdown in accountability and ethics." "Unfortunately—as has been the case in past speculative booms and busts—we witnessed an erosion of standards of responsibility and ethics that exacerbated the financial crisis." *Id*. at xxii. The FCIC found:

[I]t was the collapse of the housing bubble—fueled by low interest rates, easy and available credit, scant regulation, and toxic mortgages—that was the spark that ignited a string of events, which led to a full-blown crisis in the fall of 2008. Trillions of dollars in risky mortgages had become embedded throughout the financial system, as mortgage-related securities were packaged, repackaged, and sold to investors around the world.

*Id*. at xvi.

217. The FCIC Report also noted that during the housing boom, mortgage lenders focused on quantity rather than quality, originating loans for borrowers who had no realistic capacity to repay the loan, and noted "that the percentage of borrowers who defaulted on their mortgages within just a matter of months after taking a loan nearly doubled from the summer of 2006 to late 2007." *Id*. at xxii. A default in the first few months of a mortgage, known as an early

payment default, is known in the mortgage industry as a significant indicator of pervasive disregard for underwriting standards. Not surprisingly, the FCIC Report noted that mortgage fraud "flourished in an environment of collapsing lending standards." *Id*.

218.    In this lax lending environment, mortgage lenders went unchecked, originating mortgages for borrowers in spite of underwriting standards:

> Lenders made loans that they knew borrowers could not afford and that could cause massive losses to investors in mortgage securities. As early as September 2004, Countrywide executives recognized that many of the loans they were originating could result in "catastrophic consequences." Less than a year later, they noted that certain high-risk loans they were making could result not only in foreclosures but also in "financial and reputational catastrophe" for the firm. But they did not stop.

*Id*.

219.    Lenders and borrowers took advantage of this climate, with borrowers willing to take on loans and lenders anxious to get those borrowers into the loans, ignoring even loosened underwriting standards. The FCIC Report observed: "Many mortgage lenders set the bar so low that lenders simply took eager borrowers' qualifications on faith, often with a willful disregard for a borrower's ability to pay." *Id*. at xxiii.

220.    The predominant RMBS securitization method involved an originate-to-distribute ("OTD") model where the originators of the loans do not hold the loans, but instead repackage and securitize them. The OTD model created a situation where the origination of low quality mortgages through poor underwriting thrived. The Financial Stability Oversight Council ("FSOC") found:

> In the originate-to-distribute model, originators receive significant compensation upfront without retaining a material ongoing economic interest in the performance of the loan. This reduces the economic incentive of originators and securitizers to evaluate the credit quality of the underlying loans carefully. Some research indicates that securitization was associated with lower quality loans in the financial crisis. For instance, one study found that subprime borrowers with credit scores just above a threshold commonly used by securitizers to determine which loans to purchase defaulted at significantly higher rates

than those with credit scores below the threshold. By lower underwriting standards, securitization may have increased the amount of credit extended, resulting in riskier and unsustainable loans that otherwise may not have been originated.

Fin. Stability Oversight Council, Macroeconomic Effects of Risk Retention Requirements (2011) ("FSOC Report") at 11 (footnote omitted).

221.    The FSOC reported that as the OTD model became more pervasive in the mortgage industry, underwriting practices weakened across the industry. The FSOC Report found "[t]his deterioration was particularly prevalent with respect to the verification of the borrower's income, assets, and employment for residential real estate loans." *Id*. Similarly, the sponsors responsible for securitizing residential mortgages for trusts between 2004-2008 failed to conduct adequate due diligence reviews of the mortgage pools to ensure the mortgage loans were of the represented quality and also failed to ensure that the purported mortgaged property's appraised value was accurate.

222.    As the FCIC Report noted:

The Commission concludes that firms securitizing mortgages failed to perform adequate due diligence on the mortgages they purchased and at times knowingly waived compliance with underwriting standards. Potential investors were not fully informed or were misled about the poor quality of the mortgages contained in some mortgage-related securities. These problems appear to have been significant.

FCIC Report at 187.

223.    Additionally, the evidence shows that sponsors, and the third party due diligence providers they hired, failed to analyze adequate sample sizes of the loan pools, sometimes reviewing as little as 2%-3% of the entire loan pools. More importantly, when the sponsors and their due diligence firms identified high percentages of mortgage loans in their sample reviews as defective, the sponsors often "waived in" mortgage loans in the interest of preserving their business relationships and their own profits.

224.    In sum, reports regarding the disregard of underwriting standards and poor securitization practices were common. Defendant had exclusive access to proprietary information and data demonstrating the systematic failure of underwriting standards that was not available to the public. If validated, those practices would have directly contributed to the sharp decline in the quality of mortgages that became part of mortgage pools underlying RMBS, resulting in steep losses.

**B.    Specific Reports Concerning the Originators of Loans in the Trusts Abandoning their Underwriting Standards and the Sponsors Disregarding Prudent Securitization Practices**

225.    The governing agreements for the trusts incorporated representations and warranties concerning title to the mortgage loans, the characteristics of the borrowers and the collateral for the mortgage loans, and the credit criteria and underwriting practices for the origination of loans.

226.    However, Defendant knew and/or had reason to suspect that those representations and warranties were false and should have taken action to address the problem concerning the defective mortgage loans in the trusts. Numerous investigations, lawsuits, and media reports have demonstrated that nearly all of the largest mortgage loan originators in the RMBS market between 2000 and 2008 systematically disregarded their stated underwriting guidelines while pursuing profit by recklessly originating loans without regard for the borrowers' ability to repay. In addition, investigations, lawsuits, and media reports have shown that the primary sponsors in the RMBS market ignored prudent securitization standards. Attached as Exhibit I are detailed allegations concerning the relevant originators and sponsors. Information regarding the shoddy practices of these counterparties were available to Defendant dating from nearly the close of the trusts.

227.    The information in Exhibit I put Defendant on notice that the loans underlying the trusts did not comply with the representations and warranties in the governing agreements. As a result, Defendant should have followed up on those issues in the context of the trusts entrusted to its care, provided notice to certificateholders, and taken appropriate action to protect the trusts, including identifying the particular breaching loans in the trusts and enforcing repurchase.

### C.    A High Number of Borrower Delinquencies and Defaults on Mortgages in the Trusts' Loan Pools and Enormous Trust Losses Are Further Evidence of the Originators' Systematic Disregard of Underwriting Standards

228.    Apart from the multiple, highly-publicized RMBS lawsuits and the numerous government investigations on both a state and federal level, there were various other indications that the trusts' loan pools included large numbers of mortgage loans that materially breached the warrantor's representations and warranties, including the following: 1) the trusts' high default and delinquency rates; and 2) the trusts' enormous cumulative losses. A summary of the trusts' default and delinquency rates and the trusts' cumulative losses is attached as Exhibit J.

### 1.    The Trusts Suffered from High Delinquency and Default Rates

229.    Residential mortgages are considered delinquent if no payment has been received for over 30 days after payment is due. Residential mortgages where no payment has been received for over 90 days (or three payment cycles) are considered to be in default.

230.    By January 2009, Defendant and its responsible officers witnessed a significant rise in reported defaults and delinquencies in the loan pools backing the trusts with many defaults and delinquencies occurring within months of the loans' origination. As many commentators have noted, such rapid and numerous defaults indicate loans that should not have been made. For example, a November 2008 Federal Reserve Board study attributed the general rise in defaults, in part, to "[d]eteriorating lending standards," and posited that "the surge in early

payment defaults suggests that underwriting . . . deteriorated on dimensions that were less readily apparent to investors." Christopher J. Mayer et al., *The Rise in Mortgage Defaults*, at 15-16 Fed. Reserve Bd. Fin. & Econ. Discussion Series, Paper No. 2008-59.

231. By 2009, these massive numbers of defaults and delinquencies, including early payment defaults, which automatically breach representations and warranties, put Defendant on notice that the loans sold into the trusts did not comply with the warrantors' representations and warranties and Defendant should have taken action to address any issues. Loan pools that were properly underwritten and containing loans with the represented characteristics would have experienced substantially fewer payment problems and substantially lower percentages of defaults, foreclosures, and delinquency.

232. These default and delinquency rates were communicated to Defendant monthly through the servicer reports and trustee remittance reports. By January 2009, 18 out of the 20 trusts were reporting default and delinquency rates of over 10%, with nearly a third of all the trusts reporting delinquency rates of over 40%. The average default and delinquency rate of the trusts by January 2009 was over 32%. By January 2010, this average was over 43%.

233. Properly underwritten loans would have experienced far fewer payment problems and substantially lower percentages of defaults, foreclosures, and delinquencies, even during an economic downturn.

### 2. The Trusts Suffered Huge Losses

234. Realized losses are the losses incurred regarding any liquidated mortgage loan or any mortgage loan charged off by the servicer. The realized losses equal the portion of the stated principal balance remaining unpaid after applying all net liquidation proceeds to the mortgage loan.

235.    By January 2009, the trusts' extraordinary losses should have raised a red flag to the trustees that the mortgage loans sold to the trusts did not comply with the warrantors' representations and warranties. In particular, large realized losses are indicative of severe deficiencies in the appraisal and valuation process. As an example, the MLMI 2006-RM2 trust was reporting cumulative losses in January 2009 of over $215 million, which equates to more than 22% of the trust's total original par value.

236.    By January 2009, the total combined cumulative losses for the trusts (with reported figures) exceeded $799 million, with the trusts reporting an average loss of over $39 million. By January 2011, the total reported cumulative losses for the trusts were over $2.6 billion, with an average loss of over $134 million.

237.    The immense losses are strong evidence that the originators systematically disregarded the underwriting standards and that many mortgages in the pool were not written in adherence to the underwriting guidelines in breach of the representations and warranties.

**D.    The Collapse of the Certificates' Credit Ratings Is Further Evidence of Systematic Disregard of Underwriting Guidelines**

238.    RMBS are generally divided into slices or tranches, each of which represents a different level of risk. RMBS certificates denote the particular tranches of the security purchased by the investor.

239.    The credit rating for an RMBS reflects an assessment of the creditworthiness of that RMBS and indicates the level of risk associated with that RMBS.

240.    The vast majority of the certificates owned by the CCUs were rated triple-A at issuance. A Triple-A rated product "should be able to withstand an extreme level of stress and still meet its financial obligations." *Understanding Standard & Poor's Rating Definitions*, June 3, 2009, at 14. By the end of 2008, 9 of 32 certificates—a staggering 28%— had been

downgraded to junk status by at least one credit rating agency. By the end of 2009, this figure had increased to 100%. A complete list of the downgrades for the certificates is set forth in Exhibit K.

241. The high initial credit ratings reflected the risk associated with properly originated and underwritten mortgage loans and were based on the credit risk characteristics the warrantors represented and warranted to the credit rating agencies. Consequently, the total collapse in the credit ratings of the RMBS certificates the CCUs purchased, typically from triple-A to non-investment speculative grade, put Defendant on notice that it was required to notify certificateholders of any defaults and take appropriate action.

### E. Additional Evidence Shows That Defendant Knew of Systemic Problems That Necessarily Would Result in Breaching and Defective Loans in the Trusts

#### 1. In Its Capacity as RMBS Servicer for Other Trusts, Defendant Discovered Extensive Warrantor Breaches of Representations and Warranties

242. Defendant and its affiliated entities also served as servicers and/or master servicers for numerous other RMBS trusts. In its capacity as servicer and/or master servicer, Defendant learned that many of the loans originated and sponsored by the same parties involved in the trusts at issue in this complaint were performing poorly. For example, in its capacity as servicer and/or master servicer for those trusts, one of Defendant's duties was to prepare monthly reports for the trustees detailing the poor performance of the loans. Also, as servicer and/or master servicer, Defendant knew that the credit rating agencies had downgraded trusts as a result of the poor quality of the originators' and sponsors' loan pools because it was responsible for communicating with the ratings agencies. As servicer and/or master servicer, Defendant reviewed the loan files of the mortgage loans, discovering systematic, widespread breaches of

representations and warranties in the loan pools.

243. As servicer for various trusts, Defendant was also responsible for modifying loans and enforcing mortgages in foreclosure proceedings. Such tasks would have invariably led to the discovery that title to a substantial number of mortgages was not perfected.

244. Because of its experiences as servicer to other RMBS trusts, Defendant knew that these same defective underwriting and securitization practices affected the trusts committed to its care, and had an obligation to investigate that issue carefully.

### 2. Defendant Received Written Notice of Systematic, Widespread Breaches of Representations and Warranties from Monoline Insurers

245. Monoline insurance is credit enhancement that involves purchasing insurance to cover losses from any defaults. Many RMBS trusts were insured by monoline insurers. The warrantors made representations and warranties concerning the underwriting standards of the loans in the governing agreements for the insured RMBS, and the governing agreements for the insured RMBS transactions have a repurchase procedure through which the monoline insurers must provide notice of a breach of representation and warranty to the warrantor and the other parties to the agreement, including the trustee.

246. Monoline insurers have filed many complaints against warrantors for representations and warranty breaches in connection with other RMBS trusts to which Defendant serves or served either as master servicer, servicer, or trustee. Prior to filing suit against the warrantors, the monoline insurers often obtained and carried out forensic loan level reviews of the loans at issue.

247. In *Syncora Guarantee Inc. v. Countrywide Home Loans, Inc., et al.*, No. 650042/2009 (N.Y. Sup. Ct. Jan. 28, 2009), the monoline insurer Syncora sued Countrywide Home Loans, Inc., alleging that its review of loan files securitized by the defendants revealed

breaches in 75% of the loans reviewed, with an aggregate principal balance in excess of $187 million.

248. In *Ambac Assurance Corp., et al. v. Countrywide Home Loans, Inc., et al.*, No. 651612/2010 (N.Y. Sup. Ct. Sept. 28, 2010), the monoline insurer Ambac sued Countrywide Home Loans, Inc. and its affiliates, alleging that its review of loan files securitized by the defendants revealed breaches of representations and warranties, including an extraordinarily high incidence of material deviations from the underwriting standards that defendants represented would be followed. Of the 6,533 loans reviewed across twelve transactions, 6,362 or over 97% contained one or more breaches of the mortgage loan representations.

249. In *MBIA Ins. Co. v. Countrywide Home Loans, Inc.*, No. 602825/2008 (N.Y. Sup. Ct. Sept. 30, 2008), the monoline insurer MBIA sued Countrywide Home Loans, Inc. alleging that Countrywide "developed a systematic pattern and practice of abandoning its own guidelines for loan origination: knowingly lending to borrowers who could not afford to repay the loans, or who committed fraud in loan applications, or who otherwise did not satisfy the basic risk criteria for prudent and responsible lending that Countrywide claimed to use." The parties settled the case in 2013.

250. Because of the monoline insurers' breach notices and lawsuits, Defendant knew that these same defective underwriting and securitization practices affected other trusts containing loans originated and securitized by these same originators and sponsors. Furthermore, discovery will likely demonstrate that monoline insurers provided loan-by-loan breach notices for certain trusts in this action.

### 3. Global RMBS Repurchase Investigations and Settlements Alerted Defendant to Systematic, Widespread Breaches of Representations and Warranties

251.     RMBS certificateholders have initiated numerous mortgage repurchase directions, compelling trustees to demand that warrantors repurchase the mortgage loans due to breaches of representations and warranties. Defendant was trustee in many of the RMBS subject to these directions.

252.     U.S. Bank has also been involved in global RMBS repurchase settlements. On December 16, 2011, for example, several institutional mortgage investors in hundreds of RMBS trusts sponsored by J.P. Morgan or its affiliates issued written instructions to U.S. Bank, Wells Fargo, BNYM, HSBC, and Deutsche Bank National Trust Company, as trustees, to open investigations into large numbers of ineligible mortgages in the loan pools backing the trusts and deficient loan servicing practices. The notices covered over $95 billion of RMBS sponsored by J.P. Morgan from 2005 to 2007.

253.     As trustee, Defendant has received many breach notices from institutional investors, indicating widespread and systemic violations of representations and warranties by the warrantors. Defendant knew similar issues likely affected the other RMBS trusts committed to its care, and had an obligation to investigate that issue carefully.

254.     Upon information and belief from publicly available reports filed pursuant to Securities and Exchange Commission Rule 15Ga-1, Defendant has made numerous repurchase demands across the at-issue trusts, further demonstrating Defendant's knowledge of widespread loan-by-loan breaches of representations and warranties.

### 4. Defendant Has Been Involved in Repurchase Litigation Against Warrantors

255.    Defendant was also involved in many repurchase claims for other RMBS trusts that involved the same originators, sponsors, sellers, and servicers as the trusts at issue. In many instances, these actions were initiated by certificateholders who provided notices of breaching loans to the Defendant on a loan-by-loan basis and then directed the Defendant to bring suit. Based on its involvement in these repurchase actions, which alleged widespread, systematic breaches of representations and warranties, Defendant had an obligation to protect all trusts committed to its care and take action as appropriate.

256.    In fact, Defendant sued Bank of America, N.A., in connection with repurchase claims against Countrywide Home Loans and its affiliates. Complaint, *U.S. Bank Nat'l Ass'n, as Trustee for HarborView Mortgage Loan Trust, Series 2005-10 v. Countrywide Home Loans, Inc., et al.*, No. 652388/2011 (N.Y. Sup. Ct. Aug. 29, 2011). In the complaint, Defendant alleged that in a sample of 786 loans, 66% of the loans breached one or more representation or warranty. *Id*. ¶ 5. Defendant also alleged that it served notice on Countrywide, through its successor-in-interest—Bank of America. *Id*. ¶ 6.

257.    Similarly, Defendant, as the indenture trustee of GreenPoint Mortgage Funding Trust 2006-HE1, sued GreenPoint to force it to repurchase the loans that it had contributed to the trust. Defendant alleged that GreenPoint "pervasive[ly] fail[ed] to follow its underwriting guidelines during the origination of the Loans." Complaint, *U.S. Bank Nat'l Ass'n v. GreenPoint Mortg. Funding, Inc.*, No. 600352/2009, ¶ 35 (N.Y. Sup. Ct. Feb. 5, 2009) (alleging pervasive misrepresentations of borrowers' income, assets, employment, intent to occupy the property, inflated appraisal values, and violations of GreenPoint's underwriting guidelines regarding credit scores, debt-to-income ratios, and loan-to-value ratios).

258.     Defendant based its allegations on a forensic analysis of GreenPoint-originated loans. Of 1,030 randomly sampled loans, 93% violated GreenPoint's underwriting guidelines. *See id.* ¶ 2.

259.     Additionally, as the trustee of the Morgan Stanley Mortgage Loan Trust 2007-2AX, Defendant filed repurchase claims against Morgan Stanley Mortgage Capital, Inc. and GreenPoint, alleging that a forensic review of certain loan files from the trust established extensive breaches of the defendants' representations and warranties. Complaint, *U.S. Bank Nat'l Ass'n v. Morgan Stanley Mortgage Capital Holdings LLC et al.*, No. 650339/2013 (N.Y. Sup. Ct. July 8, 2013). A forensic analysis of 56 mortgage loan files revealed that 100% or all 56 loans breached the representations and warranties. A separate loan-level analysis of 758 other loans in the trust revealed that the principal originators of the mortgages "failed to adhere to the industry-standard and reasonable underwriting guidelines in an extremely high percentage of cases." *Id.* ¶ 5.

260.     Defendant's involvement in numerous repurchase actions, particularly its knowledge of the forensic reviews conducted in connection with that litigation, shows that Defendant was on notice of the fact that such widespread, systemic breaches of representations and warranties likely affected all of the trusts committed to its care, and had an obligation to investigate that issue carefully and take action to protect the trusts.

X.     **DEFENDANT FAILED TO ACT PRUDENTLY FOLLOWING EVENTS OF DEFAULT**

A.     **Defendant Breached the Governing Agreements By Failing to Fulfill Its Duties After Defaults and Events of Default**

261.     The master servicers and/or servicers failed to prudently service the mortgage loans underlying the trusts. The governing agreements require that the master servicers and/or

servicers administer the mortgage loans for and on behalf of the certificateholders, and do so (consistent with the terms of the governing agreements): (i) in the same manner in which they service and administer similar mortgage loans for their own portfolios or for other third parties, giving due consideration to customary and usual standards of practice of prudent institutional mortgage lenders servicing similar loans; (ii) to maximize the recoveries regarding such mortgage loans on a net present value basis; and (iii) without regard to the right of the master servicers and/or servicers to receive compensation or other fees for their services under the governing agreements, the obligation of the master servicers and/or servicers to make servicing advances under the governing agreements, and the master servicers' and/or servicers' ownership, servicing or management for others of any other mortgage loans. The master servicers and servicers did not adhere to these requirements.

262.    The master servicers and/or servicers failed to meet their obligations by: (i) failing to timely and accurately apply payments made by borrowers and failing to maintain accurate account statements; (ii) charging excessive or improper fees for default-related services; (iii) failing to properly oversee third-party vendors involved in servicing activities on behalf of the banks; (iv) providing false or misleading information to borrowers; (v) failing to properly deliver loan documentation; and (vi) failing to maintain appropriate staffing, training and quality control systems.

263.    Sometimes the master servicers and/or servicers modified mortgage loans held by the trusts. In that process, because the loan modification process involves analysis of the underlying origination and mortgage loan files and any supplemental information provided by the borrower, the master servicers and/or servicers were put on notice of breaches of representations and warranties. The master servicers and/or servicers failed to notify the

applicable parties or take action based on these breaches as required by the governing agreements.

264.    In addition, in the course of fulfilling their duties to service the loans, and particularly when required to foreclose on certain mortgage loans when appropriate, the master servicers and servicers also became aware of breaches of representations and warranties but failed to notify the trustee.

265.    The master servicers and/or servicers failed to notify parties to the governing agreements upon the discovery of mortgages in violation of the representations and warranties; failed to enforce repurchase obligations; failed to properly respond to denial of mortgage insurance claims based on originator misrepresentations; failed to foreclose upon properties when appropriate under applicable law; and failed to conduct foreclosures in a lawful fashion.

266.    Much of this conduct constituted events of default under the governing agreements. These failures have been confirmed by governmental investigations, published reports, and public and private litigation that have described the master servicers' and/or servicers' pervasive deviation from customary and lawful servicing practices.

267.    Under the governing agreements, any failure of the master servicers and/or servicers to observe or perform any covenants or agreements under the governing agreements, after notice and lapse of time, constitutes a default.

268.    In addition, the trusts suffered from additional events of default specified in the governing agreements, including, for example, events of default related to collateral performance and other downgrades.

269.    Discovery will likely show that Defendant and its responsible officers had knowledge of the facts constituting events of default.

270.     These defaults ripened into events of default under the governing agreements for the trusts. Discovery will likely show that Defendant and its responsible officers received notice and knowledge of events of default and that Defendant (or other parties) at times issued notice of these events of default that were not subsequently cured. That information is uniquely in the possession of Defendant. Even when Defendant did not issue notice, Defendant had an obligation to provide notice of such defaults, which would have resulted in additional events of default, but it failed to do so.

271.     Defendant breached the governing agreements, its duties, and violated the law after becoming aware of such breaches, defaults and/or events of default by failing to: provide notice of such breaches, defaults and/or events of default to the master servicers and/or servicers; protect the interests of the certificateholders in the trusts; enforce repurchase obligations; and make prudent decisions concerning remedies after breaches, defaults and/or events of default.

272.     Defendant failed to exercise the same skill and care as a prudent person in the same circumstances in enforcing its rights and powers under the governing agreements upon learning of the above breaches, defaults and/or events of default.

**B.     Specific Servicer Misconduct**

273.     Most of the trusts' loans are or were serviced by the following servicers and their affiliates: Countrywide Home Loans Servicing LP and Countrywide Home Loans, Inc.; Wells Fargo Bank, N.A.; Washington Mutual Bank; GMAC Mortgage Corporation or Mortgage LLC;; PHH Mortgage Corp.; Aurora Loan Services LLC and Loan Services, Inc.; Select Portfolio Servicing, Inc.; GreenPoint Mortgage Funding, Inc.; IndyMac Bank, F.S.B.; and Bank of America, N.A. Attached as Exhibit L are detailed allegations concerning these servicers and the illegal acts and practices they engaged in regarding the servicing of mortgage loans.

**C.    The Master Servicers and Servicers Defaulted on Their Duty to Notify the Trustee of Breaches of the Mortgage Loan Representations and Warranties**

274.    Under the governing agreements, master servicers and servicers typically are required to notify the trustee, among others, upon discovery of a breach of representations and warranties with respect to a mortgage loan that materially and adversely affects the loan or the interests of the certificateholders in the loans. *See* Exhibit H § V.

275.    For example, the GPMF 2007-AR1 Trust Agreement states:

Upon discovery by any of the Depositor, any NIMS Insurer, the Master Servicer or the Trustee of a breach of any of such representations and warranties that materially and adversely affects the value of the related Mortgage Loan, the party discovering such breach shall give prompt written notice to the other parties

PSA Section 2.04. The governing agreements for the other trusts similarly require such notification. *See* Exhibit H § V.

276.    In the course of their duties, the master servicer and servicers to the trusts became aware of the overwhelming and widespread problems with the underlying mortgage loans due to the shoddy origination and underwriting practices detailed above.

277.    Sometimes the master servicers and/or servicers modified mortgage loans held by the trusts. Because the loan modification process involves analysis of the underlying origination and mortgage loan files and any supplemental information provided by the borrower, the master servicers and/or servicers must have been put on notice of breaches of representations and warranties. The master servicers and/or servicers failed to notify the trustee or take action based on these breaches.

278.    In addition, in the course of fulfilling their duties to service the loans, and particularly when required to foreclose on certain mortgage loans when appropriate, the master servicers and servicers also became aware of breaches of representations and warranties but

failed to notify the trustee.

279.     These breaches materially affected the mortgage loans and the interests of the certificateholders as the breaches made it far more likely that the loans would underperform.

280.     Under the governing agreements, any failure of the master servicers and/or servicers to observe or perform any covenants or agreements under the governing agreements, including the duty to notify the trustee of breaches of representations and warranties, after notice and lapse of time, constitutes an event of default.

281.     The PSA Section 6.14 lists, as one of several events each considered an "Event of Default," the following:

> (i) Any failure by the Master Servicer to furnish to the Trustee the Mortgage Loan data sufficient to prepare the reports described in Section 4.03(a) which continues unremedied for a period of two (2) Business Days after the date upon which written notice of such failure shall have been given to such Master Servicer by the Trustee or to such Master Servicer and the Trustee by any NIMS Insurer or Holders of not less than 25% of the Class Principal Amount of each Class of Certificates affected thereby; or
>  (ii) Any failure on the part of the Master Servicer duly to observe or perform in any material respect any other of the covenants or agreements on the part of the Master Servicer contained in this Agreement which continues unremedied for a period of 30 days (or 15 days, in the case of failure to maintain any Insurance Policy required to be maintained pursuant to this Agreement) after the date on which written notice of such failure, requiring the same to be remedied, shall have been given to the Master Servicer by the Trustee or to the Master Servicer and the Trustee by any NIMS Insurer or Holders of not less than 25% of the Class Principal Amount (or Class Notional Amount) of each Class of Certificates affected thereby or by any NIMS Insurer . . .

282.     As alleged above, in the course of their duties, the master servicer and servicers to the trusts became aware of widespread problems with the underlying mortgage loans and failed to abide by their covenants.

**D.     Defendant Knew That the Trusts Suffered from Widespread Master Servicer and/or Servicer Defaults**

283.     Defendant, as trustee, knew of the servicing misconduct (and events of default)

alleged, which has been the subject of high profile government investigations and private and public lawsuits. In the aftermath of the financial crisis, servicing abuse has also received widespread attention in the media. Thus, Defendant knew of the breaches, defaults, and events of default alleged herein.

284. Defendant also knew that the master servicers and servicers were discovering breaches of representations and warranties and failing to notify the applicable parties.

285. Defendant and its affiliates acted as master servicer and servicer to numerous other RMBS trusts. In 2010, the Federal Reserve, the OCC, the FDIC, and the OTS conducted on-site reviews of foreclosure processing at fourteen federally regulated mortgage servicers, including Defendant.

286. In April 2011, the investigating agencies issued a report titled "Interagency Review of Foreclosure Policies and Practices." The report found, among other things, that the servicers failed to evaluate "compliance with applicable laws and regulations, court orders, pooling and servicing agreements, and similar contractual arrangements." Based on the deficiencies identified in the report, the investigating agencies initiated enforcement actions against each of the servicers subject to the report. *Available at* http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47a.pdf.

287. Ally/GMAC, Aurora Bank, Countrywide Financial, HSBC, OneWest, and Wells Fargo were all subjects of the investigation. These entities and their affiliates acted as master servicer and servicer to the overwhelming majority of the trusts.

288. Thus, Defendant knew that servicers failed to implement proper quality control, audit and compliance standards and thus failed to adhere to the notification requirements in the governing agreements.

289.     Defendant and its responsible officers also received servicing reports and monthly remittance reports that revealed widespread modifications, large losses and write-downs, and poor loan quality. Through these reports, Defendant, based on its roles in the RMBS, knew that there were widespread breaches of representations and warranties that the master servicers and servicers had discovered but failed to give the required notification.

290.     This failure by the master servicer and servicers to prudently service the loans, notify Defendant of defective loans, and other associated problems constituted events of default, yet rather than adhere to its contractual obligations upon such a default, Defendant ignored the master servicer and servicer misconduct.

291.     In addition to the events of default discussed above, on July 21, 2011, the Association of Mortgage Investors notified Defendant that "substantial evidence [] has emerged of abuses in the servicing and monitoring of" RMBS. The letter set forth in detail the publicly available evidence demonstrating that there was widespread evidence, including some of the evidence referenced in this complaint, that loan originators had systemically breached representations and warranties provided to securitization trusts, and that the parties servicing loans underlying securitization trusts had systemically breached their obligations under applicable servicing agreements. The letter cautioned, "[y]ou cannot be negligent in ascertaining the pertinent facts regarding the underlying collateral;" "[u]pon discovery of representation or warranty breaches, you have to notify the appropriate parties;" "you must comply with your obligations . . . to take action to remedy the servicer Events of Default in the best interests of the Certificateholders." The AMI sent similar letters to all major RMBS trustees.

292.     Defendant breached the governing agreements, its duties and applicable law after becoming aware of all of the foregoing breaches, defaults, and/or events of default by failing to

do the following: provide notice of such breaches, defaults, and/or events of default to the master servicers and/or servicers; protect the interests of the certificateholders in the trusts; enforce repurchase obligations; and make prudent decisions concerning remedies after breaches, defaults and/or events of default.

## XI. DEFENDANT HAD CONFLICTS OF INTEREST

293. Defendant failed and unreasonably refused to take action to protect the trusts and certificateholders against warrantor breaches and servicer violations because it would have revealed that Defendant was engaged in the same misconduct in its roles for other RMBS trusts.

294. Many of the same banks or their affiliate entities that act as originators, sponsors, and servicers to the trusts were parties to trusts that included loans originated by Defendant. Accordingly, because Defendant faced enormous repurchase liability for loans sold in breach of representations and warranties, including loans in RMBS trusts sponsored by the same sponsors of the trusts, or trusts where the warrantors at issue here acted as trustee or servicer, Defendant was disincentivized to take any action to protect the trusts because it would benefit from similarly lenient treatment from other trustees.

295. Defendant knew that these entities, acting as sponsor, trustee or servicer, were aware of trusts with massive number of loans with breaches of representations and warranties where Defendant was the warrantor.

296. Defendant also failed to take appropriate action due to its, and its affiliates', economic intertwinement with the parties it was supposed to police. Defendant's highly profitable securitization businesses was dependent upon the good graces of originators, servicers, and sponsors. Strictly enforcing repurchase obligations would have harmed important business

relationships and cut off the supply of mortgage loans to Defendant's securitization arm.

297.    Defendant thus turned a blind eye to breaches of R&Ws in the hopes that counterparties would later return a favor. Defendant benefited from its decision not to act with regard to mortgage file deficiencies, R&W breaches, and events of default, and was economically beholden to sellers and servicers because Defendant faced repurchase liability for the sale and securitization of its own loans if Defendant took action against them. Defendant refused to act against sellers and servicers because doing so would have exposed Defendant's misconduct as originator, warrantor, seller, or servicer for other RMBS trusts in which these same entities served as either trustee or servicer. Further, this conflict was exacerbated by Defendant's ongoing business relationships with the originators, warrantors, sellers, servicers and related companies, the servicers' payment of Defendant's trustee fees, and Defendant's economic disincentive to declare events of default.

298.    As mentioned above, during the fourth quarter of 2010, banking regulators reviewed the adequacy of controls and governance over Defendant's foreclosure processes. The reviews uncovered significant problems in Defendant's foreclosure processing, including "critical weaknesses" in Defendant's foreclosure practices and oversight of default services vendors. Interagency Review of Foreclosure Policies and Practices, *available at* http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47a.pdf.

299.    In addition, the OCC entered into consent orders with Defendant and other servicers.

300.    In the OCC Consent Order with Defendant, the government found, among other things, that it failed to document mortgage loans properly and attempted to cover-up this failure, filed or caused to be filed affidavits by its employees in which the affiant represented the

assertions in the affidavit were made based on personal knowledge when they in fact were not, filed or caused to be filed affidavits that were not properly notarized, and failed to devote adequate oversight and internal controls, policies, and procedures to its foreclosure processes. *In re U.S. Bank N.A. and U.S. Bank N.A. ND*, Consent Order, AA-EC-11-18 (Apr. 13, 2011), *available at* http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47j.pdf.

301.    Despite pledging to reform its servicing misconduct and foreclosure abuses years ago, Defendant failed to comply with applicable federal regulatory standards. On June 17, 2015, the OCC announced that it was imposing further restrictions on the mortgage servicing operations of Defendant and five other banks for failing to meet the requirements of the prior consent orders. *See* Press Release, Office of Comptroller of Currency, OCC to Escheat Funds from the Foreclosure Review, Terminates Orders Against Three Mortgage Servicers, Imposes Restrictions on Six Others (June 17, 2015), *available at* http://www.occ.gov/news-issuances/news-releases/2015/nr-occ-2015-85.html. Among other penalties imposed under the amended consent orders, Defendant was prohibited from: (i) acquiring new servicing rights on existing securitizations; (ii) entering into new contracts to perform residential mortgage servicing for other parties; (iii) outsourcing or sub-servicing new residential mortgage servicing activities to other parties; (iv) off-shoring new residential mortgage servicing activities; and (v) making any new appointments of senior officers responsible for residential mortgage servicing or residential mortgage servicing risk management and compliance.

302.    Because Defendant was engaging in the same illicit and improper acts as the servicers for the trusts, Defendant had a conflict of interest that caused it to fail to take action in response to the servicer violations, or even alert the certificateholders to the servicers' misconduct.

303.     In addition, Defendant, as originator for other RMBS trusts, sold billions of dollars of loans, many of which materially breached representations and warranties. As just one example, Defendant paid $200 million following a DOJ investigation of Defendant's origination practices. Defendant knowingly originated and underwrote FHA-insured mortgage loans from 2006 through 2011 that did not meet the necessary underwriting requirements. Press Release, Dep't of Just., Justice Department, U.S. Bank to Pay $200 Million to Resolve Alleged FHA Mortgage Lending Violations (June 30, 2014), *available at* http://www.justice.gov/opa/pr/us-bank-pay-200-million-resolve-alleged-fha-mortgage-lending-violations. Defendant also admitted that it failed to identify deficiencies in FHA-insured loans, failed to report deficient loans and did not take corrective action regarding the loans. *Id.*

304.     Defendant failed and unreasonably refused to take action to protect the trusts and certificateholders against warrantor breaches and servicer violations because doing so would have required the Defendant to take legal and policy positions contrary to its own interests. In order to fulfill its obligation to enforce the repurchase of breaching loans in a non-negligent manner, Defendant would have had to advocate for an expansive interpretation of the repurchase obligation. Such an interpretation would conflict with positions Defendant sought to take in defending its own poor origination practices.

305.     Exhibit I contains additional details concerning Defendant's misconduct in servicing and originating residential mortgage loans.

## XII.    THE "NO ACTION" CLAUSES DO NOT APPLY

306.     The "no action" clauses in the governing agreements do not apply to this lawsuit because the claims are brought against Defendant as trustee, not against a third party. The PSAs expressly permit suits against the trustee, stating that no provision of the agreements "shall be

construed to relieve the Trustee from liability for its own negligent action, its own negligent failure to act or its own willful misconduct; provided." PSA Section 6.01.

307.    Additionally, under New York law, "no action" clauses do not apply to an action against the trustee, as here, for their own wrongdoing. Defendant is not being asked to sue as trustee to enforce rights and obligations under the governing agreements. Rather, this action asserts claims against Defendant for breaching its contractual obligations.

308.    Because this is not an action, suit or proceeding that Defendant is capable of bringing in its own name as trustee under the governing agreements, the "no action" clauses do not apply.

309.    Compliance with the "no action" clauses' pre-suit requirements also would have been futile. The no action clauses (if they applied) would require Plaintiffs to demand that Defendant initiate proceedings against itself and to indemnify Defendant for its own liability to the trusts, an absurd result that the parties did not intend. *See Cruden v. Bank of New York*, 957 F. 2d 961, 968 (2d Cir. 1992).

310.    Similarly, compliance with the "no action" clauses' pre-suit requirements also would have been futile where Plaintiffs would have had to demand that trust administrators or securities administrators bring suit against Defendant. In those instances, the trust administrators and securities administrators were likewise conflicted due to their overlapping roles with respect to the trust including their role as master servicers. In addition, the trust administrators or securities administrators were also trustee for other RMBS deals and were subject to conflicts of interest.

## XIII. DEFENDANT MAY NOT USE CERTIFICATEHOLDERS' TRUST FUNDS TO DEFEND AGAINST SUITS BY TRUST-BENEFICIARY INVESTORS

### A. The Parties Entered Binding Agreements Conveying Beneficial Ownership of the Trusts to Certificateholders

311. The trusts are created under common law and pursuant to the terms of the PSA for each trust. As such, the trusts are non-juridical entities that cannot own property, enter contracts, or sue or be sued. Legal title to trust assets rests with the trustee, and equitable title to those assets rests with the trusts' beneficiaries, including Plaintiffs.

312. Certificateholders obtain a beneficial interest in the trusts via the certificates.

313. These certificates are binding contracts between the certificateholders and Defendant, as trustee. The certificates, in turn, incorporate the terms of the trusts' governing PSAs and mutually bind certificateholders and Defendant to the terms thereof.

314. The PSAs were drafted with the final aim of selling certificates to investors. Indeed, without the sale of certificates to investors, the PSAs would have no purpose or function. Accordingly, the trustee and other parties to the PSAs drafted the certificates and attached them to each PSA as a Form of Certificate for each tranche to be sold from the RMBS trust then being created.

315. The typical Form of Certificate relevant here acknowledges the applicable governing agreements, the parties thereto, and states that the holder of the certificate is bound by the terms of the PSAs. *See, e.g.*, Exh. P, HVMLT 2006-4 PSA Exhibit A-1, Form of Class A-1 Certificate.[6]

316. The CCUs, whose interests Plaintiffs assumed, entered into these binding

---

[6] Copies of the GPMF 2007-AR1 Form of Certificates are not publicly available. Plaintiffs have instead cited to certificates from the HarborView Mortgage Loan Trust 2006-4 ("HVMLT 2006-4") PSA.

contracts with Defendant and the other parties to the PSAs between 2005 and 2007, on the Trade Date(s) shown in Exhibit A.

317.     Certificateholders and the trustee therefore mutually agreed to and accepted the terms, provisions and conditions of the PSAs, becoming first parties to these contracts, upon acceptance of the certificates. The contracts are governed by New York or Delaware law.

318.     The contracts between certificateholders and the trustees are subject to the firmly established American Rule against fee-shifting indemnities, and the rule that fee-shifting between litigation adversaries or first parties to contracts requires unmistakably clear contractual language to that effect. *See Hooper Assocs. v. AGS Computers, Inc.*, 74 N.Y. 2d 487 (1989). There is no clear (let alone unmistakably clear) contractual language authorizing the trustees to shift litigation expenses to their adversaries, who are first-parties to the contractual arrangement.

319.     At the time certificateholders were presented with contractual terms in the certificates and fully incorporated PSAs, the certificates and the PSAs had already been drafted by others, including Defendant, and were presented to investors (including Plaintiffs' predecessors) as contracts of adhesion. Plaintiffs and their predecessors did not participate in the drafting process.

**B.     Defendant's Limited Right to Indemnification from Certificateholders' Trust Funds Does Not Extend to Suits By Certificateholders**

320.     The PSAs incorporated by reference in the investor certificates allow Defendant to draw indemnification from the trust funds in limited circumstances.

### SECTION 8.05   Trustee's Fees and Expenses

The Trustee shall be compensated by the Trustee Fee as compensation for its services hereunder.   In addition, the Trustee will be entitled to recover from the Distribution Account pursuant to Section 4.03(a) all reasonable out-of-pocket expenses, disbursements and advances, including without limitation, in connection with any filing that the Trustee is required to make under Section 3.06 hereof, any Event of Default, any

breach of this Agreement or any claim or legal action (including any pending or threatened claim or legal action) incurred or made by the Trustee in the performance of its duties or the administration of the trusts hereunder (including, but not limited to, the performance of its duties under Section 2.03 hereof) or under the Certificate Insurance Policy (including the reasonable compensation, expenses and disbursements of its counsel) except any such expense, disbursement or advance as may arise from its negligence or intentional misconduct or which is specifically designated herein as the responsibility of the Depositor, the Seller, or the Certificateholders hereunder.
Ex. P.

321.    The Trust Fund is a non-juridical entity, functioning essentially as a bank account, with legal title to the corresponding assets held by the trustee and equitable title to those assets held by the beneficiary certificateholders.[7] Accordingly, the true indemnitors, and the only cognizable entities that bear a burden when Trust Funds are depleted, are the beneficial owners of those funds, namely, the certificateholders, including Plaintiffs. In short, when Trust Funds are used to pay trustee defense costs, trust beneficiaries effectively pay the cost and bear the burden.

322.    That trust beneficiaries bear the cost of withdrawals of trust funds for litigation defense is also reflected in the distribution structure or payment "waterfall." To the extent the trustee receives funds from the Trust Fund for its legal expenses, the extent of funds for certificateholders is directly reduced. Practically, then, the indemnitors under PSA § 8.05 again are the certificateholder beneficiaries that would otherwise receive any funds the trustee may withdraw for indemnification.

323.    Certificateholders, who are parties to the certificates and fully incorporated PSAs, are therefore the first-party indemnitors under the applicable PSA provisions, and the trustee is the first-party indemnitee under the same provision. Indeed, if certificateholders are not treated

---

[7] Some of the relevant indemnification provisions provide for indemnification from the Distribution Account rather than the Trust Fund. Whether drawn from the "Trust Fund" or the "Distribution Account," the indemnification comes from the functional equivalent of a bank account that is beneficially owned by investor beneficiaries.

as the first-party indemnitors, then no one would be, as there is no other real, legally cognizable entity or party who could be said to provide the indemnity drawn from the "Trust Fund" or "Distribution Account."

324.    Nothing in the PSAs' indemnity provisions clearly or unmistakably demonstrates the parties' intent for certificateholders to indemnify the trustee in suits brought by certificateholders against the trustee. Such indemnitor-indemnitee suits are not explicitly referenced. Nor are such suits covered by implication, as there are myriad third-party claims that would not involve fee shifting (*i.e.*, claims by third parties to the indemnity provision that would not be providing the indemnification as a legal or practical matter) for which the trustee arguably could draw indemnification from the certificateholders' Trust Funds.

325.    For example, in its role as enforcer of warrantors' repurchase obligations, the trustee was required to incur legal costs, including the costs of pursuing repurchase litigation if necessary. To ensure that this critical remedy did not go unenforced, the trustee could seek indemnification from the certificateholders' Trust Funds to cover such costs, if it was not otherwise indemnified by another source.[8]

326.    RMBS trustees also faced suits by third parties (*i.e.*, parties not providing the indemnity) in the course of performing their trustee duties and arguably are allowed to use certificateholder trust funds for indemnification in such suits. For example, trustees were named

---

[8] The governing agreements typically required the warrantor ultimately to bear the costs of repurchase litigation. For example, HVMLT 2006-4 PSA § 1.01 defines the "Purchase Price" at which the warrantor must buyback defective or breaching loans from the trust explicitly to include "in the case of a Mortgage Loan required to be purchased pursuant to Section 2.03 hereof, expenses reasonably incurred or to be incurred by the Trustee in respect of the breach or defect giving rise to the purchase obligation." Exh. P. Under such provisions, to the extent the trustee initially drew indemnification from the trusts for enforcement, it was required to recover any such indemnification from the warrantor, either directly or as part of the repurchase price.

as parties in foreclosure actions and faced numerous counterclaims in that capacity.[9] RMBS trustees also owned properties after foreclosing and faced liability from municipalities for harm caused by failure to maintain or control these trust-owned properties.[10] On information and belief, such trustees have taken the position that they are entitled to indemnification from trust funds for such third-party suits.

327.    Thus, to the extent § 8.05 arguably allows the trustee to draw indemnification from certificateholders' funds for certain third-party or non-indemnitor suits, it cannot be construed to cover first-party claims between investor certificateholders and the trustee. Nothing in § 8.05 would be rendered superfluous by construing § 8.05 as limited to such claims. On the other hand, certificateholder-beneficiaries will be economically disincentivized from vindicating their rights against the trustee when they breach their trustee duties if § 8.05 were construed to apply to suits brought by certificateholders against the trustee, contrary to the American Rule and the policies favoring open access to the courts that underlie the New York Court of Appeal's decision in *Hooper*.

### C.    Defendant Is Not Entitled to Judgment-Shifting Indemnification

328.    If Defendant is deemed entitled to indemnity from certificateholders' Trust Funds it may not only attempt to cause certificateholders to bear the cost of their adversary's fees, win or lose, but also any judgment or settlement secured in this case or any other case by investors against their trustee. To the extent certificateholders must forego distributions from their Trust

---

[9] *See, e.g.*, *U.S. Bank Nat. Ass'n v. Sorrentino*, 118 A.3d 607, 610 (2015); *U.S. Bank Nat. Ass'n v. Capparelli*, 2014 WL 2807648, at *1 (S.D. Fla. June 20, 2014).

[10] *See, e.g.*, Jessica Garrison & Angel Jennings, "Second Bank Is Sued Over Blight," L.A. Times (7/17/12), *available at* http://articles.latimes.com/2012/jul/17/local/la-me-us-bank-slumlord-20120717.

Funds to fund any recovery they obtain through proving Defendant's breach, they would be forced to pay their own recovery, while Defendant would pay nothing.

329. Such a reading would be commercially unreasonable. Defendant would have incentives to breach its contractual obligations to certificateholders because certificateholders would have no recourse: if investors sued and prevailed, they would recover only at the cost of depleting their own Trust Funds, diminishing payments on their investment. Certificateholders would therefore have no meaningful, enforceable rights under the contracts, rendering them illusory. Any construction that would authorize judgment shifting from a losing litigant to its successful adversary must be avoided pursuant to well-settled rules against absurd constructions.

### D. Claims in this Litigation, If Proven, Would Necessarily Establish Defendant's Negligence, and Defendant Therefore Cannot Meet Its Burden of Proving Entitlement to Indemnification

330. As noted, Defendant is not entitled to indemnification under *Hooper* for fees, costs, and expenses incurred in this suit because of settled rules against fee-shifting between adversaries, regardless which party prevails or the culpability of a party's conduct.

331. But, even if *Hooper* were deemed not to apply — *Hooper* does apply — then indemnification nevertheless would be impermissible because in all events the PSAs expressly preclude indemnification for fees, expenses, and liability incurred as a result of "willful malfeasance, bad faith or negligence." *See* Exh. P § 8.05. Notably, the plain terms of the PSAs subject Defendant to liability in suits brought by any party based on simple negligence, including negligence in carrying out its contractual duties.

332. In this suit, Plaintiffs allege that Defendant negligently failed to address mortgage loan document deficiencies and breaches of representations and warranties with respect to the loans, and that it failed to act reasonably following events of default, as required under the PSAs.

Plaintiffs also allege that Defendant impermissibly acted under ongoing conflicts of interest and failed to carry out its ministerial duties with due care. Other investor suits against Defendant have plausibly alleged similar misconduct and have survived motions to dismiss.

333.    At a minimum, unless and until Defendant both (1) proves that *Hooper* does not apply (which it cannot prove) and (2) successfully defends against these allegations, it cannot claim that the liability, fees, and expenses are indemnifiable. Defendant bears the burden of proof and would ordinarily be able to obtain indemnification from its adversary only through a motion and order at the end of a case.

### E.    Any Indemnification From Trust Funds Would Be Limited to Reasonable Fees and Expenses

334.    To the extent that Defendant has failed to provide certificateholders with adequate disclosure of funds it has withdrawn from the at-issue trusts in other investor suits, Defendant has been acting in its own interest, to the detriment of certificateholders, rather than acting for the benefit of certificateholders as required.

335.    Plaintiffs therefore seek an order requiring Defendant to disclose any amounts it has billed with sufficient detail to ascertain the reasonableness of its indemnification withdrawals from the trusts to date (if it is entitled to any indemnification at all), and disgorgement of any amounts it cannot establish are reasonable. Plaintiffs will also seek this information in the normal course of discovery.

## XIV.   CLAIMS FOR RELIEF

### COUNT ONE – BREACH OF CONTRACT

336.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

337.    NCUA Board, as liquidating agent for each of the CCUs, brings this count to

recover damages arising at any time related to the NCUA Certificates.

338. The PSAs are valid and binding contracts entered into between Defendant, each trust, the sponsors, the master servicers, the servicers, and depositors.

339. The PSAs provide, among other things, the terms under which Defendant acts as trustee for the trusts.

340. As current holders of certificates issued by each trust, Plaintiffs are express, intended third party beneficiaries under the PSAs entitled to enforce the performance of the Trustee. Further, the certificates and the PSAs they incorporate are to be construed as one contract between the certificateholders and the trustee.

341. Defendant breached several obligations that it undertook on behalf of Plaintiffs as certificateholders including, without limitation, to perform or cause to be performed through its agents or custodians:

(a) take physical possession of the operative documents for the mortgage loans in the trusts;

(b) identify all mortgage loans for which there was missing, defective, or incomplete documentation on the final exception reports;

(c) make accurate representations in final certifications and exception reports;

(d) protect the interests of the beneficiaries of the trusts;

(e) provide notice of material defects and enforce warrantor duties to repurchase loans lacking adequate documentation pursuant to PSA § 2 or similar sections;

(f) provide notice of material breaches of warrantor representations and warranties relating to the mortgage loans upon its discovery or receipt of notice of such breaches pursuant to PSA § 2 or similar sections;

(g) make prudent decisions concerning the exercise of appropriate remedies following Events of Default under PSA § 7 or similar sections;

(h) enforce the repurchase obligations of the warrantors.

342.     The specific provisions breached by Defendant are further detailed herein and in the Exhibits hereto.[11]

343.     Defendant's breach of its duties set forth in the PSAs, as described above, caused Plaintiffs' losses on their certificates and diminished their value.

344.     Plaintiffs have performed their obligations under the PSAs.

345.     Defendant is liable to Plaintiffs for the losses they suffered as a direct result of Defendant's failure to perform its contractual obligations under the PSAs.

## COUNT TWO – DECLARATORY JUDGMENT REGARDING RIGHT TO INDEMNIFICATION FROM THE TRUST FUNDS

346.     Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

347.     A valid and justiciable controversy exists between Plaintiffs and Defendant regarding any of Defendant's withdrawal of investor trust funds to fund its litigation defense of this and any similar suits brought by other investors, or to pay any judgment or settlement.

348.     Because investors, the beneficial owners of all trust funds and assets, are the indemnitors that would bear their adversary's defense costs and are first parties to the certificates pursuant to *Hooper*, Defendant may not use trust funds to pay its litigation costs or to fund any judgment in this or any similar suit brought by different investors.

349.     Plaintiffs therefore seek a declaration that Defendant is not permitted

---

[11] Fully executed copies of each of the PSAs are solely in possession of the trustee and will be requested in discovery. Copies of those agreements, without signature pages but otherwise presumed to be true and accurate, are publically available on the SEC EDGAR website. Due to the number and length of the agreements, only the relevant portions have been attached hereto. Plaintiffs incorporate the full PSAs and governing agreement herein by reference.

indemnification from the trusts for any loss, liability, expense (including attorney fees), or judgment associated with this case or any other case brought by an investor against Defendant for breach of its trustee duties.

350.     Plaintiffs likewise seek a declaration that Defendant must disclose the amount of indemnification it has billed each trust for other litigation brought by an investor against Defendant for breach of its trustee duties.

351.     As a fallback, even if *Hooper* were deemed not to apply — *Hooper* does apply — then Defendant still would not be entitled to indemnification from the trusts for any loss, liability, expense, or judgment because the PSA carve-out precluding such indemnification for negligent, grossly negligent or willful conduct would apply. Plaintiffs therefore further contend, in the alternative, that Defendant is not entitled to advancement of legal fees from the trusts or indemnification from the trusts unless and until it has proven entitlement to such relief.

352.     The requested declaratory judgment will serve a useful purpose in clarifying and settling the legal issue regarding the parties' relative burdens in this case and the stakes in this litigation. The requested declaratory judgment will also serve a useful purpose in removing Defendant's distorted litigation incentives, which are presently based on an assumption of limitless litigation resources paid for by its adversaries.

## COUNT THREE – BREACH OF CONTRACT REGARDING UNLAWFUL WITHDRAWALS FROM TRUST FUNDS AND DISGORGEMENT

353.     Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

354.     As set forth in detail above, the certificates and fully incorporated PSAs are enforceable contracts between the parties.

355.     These agreements do not permit Defendant to draw indemnification from the

trusts for any purpose associated with this case or any other case brought by an investor against Defendant for breach of its trustee duties. And in all events the PSAs do not permit Defendant to draw such indemnification before it has met its burden of proving entitlement to indemnification, including proving the reasonableness of the amounts withdrawn.

356.     Upon information and belief, Defendant has breached these agreements by drawing indemnification from the Trust Funds for cases brought by investors against Defendant for breach of its trustee duties and without meeting its burden of proving entitlement to indemnification, including proving the reasonableness of the amounts withdrawn. Defendant's breaches deprived Plaintiffs of consideration and have caused Plaintiffs to suffer damages in the amount of all legal charges, fees, and expenses of any kind billed to the trusts to-date in relation to any case brought by an investor against Defendant for breach of its trustee duties.

357.     Defendant is liable to Plaintiffs for damages caused by its breach of contract and should be ordered to disgorge all funds impermissibly seized from the trusts.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A.     An award of all appropriate damages and/or equitable relief in favor of Plaintiffs against Defendant for breaches of its duties in an amount to be determined at trial, including any applicable pre- or post-judgment interest thereon;

B.     Compelling Defendant to provide an accounting of the legal fees and costs it has sought and/or received from the trusts associated with any case brought by an investor against Defendant for breach of its trustee duties;

C.     Providing declaratory relief in favor of Plaintiffs and pursuant to *Hooper* to establish that Defendant is prohibited from using Trust Funds as indemnification for any purpose

associated with this case or any other case brought by an investor against Defendant for breach of its trustee duties;

D.  Disgorging any Trust Funds Defendant has improperly taken from the Trusts associated with any case brought by an investor against Defendant for breach of its trustee duties;

E.  Awarding Plaintiffs all reasonable costs and expenses incurred in this action, including attorney's fees, expert fees, and any other properly taxable costs and expenses;

F.  Any other relief that the Court deems just and proper.

## XV.  JURY DEMAND

Plaintiffs hereby demand a trial by jury of all issues properly triable.

Dated: September 14, 2021

David C. Frederick
Scott K. Attaway
Matthew M. Duffy
KELLOGG, HANSEN, TODD,
FIGEL & FREDERICK P.L.L.C.
Sumner Square
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Phone: (202) 326-7900
Fax: (202) 326-7999
dfrederick@kelloghansen.com
sattaway@kelloghansen.com
mduffy@kelloghansen.com

David H. Wollmuth
William A. Maher
Steven S. Fitzgerald
Ryan A. Kane

By: *John A. Libra*

George A. Zelcs
John A. Libra
Matthew C. Davies
KOREIN TILLERY LLC
205 North Michigan Avenue
Suite 1950
Chicago, Illinois 60601
Phone: (312) 641-9760
Fax: (312) 641-9751
gzelcs@koreintillery.com
jlibra@koreintillery.com
mdavies@koreintillery.com

Stephen M. Tillery
Michael Forrest
KOREIN TILLERY LLC

WOLLMUTH MAHER & DEUTSCH
LLP
500 Fifth Avenue
New York, New York 10110
Phone: (212) 382-3300
Fax: (212) 382-0050
dwollmuth@wmd-law.com

Of Counsel:
Jeffrey Zick, Associate General
Counsel
NATIONAL CREDIT UNION
ADMINISTRATION
1775 Duke Street
Alexandria, Virginia 22314
jzick@ncua.gov

505 North Seventh Street
Suite 3600
St. Louis, Missouri 63101-1625
Phone: (314) 241-4844
Fax: (314) 241-3525
stillery@koreintillery.com
mforrest@koreintillery.com

*Attorneys for the National Credit Union
Administration Board as liquidating agent*